# EXHIBIT A

*Courser v. Allard et al.*
Case No. 1:18-CV-874


Testimony of Todd Anthony Courser
Wednesday September 9, 2015
Michigan House of Representatives

TESTIMONY OF TODD ANTHONY COURSER

WEDNESDAY, SEPTEMBER 9, 2015

MICHIGAN HOUSE OF REPRESENTATIVES

LANSING, MICHIGAN

CASE NO. AG# 2016-0132541-A

TRANSCRIBED BY:

JoEllen Byrne, CER 7242
LEGALLY CORRECT TRANSCRIPTION, INC.
P.O. Box 181
East Lansing, Michigan  48826
(517) 332-1234

Michigan Department of State
Legal Services Administration

1

1      Lansing, Michigan

2      Wednesday, September 9, 2015

3      (At 11:41 a.m., Rep. Todd Anthony Courser Sworn)

4      CHAIRMAN MCBROOM:   Do you swear that the evidence

5  that you shall give shall be the truth, the whole truth and

6  nothing but the truth, so help you God?

7      REP. COURSER:   I do.

8      CHAIRMAN MCBROOM:   Thank you.

9           REP. TODD ANTHONY COURSER

10  duly sworn by the Chairman, testified on his own behalf:

11      CHAIRMAN MCBROOM:   Thank you for attending,

12  Representative.   If you would first introduce your counsel

13  with you, please.

14      REP. COURSER:   Yes.   Thank you, Chairman McBroom.

15  This is Dan Randazzo and Dareth Wilson.

16      And Ryan, help me with your last name.

17      MR. DOBSON:   Ryan Dobson.

18      REP. COURSER:   Thank you.

19      I appreciate you giving me the opportunity to speak

20  this morning.   I'm gonna speak first from a prepared

21  statement and then--and then cover a few more issues after

22  that.   And I'll be happy to take questions after that.

23      This--this goes to my request yesterday for the

24  censure.   I offer today my most humble and sincere apologies.

25  I would humbly accept a public censure for my role in the

1   events and actions surrounding the investigation by the
2   Select Committee formed through House Resolution 129 for the
3   Michigan House of Representatives.   It is my most humble
4   opinion that a censure is the most appropriate resolution for
5   me and the constituents of the 82nd District that I dutifully
6   and respectfully serve.
7            I'm asking this esteemed body for forgiveness for
8   my failures throughout this ordeal, for the opportunity for
9   redemption and renewal and to continue as the state
10  representative for the people of the 82nd District in the
11  great state of Michigan.
12           I have admitted publicly that I was involved in an
13  inappropriate relationship and the attempted cover-up.   I
14  look back at the events surrounding the disclosure of my
15  relationship with Rep. Gamrat, and I do not recognize the
16  person that did those things.   I've no excuse, nor can I
17  explain the ridiculous e-mail and the voice recordings,
18  except to say that they were the actions of a desperate
19  person.
20           Even now, looking at my actions and trying to
21  explain those actions in and around May 19th leaves most
22  everyone, including myself, bewildered.   All I can say is
23  that this was an incredibly tense moment in all regards.   My
24  actions in and around these events in no way rose to the
25  honor that has been bestowed upon me as state representative.

1      I would also like to confirm that it was a mistake

2  to not have clear guidelines on the strict use of government

3  time by my staff.  This created an untenable situation for

4  them and for the official office in Lansing.  This caused a

5  lack of clarity of roles and responsibilities and caused

6  difficulty in delineating personal, political and official

7  duties for the staff.

8      Maintaining and allowing joint staffing was a

9  mistake.  I regret that the combined--combining of the staff

10 improperly and inextricably intertwined personal and

11 political matters.

12      Moreover, I will be cognizant of how I treat my

13 staff in the future.  These failures were mine alone.  And

14 for these failures, I offer my most heartfelt apology.  I've

15 already taken steps to eliminate the conflict with staff

16 working on legislative, political and personal tasks.  We are

17 in compliance with the House Business Office rules.  All of

18 the above stated issues have been corrected, and new staff

19 has been in place in serving constituents.  Constituent

20 calls, e-mails and letters are being returned promptly and

21 respectfully.

22      I understand and accept any conditions placed upon

23 my office by the House of Representatives as it relates to my

24 request for censure.  I would ask that the members of the

25 State House accept my censure to allow this regretful chapter

Michigan Department of State
Legal Services Administration

4

1   to close.  I believe this is the best outcome possible for

2   both the 82nd District and also for the people of our great

3   state.  I believe in my--I believe and my constituents

4   believe that I am qualified for the job.  Otherwise, I would

5   not have been elected.  And I still have their support.

6          As General Counsel stated yesterday, there's no

7   bright line as it relates to the issues before this

8   Committee.  The question is, does the events described in the

9   report alone show that I have no honor or integrity?  I must

10  indicate no.  While the events in the report are horrible,

11  there is much left unsaid about me and the work that I've

12  done since being elected.

13         If I believe censored--I believe if censured, I

14  will be able to restore my dignity and that of the office in

15  this institution.  I will be able to effective--to be

16  effective and know that I can rebuild the public trust

17  through my actions.

18         As Winston Churchill stated, success consists of

19  going from failure to failure without loss of enthusiasm.  I

20  have failed, but I remain enthusiastic about the

21  opportunities that are before us.  Finally, these

22  responsibilities are mine and mine alone.  And for these

23  failures, I offer my most heartfelt apology.  And I

24  understand and accept any conditions placed upon my office by

25  the House of Representatives as it relates to my request for

1    censure.

2              I would ask that the members of the State House

3    accept my censure, however harsh they deem appropriate, and

4    to allow this regretful chapter to close.  I believe this is

5    the best outcome possible, both for the 82nd District and

6    also for the people of our great state.

7              God bless you, each one of you, for your service.

8    Thank you.

9              CHAIRMAN MCBROOM:  Is any of your legal counsel

10   prepared to say anything?

11             REP. COURSER:  I actually have--I'd like to speak

12   to the--I'm gonna have to kind of go off this for a second

13   because I--I think the--a lot of this relates to the

14   qualifications.  And Mr. Swartzle laid that out pretty

15   specifically yesterday.

16             I think I need to kind of explain this--this idea,

17   the hostile work environment, and also the e-mail, which is--

18   is best I can tell you without--without prepared notes and

19   that.  But the relationship I had with these--with Ben and

20   Josh, Ben Graham and Josh Kline, it was--those were core

21   relationships in my life.  And you know, these weren't guys

22   that just came to work.  And I know a lot has been made of my

23   harsh treatment of my staff, and I know the e-mails kind of

24   point to that.

25             Those were moments--moments that happened.  And

1    it's hard to really explain.  I--I had a relationship with

2    these guys that goes back to Ben's wedding, when he was

3    barely old enough to drive and open houses and, you know,

4    with their family.  And with Josh, I prayed with him more

5    times than I can count.  And so my personal relationship with

6    these guys really trumped--you know, it was--I had a

7    relationship with them that was--that were the more intense

8    relationships as far as friendships that I had.

9         And I'm pretty particular about the people that are

10   with me.  And that friendship, I just have to say it--I mean,

11   I can't say it any other way.  You know, I--I love them both.

12   And it's--it still hurts to think that those relationships

13   are severed.  I--I don't know how to really explain it.  But

14   even going into it, it wasn't that I--you know, I wanted them

15   to be a part of what was happening here, and they wanted

16   desperately to be in Lansing.  And I wanted that for them.

17        But their skill set didn't quite fit on the front

18   end.  And we had numerous conversations about that.  And I

19   can tell you even today when the revelations come out about

20   Josh and that situation, my heart breaks for him and his

21   family.  And I'm hoping in the future that those

22   relationships can be restored.  I don't--I don't hold any

23   ill-will to either one of them.  I--I don't.

24        And it's tough in--in the situation where, you

25   know, there's all this theater happening around us and all

1    the cameras and all of that.  But in reality, you know, these

2    guys were with me for years.  In Josh's case, I've known the

3    family for 25 years.  And you know, it does, it absolutely

4    breaks my heart.  But when I came into the new position of

5    being the state representative, I had now responsibility for

6    administration to the district.  And these guys have some

7    amazing talents, you know.  Fighting political battle after

8    political battle didn't really translate to being good

9    administrators.  And I'm the one responsible for that.  It's

10   me.

11            I just wanted to share with you folks that, in--in

12   reality, this wasn't me firing them because I was hostile.

13   The other--the other case is really the truth.  I didn't want

14   them to go.  There was no desire for that.  And you know, I

15   know that people say, why did they do it?  I get this

16   question every single day from people.  Why would they do

17   that?  Why would he tape you?  I think the revelation of my--

18   my failure--I do--I think the revelation of my failure--they

19   found out about it back in February.  And I think the

20   revelation of my failure, inside of that, and also the fact

21   that our relationship was kind of being torn away, meaning it

22   wasn't working in Lansing, I think it hurt them.

23            And--and so it's difficult as I sit here, because

24   obviously this is playing out in public.  But in reality, you

25   know, I'm responsible for all of that.  I'm responsible for

1   this room being here today and all of you folks having to

2   take part of your summer to deal with this.   But I just don't

3   want that to be lost in the mix.   You know, these guys were--

4   they're--even now, you know, I wish the best for them and

5   their families.   And I wish they could've gotten jobs in

6   other places.   And I'm sure they're gonna go on to success.

7        But I wanted you folks to know that, that in

8   reality, you know, those relationships were core--core to me.

9   And I think they were to them.   And knowing their testimonies

10  and all of that and them knowing mine, I think it was just a

11  tremendous failure knowing what I had done.   And it was.

12  And they were sons on occasion and brothers on occasion and

13  fraternity brothers on occasion.   And yeah, did I--did I

14  growl at them on occasion when things didn't get done or

15  weren't done right?   I did.   I did.

16       So I--I think I need to talk about just for a

17  minute the e-mail and the recording.   I think you folks need

18  to hear it, because I think you listened to it and I think

19  you guys have listened to it, the Committee.   And God bless

20  you for suffering through it.   I don't know how many times

21  you've had to go through it.

22       You know, when I listen to it, you know, the--I

23  don't recognize myself.   I don't.   You know, even after I

24  listened to it and tried to explain what actually happened in

25  those moments and what led up to those moments, people say,

1   what was he trying to do?  They say, was he--was it a

2   misdirection?  Was it to find out who the texter was?  Or is

3   it deflection?

4           They were the steps of a desperate person.  They

5   were the steps of a person who, you know, the revelation of

6   those things were gonna come out in the next few minutes.

7   And those things were gonna happen.  And that was mixed in

8   with a really serious personal--personal moment of--of--I

9   didn't--you know, I--I don't think the tape really kind of

10  reflects where I was at.  I--it wasn't about the--the--

11  covering it up.

12          What was going on there, when I look back and the--

13  the craziness of all of that, I wanted to die.  It was a

14  really, really desperate and difficult spot.  And you know,

15  when you're in that spot--and I hope to God none of you are

16  or have ever been in that spot--but there were a whole bunch

17  of things that play, whether they're health.  And also the

18  situation in regards to my--my family.  At that point, my

19  mother knew.  At that point, my brother knew.  And I was

20  either telling my wife that night or in the next night or

21  two.

22          I don't know if you know what that's like to have

23  to reveal those things to your spouse and know that your

24  children are going to have to face those things.  But that's

25  where I was at.  So every concrete embankment, every tree,

1   every moment, they weren't just concrete embankments anymore.

2   They weren't.  They were options.  And it was difficult for

3   those moments.

4            And I look back now, months later, and I try to

5   explain it and I listen to the tape myself.  And I stepped

6   out to kind of collect myself again.  I listen to those

7   moments and I think, what the hell do you do with that?  You

8   know, what do you--what do you do with that?  Because if I

9   listen to the tape and, you know, Brock did a nice job of

10  setting up the prosecution.  You know, what--what do you do

11  with that?  If I don't know what to do with that--and I'm the

12  one that was there and went through it--I don't know what you

13  folks do with that.  I mean, I'm just being honest.  So I--I

14  thank you for, you know, trying to wade through this.

15           And sure, I would, you know, like to go back and

16  change the things I've done.  I can't.  There was--it was a

17  crazy moment by a man who was in a really desperate spot.

18  And yet, I felt like that I owed you folks, really, what was

19  happening in my mind and also with those relationships.  And

20  it's difficult at times to be able to come forward and try to

21  explain it, because you can't explain the unexplainable.  It

22  was a difficult time.  There was a tape made.

23           When Ben--Ben Graham knew or didn't know or Josh

24  knew or didn't know or Keith knew or didn't know, my

25  understanding is they knew back in February sometime.  And I

1   think they were brokenhearted for the relationships what we

2   had, and it was all changing.  And that was really difficult

3   for all of us.  And just because you have friends doesn't

4   mean that it's a good idea for you to work together or try to

5   put together the next steps in your life.  And I think this

6   is a case in point of failure of leadership on my part.  And

7   it was.

8        So I--I get to this spot and I look at it.  And

9   quite honestly, when I look at the tape and hear it and heard

10   it in Tim Bolin's office in its entirety--and I--I listened

11   to the tape.  And it sounds like a complete record.  And yet,

12   I don't really recognize myself in those moments.  There was

13   a lot of pressure.  Obviously, the anonymous texter was part

14   of that.  But there's the pressure--the idea of having to

15   reveal all of this to--to you all and to the public, in

16   general, but more importantly, to my wife and children.

17        And obviously, that's all happened and that's all

18   playing out.  And we're working through those--all of those

19   situations.  But I just think it's important to be able to

20   come to you folks.  If it was me and I'm looking at it--Brock

21   said his senses of--sorry, Brock, if I'm referring to you as

22   Brock.  Mr. Swartzle says, you know, immediate expulsion.

23   And you know, obviously I read here and I'm saying censure is

24   more appropriate.  But without more around that of how you

25   got to that spot, and if you--you guys have the

1   responsibility, the Committee has the responsibility and also

2   the Legislature has the responsibility of--of deciding is

3   that it or is there discernment to look further and deeper

4   into what was all going on there and what was sort of

5   motivating those moments.  And I--I think that's tough work.

6     If I was looking at me and looking at me in that

7   situation, me, just hearing it, I would say expulsion was--

8   was completely appropriate as an option.  I put forward the

9   censure because I think that if there's an opportunity to be

10  able to redeem myself and to be able to come forward, I would

11  ask that the alternatives--the--the alternative censure be

12  put forward to the--to the House, as well, if the Committee

13  comes back with expulsion.  But I know that that's your--your

14  call with that.

15    It's--obviously, this is all playing out in front--

16  I would like to speak for one more moment, if I can, and then

17  I'll do whatever questions you folks have from the report.  I

18  think I owe that to you all and to the public as well.

19    But I--the question is whether or not--what Mr.

20  Sorry [phonetic] knew or what Mr. Swartzle knew or what the

21  Speaker knew.  I--I don't know what they knew.  I know they

22  met with them several times.  I know they didn't go to human

23  resources.  We know all of that.  But I don't know what the

24  hell you'd do with it if you knew.  I don't know what--what

25  they would do in that situation, because it's such a unique

1    spot, you end up in this position where, you know, what do

2    you do with that, knowing that he sent out this crazy e-mail

3    and not knowing, really, where his mind was at and what was

4    going on?  And maybe you heard it.  Maybe you knew there was

5    a tape.  Probably didn't.  I can't imagine that was

6    disclosed.  And they didn't know about the texter.

7              So I was kind of on an island, trying to figure out

8    who was doing this.  So anybody that spoke to me, I'm looking

9    at them thinking, are you involved in this?  In reality, I

10   don't know that that was the case.  But I think, inside of

11   this, it was a series from--a process.  We can look at the

12   process.  You can say a series of unfortunate events the way

13   that it happened.  You can say it that way.  But it was all

14   set in motion by me.

15             And I--I just wanted to come before you without the

16   prepared statement and the censure and just tell you that I

17   am--I am deeply and truly sorry for what I've put this

18   Committee through and the House and the--the smearing of

19   that.  You folks have the responsibility of looking at

20   qualifications and--and saying, is this just a really stupid

21   e-mail at a really dumb spot in somebody's life in a tape

22   that's made about this or is there more and does this rise to

23   expulsion or censure?  I know you guys are wrestling with

24   that, and I understand that.

25             So--but I just felt like--I did this in explaining

1    this all in the front against the advice of my attorney, so

2    just--just so you're aware of that.  It isn't the first time

3    I didn't take somebody's advice.

4            But people ask me who--you know, who is the texter?

5    Whatever.  And that continues to happen.  Law enforcement is

6    looking into that.  I don't know how really aggressive

7    they've been to look at it, but they're--they're working

8    through those details.  There's two people I'm pretty sure

9    that it's not.  I'm--I'm pretty sure that it's not me.  And

10   I'm pretty sure that it's not Chad Livengood.  I can go on

11   the record and tell you that.

12           So--but otherwise, I just want to thank you all for

13   the opportunity to come before you today, even in the really,

14   really harsh and difficult circumstances, personally, to be

15   able to hear and listen to and have my own words really

16   condemning me.  Thank you.

17           CHAIRMAN MCBROOM:  Thank you, Representative.  Does

18   one of your legal counsel wish to speak first?

19           MR. RANDAZZO:  Yes.  Thank you, Mr. Chairman.  Very

20   briefly, we're here to--

21           CHAIRMAN MCBROOM:  Can you remind us of the name

22   again, just for--

23           MR. RANDAZZO:  Dan Randazzo.

24           CHAIRMAN MCBROOM:  Okay.  Thank you.

25           MR. RANDAZZO:  We're here to--you're here to

1   examine the qualifications of Rep. Courser.  And in looking

2   at that, you have before you an incident with a trickle

3   effect of a number of other incidents that followed.  And the

4   question for you is:  Is this a pattern of behavior that is

5   sufficient to be qualified for expulsion?  And I think before

6   you make that decision, you have to look at Mr. Courser and

7   his whole body of work, not this incident in isolation.

8           Yes, he admits that it's a stain on this--on this

9   House of Representatives.  It's a stain on anybody related to

10  this incident.  And he's taken full responsibility for that.

11  In fact, in the audiotape that we heard today, he took full

12  responsibility even back then and knew that there were going

13  to be significant, if not detrimental, things that flowed

14  from--from his actions.

15          But again, I think you have to look at not only

16  these incidents, you can't look at them in isolation; you

17  have to look at him as a whole.  And clearly, his

18  constituents elected him to office because they thought he

19  was fit.  And they continue to support him.  I know that--

20  I've looked at a number of e-mails and--that have been sent

21  to him since this incident broke, in full support of him.  In

22  fact, while he walked out earlier today, some of his

23  supporters were here on a tour, and--and offered prayers for

24  him and still supported him.

25          So I'm asking you not to look at these incidents

1    alone, but to look at his whole body of work and his

2    character in general.  Thank you.

3             CHAIRMAN MCBROOM:  Thank you.  Any of the other

4    members?

5             [No Verbal Response]

6             CHAIRMAN MCBROOM:  All right.  Representative, with

7    such huge examples of lying, disrespect, willful deceit,

8    misdirection, disdain for fellow members, how are we supposed

9    to believe that right now is the moment that you're actually

10   being candid with us?

11            MR. RANDAZZO:  Well, when you look at this

12   situation and his explanation for why it occurred, it's a

13   desperate man in a desperate situation making bad choices.

14   And he's admitted to that.

15            CHAIRMAN MCBROOM:  Sir, I--you know, if that

16   example alone were what we have to go with--but you're

17   encouraging us to take a broader view of all of the evidence.

18   And what I have here--I mean, I have e-mails just from Monday

19   where there's still just accusations--last Monday--

20   accusations towards other people, towards the other members

21   of the House.  A lack of taking responsibility.  We have

22   forgeries on blue blacks.

23            And I mean, I'm just--there is--there is a

24   continuing pattern here.  And you're encouraging us to look

25   at what the continuing pattern is.  I'm concerned that the

1  continuing pattern is not helping me believe the testimony

2  today is what's--what is the genuine person.

3  REP. COURSER:  If I can, Chairman McBroom, I

4  appreciate the question.  I think it's--I think it goes to

5  kind of the point of the call of the question.  Last week--

6  even the--the steps since then, obviously, they've been out

7  of emotion when it comes to my responses since the news story

8  broke on August 7th.

9  And one of the things I have to do is apologize to

10  the Committee, my misunderstanding on the front end of really

11  sort of the way that the Committee was constructed.  I

12  thought you folks were getting hand-picked evidence that was

13  going to come to you, and you weren't going to get the full

14  evidentiary findings of the House.  And that was my failure,

15  my failure of understanding just on--on the front end of the

16  whole thing.  So I certainly have to apologize to you folks.

17  I hear it's 833 pages in the actual redacted

18  portions.  So, obviously, you folks have looked at a huge

19  body of work.  And so, just--just in looking at that, I--you

20  know, I think there is a--I think you folks, obviously, have

21  had full access to the evidence.  I understand--not

22  understanding the difference between this and a criminal

23  proceeding, which has been pointed out to me plenty of times.

24  I--I feel like that you folks have already seen the evidence.

25  Some of it, obviously, is gonna be passed across this table

1    in--in--in conversation from each of the people you called

2    forward.  And I think you're calling forward the people that

3    make sense for this--this discovery process.

4         Obviously, I think there should be--you know, there

5    should be a few more when it comes to an understanding of the

6    background.  But I just tried to speak to that as far as the

7    staff and also to the e-mail itself, because I felt like you

8    folks needed to hear that and know that.

9         My heart is sincere when it comes to the idea of

10   trying to move forward and go in the right direction.  It is.

11   And you know, I--I think inside of that, I think there's a

12   couple of other--there's a--there's a couple of other things

13   when it comes to my reaction since August 7th.  You can just

14   say it was--it was responding.  And really, respondings were

15   out of the idea of still being attacked and not feeling like

16   there was gonna be a fair shake.  Everything that I've said

17   wasn't necessarily getting, you know--getting understood as

18   me trying to explain it.  And when I did try to explain it,

19   it was me casting accusations and dispersions on other

20   people.

21        And I really didn't appreciate the effect of that

22   and how that was affecting the Committee and also the rest of

23   the membership.  So, again, it was--it was--inside of that,

24   there was--there was a lot going on.  And I just wanna

25   apologizes to you folks because, obviously, you guys have

1    looked at the full evidentiary hearing--or the full

2    evidentiary package and have had an opportunity to look at

3    it.  I know the public, obviously, is looking through it as

4    well.  And I--I--if you want to speak to the other issues in

5    the report, I know there are eight underlying allegations.

6    If you'd like to, I certainly would be happy to go through

7    those.

8         CHAIRMAN MCBROOM:  Well, Representative, I mean, I

9    appreciate that you're trying to apologize and that you're

10   telling us you're being honest now.  But my question really

11   still comes back to, you know, why now?  Why suddenly?  I

12   understand you didn't understand process.  You didn't--you

13   were under pressure and duress and things like that.  But we

14   see a long pattern here that even predates May, even predates

15   the recordings within the investigation of dishonesty.

16        And it's hard for me to accept that now is suddenly

17   the moment when the light shines in and I can believe that

18   this is not another attempt at misdirection, that this is not

19   another attempt at manipulation.  And I'm wondering, what can

20   you offer to verify?  I mean, you called this Committee

21   before it even met--I mean, you can say you misunderstood the

22   process.  But I mean, we hadn't even been assigned and we're

23   a kangaroo court.  And so those misdirections and--and stuff,

24   like you admit, are damaging to this process.  But I and this

25   Committee are charged with determining can we move--can the

```
 1    House maintain you in its presence and still believe that--
 2    that somehow the behavior that we're seeing today is the real
 3    you and not what we've seen over several months is the real
 4    you.
 5         REP. COURSER:  I appreciate that.  Obviously, it's
 6    difficult circumstances all around.  And you know, what is
 7    the--sort of the--I'm trying to be as real with you as I can.
 8    I don't come and tell you those stories--I'm telling you
 9    those stories because that's really the situation as far as
10    my relationship with those men.  And also the e-mail.  I
11    think it's tough.
12         Like I said, I think just based on th e-mail and
13    the testimony there, you have to kind of call into question
14    what was going on in that person's life.  Either you can look
15    at those incidents--if you wanna speak to the issues before
16    May 19th, you mentioned forgery.  If you wanna go through the
17    House report and--and deal with those one at a time, I'd be
18    happy to do that.
19         If you're--if you're saying that the alleged
20    misconduct inside of the House report, I'd be happy to
21    address those.
22         CHAIRMAN MCBROOM:  Other--other member's questions?
23    Vice-Chair Heise.
24    VICE-CHAIR HEISE:  Thank you.
25    Okay.  In your--in the tapes that I've heard--and
```

1    there's more than one.  I'm assuming you've heard all four

2    tapes?

3         REP. COURSER:  I have not.  The opportunity to be

4    able to hear them, I ran out of time because of the other

5    representative, her team being on it and then myself being--

6    being after that.

7         VICE-CHAIR HEISE:  Have you read the entire report

8    yet?

9         REP. COURSER:  It was--no, it was released,

10   obviously, last night.  I tried to get a copy over the

11   weekend and was unable to procure it.

12        VICE-CHAIR HEISE:  All right.  So you've had no

13   opportunity to--

14        CHAIRMAN MCBROOM:  Representative, you've been

15   afforded the opportunity to come and view the report, the

16   same as the other representative.

17        REP. COURSER:  I couldn't.  Actually, I requested

18   that on Wednesday.  They were busy on Thursday.  She was in

19   there.  We were able to see it when it came to Friday.  We

20   spent, I think, five hours with the material.  I asked for a

21   copy of it at that point.  There was some confusion as far as

22   the ability to be able to give me that copy.  I don't think

23   it had been completely redacted at that point.  And so I was

24   not able to.  But I will speak to the underlying allegations,

25   all the same, if you--if you want to bring those out.

1        VICE-CHAIR HEISE:   The allegations or the evidence?

2        REP. COURSER:   The evidence.   I'm sorry.

3        VICE-CHAIR HEISE:   So you can speak to the

4 evidence?

5        REP. COURSER:   Well, whatever.   If you--if you have

6 an issue that you'd--you'd like to bring out, I--

7        VICE-CHAIR HEISE:   All right.

8        REP. COURSER:   I know from the report and the nine

9 pages what the underlying allegations are, and I'll try to do

10 my best to answer it.

11        VICE-CHAIR HEISE:   Okay.   So in the tapes, you've

12 described--you've told us today that that's--that wasn't you.

13 That was--was a different person.   And can you elaborate a

14 little bit more on--on your state of mind, then, in those

15 tapes?

16        REP. COURSER:   Well, I think I've already explained

17 sort of my state of mind.   Especially, just the first one in

18 my office, the difficulties that were there.   Obviously, then

19 explaining it in the second audio, I think it's mostly me

20 that's speaking in the second audio.   I can't speak to the

21 specificity on the other two.   My understanding is they speak

22 more to campaign or political stuff, conversations in the

23 last two audios that happened.

24        VICE-CHAIR HEISE:   So what--what person were you

25 when you issued the 4,000-word Facebook essay about a week

1  ago?

2         REP. COURSER:  In that situation, I was responding,

3  obviously, out of emotion.  I did.  And obviously, that's

4  the--what we just talked about with Chairman McBroom,

5  discussing the issues related to it and responding to, say,

6  you know, I didn't understand the--the makeup and that you

7  folks had the full evidentiary package and were gonna have

8  full access to that.  And I think you folks have.

9         VICE-CHAIR HEISE:  So do you believe that you've

10  been--that you were part of some kind of a conspiracy?  Is

11  there some sort of a conspiracy that's being waged against

12  you?

13         REP. COURSER:  Well, I--I would just go to the

14  texts, obviously, that were happening.  I don't--I don't lay

15  that at anybody's feet.  I don't think the Committee was

16  involved in that.  I don't think the leadership was aware of

17  it.  I think that was a separate thing that was going on that

18  created, obviously--you know, when you have months and months

19  and months of that, the personal pressure that was related to

20  that, obviously created a different paradigm for how all

21  these things look and the way that they--they go together.

22  So, obviously, that person hasn't been found.

23         And you folks will have to weigh whether or not

24  those are contributing circumstances to the e-mail itself and

25  also the responses that happened.  The last text actually

1 happened on August 7th in relation to that.  I know that

2 that's not really a part of the qualifications that you folks

3 are discussing.  But for me, it was--it was really paramount

4 that that was continuing to happen, continuing the awareness,

5 the tracking, the GPSing.  All of that.  And that was the--

6 that was the world I was operating it.

7    VICE-CHAIR HEISE:  So the outlandish e-mail that

8 you concocted with your staff, that--is that just part of

9 your past now or do you still--do you still own that?

10    REP. COURSER:  The May 19th e-mail?

11    VICE-CHAIR HEISE:  The--the one that we reviewed

12 yesterday with the--the inoculate the herd e-mail, the one

13 that you directed your staff to send out.

14    REP. COURSER:  Well, I--I mean, obviously, he was--

15 he was a friend of mine.  I've spoken to that.  He ended up

16 being--he used staff.  We were off State time, off State

17 hours in a spot where he operated a consulting business, had

18 his computer equipment and--and worked for other--other

19 political people.  I've already said publicly numerous times

20 that I'm the one that concocted it and put it together in

21 some bizarre attempt to try and--to try and deal with the

22 issues that were there.

23    VICE-CHAIR HEISE:  Do you believe that that e-mail

24 has brought this body into disrepute and--and shame?

25    REP. COURSER:  Yeah.  I think the--I think it's

1    brought a lot of disrepute and shame to myself and my own

2    family.  And I think that having the embarrassment brought to

3    the House, I think, is--is something that I certainly am

4    really, really sorry that that's happened.

5         VICE-CHAIR HEISE:  Have you apologized to your

6    staff at all?  You describe almost a family type of

7    relationship with these two.  Have you--have you personally

8    apologized to them?

9         REP. COURSER:  I did, actually.  I sure did.

10   Actually, in the second tape, you know, I apologized to Ben.

11   You can hear that.  And there were several other times that

12   weren't taped where we had discussions about it.  And just

13   saying, you know, obviously, it was a huge failure.  And I

14   know I was a disappointment to him and the difficulties

15   inside of that.  And I know, you know, in regards to the

16   others, I didn't have the opportunity to apologizes to Mr.

17   Allard in regards to that, that I can remember.  I just can't

18   remember.

19        VICE-CHAIR HEISE:  You state that this was--I don't

20   know--a moment of--of extreme emotion brought about by, you

21   know, various factors that were going on in your life.  But

22   you've said in the--at least one of the tapes that I've seen,

23   you say that this is something that you've been thinking

24   about for eight, nine, 10 years.  And you also make reference

25   to a prior incident two or three years ago where--where it

1   sounds to me, at least, like you've--you had done a similar

2   type of false flag operation.  How would you respond to that?

3         REP. COURSER:  No.  There was a false flag

4   operation or some kind of operation done on me in regards to

5   the prior--the prior election.  I don't--I was not involved

6   in the--that whole situation.  I would speak to the other

7   issue.  I think in the--in the--if I remember the tape that

8   we just--that we just listened to, you know, talking about

9   sort of the--thinking about how this would all end.  And I'm

10   not really sure where that comment came from or what that

11   really was derived to in that--in that moment.

12         I know all along the way I've wondered how this

13   would all end, you know, as far as my political time and what

14   that would actually look like.  And you know, I can't really

15   speak to the specifics of that--that comment, as to what

16   was--what was going on at that second.

17        VICE-CHAIR HEISE:  Do you believe you spent any

18   State money for the purposes of perpetuating your affair?

19        REP. COURSER:  No.  I think the situation inside of

20   the--inside of that, we had a series of intertwined personal

21   business and also political--personal business, political

22   official.  The--the situation was inside of that, that we had

23   a--we had an untenable work situation related to the personal

24   relationships that I had.  I don't think inside of that, that

25   I asked anybody to cover it up or hide it in any specific

1    way.  What I was asking them to do is try and allow my family

2    and myself to work through those things personally so that

3    we'd have that opportunity to be able to do that.

4         My wife found out that weekend.  I'm obviously in

5    counseling.  She's in separate counseling.  We're going

6    through those steps.  I'm working with counselors myself in

7    trying to work through those steps and trying to do that in

8    private.  And that was really what the situation was.

9         CHAIRMAN MCBROOM:  I want to establish some clarity

10   on that last answer, if I may interrupt Vice-Chair's line of

11   questioning.

12        Did you--how did you just answer the question?  Did

13   you misuse State resources?

14        REP. COURSER:  In--inside of that, I mean,

15   obviously, the--the misuse of State resources, there were

16   personal conversations in the State House, speaking

17   specifically to the report.  People wanted me to stipulate to

18   everything in the report.  The problem, obviously, with that

19   is that there are some things where they say they may or may

20   not be legal.  No rule cited in some of the--some of the

21   report findings.  And so there was no rule on some of those.

22        So until you stipulate to all of them, what are you

23   actually stipulating to?  So that's in the precursor to what

24   you're saying.  The misuse of State resources, it was clear

25   in the audiotapes when it came to the--the conversations as

1    far as personal and political stuff that was happening on

2    State property.  I absolutely completely stipulate to--to

3    that.  I take full ownership of that.  There were

4    conversations that happened.  There were conversations that

5    happened in regards to our personal lives, both related to

6    this--this stuff and also to staff's personal lives and also

7    to political happenings that were happening out in the--

8             CHAIRMAN MCBROOM:  Representative, I'm not at this

9    point trying to ask about misuse of conversations that were

10   had.  I'm asking about the State resources themselves.  Are

11   you saying yes or no to having misused State resources?

12            REP. COURSER:  I'm not understanding.

13            MR. RANDAZZO:  Mr. Chairman, I--I think he's

14   stipulated to the report that was generated regarding the

15   misuse of State funds.  And I guess the question, if you

16   could rephrase it in specificity as to what.  He's already

17   stipulated to the report.

18            CHAIRMAN MCBROOM:  Well, it's very clear within the

19   House Business Office rules that State resources involve

20   equipment, computers, office space, staff.

21            MR. RANDAZZO:  So you're asking him if he used

22   State resources other than what's already been in the report?

23   Is that--

24            CHAIRMAN MCBROOM:  No.  I'm asking--I'm seeing a

25   lack of continuity here.  Okay.  The report says that you

1   misused State resources, including those things that I've

2   just listed.  You're now, at least, being difficult to answer

3   whether or not you misused State resources.  Rep. Heise

4   asked.  You seemed to say no.  And now I'm asking if that's

5   what you want to say.  Are you saying yes or no to misusing

6   State resources?

7           MR. RANDAZZO:  I think Representative Heise's

8   question was, did he misuse State resources with the affair?

9           CHAIRMAN MCBROOM:  No.  He asked--

10          MR. RANDAZZO:  With the relationship.

11          CHAIRMAN MCBROOM:  --if he--

12          MR. RANDAZZO:  That's my recollection.

13          CHAIRMAN MCBROOM:  That's not correct.

14          VICE-CHAIR HEISE:  Fine.  Let's expand on that.

15  Have you misused State resources?

16          REP. COURSER:  Okay.  Well, we're going to go to

17  the broader question.

18          VICE-CHAIR HEISE:  I mean, affairs, politics,

19  whatever?

20          REP. COURSER:  I think I've already in my prior

21  statement said that as far as personal in the conversations

22  that happened, there was clear--clearly, there was the use of

23  State resources, meaning the property and the facilities to

24  facilitate those conversations.

25          CHAIRMAN MCBROOM:  Hold on, Representative.

1   There's a point of order.

2          VICE-CHAIR CHIRKUN:  Mr. Chairman, I asked the same

3   question to Ms. Gamrat yesterday and her attorney and the

4   Board didn't allow her to answer it because of the relevance.

5   And I'm gonna raise that objection now.

6          CHAIRMAN MCBROOM:  I--I appreciate the point of

7   order, Representative, but there's a distinctive difference

8   here.  She stipulated very specifically to all of the things

9   in the report.  And now Mr. Courser, in my listening, has

10  suddenly created an inconsistency between what he has

11  stipulated and what was in the report and what he's saying

12  here in front of us now.  And that lack--that lack of

13  consistency, I believe, is important to--to dive into.

14         VICE-CHAIR CHIRKUN:  But Mr. Chairman, he did

15  stipulate to what was in the report.

16         CHAIRMAN MCBROOM:  And then in his comments, seemed

17  to refute that.

18         VICE-CHAIR HEISE:  Okay.

19         REP. COURSER:  I think my--what I--I was speaking

20  to the situation with the relationship.  There was clear

21  misuse of--of State resources, just because of the interplay

22  between the personal, the political and the official.  And

23  I--in my statement today, I--I clearly said that those things

24  really facilitated the misuse of State resources.  So I was

25  speaking to it generally, Chairman Heise, as far as

1   specifically to the--to the relationship.  I've already

2   spoken to the fact that I think that's where the

3   clarification is coming in.  I could be wrong.

4          CHAIRMAN MCBROOM:  Okay.

5          REP. COURSER:  Meaning there were misuse of State

6   resources in conversations that happened.  And it's pretty

7   clear on the tapes that those happened at the State House.

8   If you're asking about further than that, I guess--if you

9   could give me some clarification, I'd be happy to answer it.

10         VICE-CHAIR HEISE:  Okay.  So you believe that

11  you've misused State resources?

12         REP. COURSER:  Yes.

13         VICE-CHAIR HEISE:  Okay.  Thank you.

14         CHAIRMAN MCBROOM:  Rep. VerHeulen.

15         REP. VERHEULEN:  Thank you, Mr. Chairman.  Thank

16  you, Rep. Courser and Counsel, for being here.

17         I--I just have a series of what I think are very

18  short--short questions that you're able to answer almost with

19  a yes or no, and some of which relate to comments I've heard

20  attributable to you.  The first is, on August 31st, you said

21  that the House Business Office, quote, doctored the report,

22  close quote, and that it was a, quote, political hit, close

23  quote.  Do you maintain or repudiate your words of October--

24  August 31st?

25         REP. COURSER:  The August 31st e-mail I was posing

1    a series of questions in regards to, you know, whether or not

2    the process was going to be fair and if I'd be allowed a fair

3    hearing or a fair adjudication of the underlying issues.   I

4    didn't feel at that point--and that was out of emotion in

5    regards to that.  So I--I--honestly, I think you folks have

6    looked at it.  I feel very confident that you folks have

7    looked at the record.  I looked at the portions that I could

8    look at.  I think it's been released to the public.  I don't

9    think there's any, you know, hidden voodoo that's--that's

10   occurred.  The public is now going through and looking at

11   the--the various pieces.

12        So I think the--you've--there's been a lot of

13   transparency to the things that are here.  And I appreciate

14   that in regards to all of that.  So my fear was, obviously,

15   is that this wouldn't be the opportunity to be able to, one,

16   even speak to you folks in regards to the issues--the

17   underlying issues that are here.  That was my--my sense of

18   it.  That has been dispelled.

19        REP. VERHEULEN:  So if I--if I understand

20   correctly, you're not saying under oath that the report was

21   not doctored.  Is that correct?

22        REP. COURSER:  Well, I wouldn't know what happened

23   between the House.  I didn't read all 833 pages that were

24   released.  So I couldn't--I couldn't speak to that.

25        REP. VERHEULEN:  To the best of your knowledge, at

1    this point, you have no evidence--

2            REP. COURSER:  To the best of my knowledge, yes.

3    Yes, Rob.

4            REP. VERHEULEN:  And you do not believe at this

5    point that it was a, quote, political hit?

6            REP. COURSER:  I don't.  Asking that question, it

7    was actually with a question mark, I think, after that.

8            REP. VERHEULEN:  And the same question with respect

9    to your comment that you were being, quote, targeted as a

10   form of political retribution.  So I'm taking it that you're

11   testifying today that you do not view this process as a form

12   of political retribution?

13           REP. COURSER:  No, I have not.  No.

14           REP. VERHEULEN:  Then I--just with respect to the

15   report itself, do you--do you agree that the--with the

16   findings of the House Business Office that there was official

17   misconduct and misuse of State resources?

18           REP. COURSER:  Yes.

19           REP. VERHEULEN:  Do you agree that you engaged in

20   deceptive, deceitful and dishonest conduct?

21           REP. COURSER:  Yes.

22           REP. VERHEULEN:  Do you believe that you abused or

23   misused your State employees?

24           REP. COURSER:  In regards to their--

25           REP. VERHEULEN:  As identified in the Business

1    Office report.

2         REP. COURSER: Yes. I spoke to that at the

3    beginning right after my censure resolution to explain sort

4    of the background of that. And I think those moments, inside

5    of the e-mails, those were moments. And I--I think that they

6    were, by and large, well treated. I think there were moments

7    where it was--obviously, there were--I could've treated them

8    better, certainly. But--but again, they were very personal

9    relationships. And so we were dealing with those issues.

10   And most of those issues were--I would say were--as I said

11   before, were caused by me and the lack of real clear bright

12   lines between work and personal in those relationships.

13        REP. VERHEULEN: Did you instruct or allow your

14   staff to forge your signature on blue backs?

15        REP. COURSER: No, I did not. What--I think that

16   needs some clarification. Forging, obviously, is done

17   without my knowledge or without my consent. The--the events

18   that led up to--to that week, I can explain, if you wanna

19   hear it. If you don't, somebody can object, I guess. Inside

20   of that, the--I wasn't going to be available the day that

21   those came back. I spoke to my chief of staff. I asked what

22   was the process to be able to do that. In the legal

23   profession, we do it. It's called signing for another. And

24   so you can sign for other attorneys, attorneys I've never

25   met, with their permission. And so I was--I was falling

1    under that.

2           I asked my chief of staff at that point to speak

3    with the Business Office to say, is there an exception for

4    that?  My understanding was, and they affirmed to me, that,

5    yes, it was not a problem to do that.  I should've checked

6    myself in regards to that.  But that's actually how it

7    happened.  So when they came back, they let me know.  And I

8    said, yeah, well, if--if it's okay, go ahead and do it.  So I

9    should've checked and been more involved in that.

10          REP. VERHEULEN:  Thank you.

11          CHAIRMAN MCBROOM:  Representative, are you saying

12   that the House Business Office told your staff it was all

13   right to have somebody else sign the blue backs for you?

14          REP. COURSER:  No, I don't know that they ever

15   had--my staff ever had any communications with the House

16   Business Office.  But they informed me that it was okay to do

17   it.  It still falls on my shoulders, regardless.  I don't

18   think it was forgery.  It was probably the idea that they

19   were signed by staffers, but I was aware of the fact that

20   they did it.  At that point, not understanding that there was

21   any problem with that situation.

22          CHAIRMAN MCBROOM:  You--you understand that it was

23   your responsibility to know these rules?

24          REP. COURSER:  Right.  I--I think I've clarified

25   that I should've checked with the House Business Office

1  myself and not relied on the staff in that situation.

2          CHAIRMAN MCBROOM:  Rep. VerHeulen, did you have

3  more?

4          REP. VERHEULEN:  I have two--two more short

5  questions.

6          CHAIRMAN MCBROOM:  Thank you.

7          REP. VERHEULEN:  Representative, you may have

8  answered this, but I--I just wanted to confirm it for the

9  record.  I--I saw your reference--your characterization of

10 this Committee as a kangaroo court.  And I believe I think I

11 heard you say you no longer hold that view.

12         REP. COURSER:  That's correct.  Yeah, I would--I

13 mean, I would just reiterate that is not the case.  I'm

14 assuming you folks have had the full evidentiary package.

15 That's my assumption.  You guys have had the opportunity to

16 look through it.  You can determine if there is more

17 maliciousness or more misconduct or are these really the acts

18 of a desperate man who sent a really ridiculous and stupid

19 e-mail that is sort of baffling and mind-boggling and is--is

20 that what it amounts to?  And I know you folks will wrestle

21 with that issue and try to discern what's the right steps

22 forward.

23         REP. VERHEULEN:  My final question at this point,

24 Mr. Chairman, is, Representative, do you believe the House

25 should accept or tolerate the conduct that you engaged in?

1    REP. COURSER:  In regards to all of it?

2    REP. VERHEULEN:  As reflected in the House Business

3    report, which I--I think you previously characterized as a

4    balanced report or an accurate report.

5    REP. COURSER:  No, I don't think that the House

6    should tolerate it at all.  That's why I said I think you

7    folks are going to wrestle with the idea, you know, does this

8    rise to the idea of censuring?  Is this a pattern of behavior

9    or is it a ridiculous e-mail and a ridiculous moment in some

10   guy's really, really hard life that happened to end up on

11   tape?  I think that that's a--that's a really tough

12   situation.

13        I just bring forward the censure because in my

14   heart of hearts, I'm falling on the grace and mercy of the

15   Court in saying I--I would ask for a lesser penalty than--

16   than expulsion in that situation.  Honestly, that's really

17   the situation.  So I know you folks have to wrestle with

18   that.  I know that won't be an easy task, nor will it be an

19   easy task for the full House.

20   REP. VERHEULEN:  Thank you.  Thank you, Mr.

21   Chairman.

22   CHAIRMAN MCBROOM:  Thank you, Rep. VerHeulen.

23   Rep. Liberati.

24   REP. LIBERATI:  Thank you, Mr. Chair.

25   Good afternoon, Todd.

1       REP. COURSER:  Yes.

2       REP. LIBERATI:  Rep. Courser, there seems to be a

3   little confusion, in my mind anyways, on the May 19th tape

4   recording about the--about how you authored the e-mail, how

5   it was developed.  The false flag e-mail.  There was a phone

6   call that was from Cindy, you said.  And when I ask you, is

7   that--was it truly Cindy?

8       REP. COURSER:  That is accurate.

9       REP. LIBERATI:  Okay.  How much did she know?  She

10  has stated that she didn't know the full details.  Can you--

11  can you maybe just give us a little narrative on--on the

12  authoring and the editing of that e-mail with Cindy and Joe?

13      REP. COURSER:  I would be happy to, yeah.  The--the

14  situation was she had a really bad signal that night.

15  Obviously, I was in--I've already said in sort of a different

16  state, both for health reasons, also just fatigue.  In sort

17  of my own personal, you know, my personal low spot.  And I,

18  obviously, reached out to a friend in that situation.  What

19  happened was that call came in at that moment, I'm

20  recollecting, as far as the situation that happened.

21          So I just tell you all of that because, in reality,

22  I wrote that e-mail in the moments after I had asked Ben to

23  come and see me.  So it was--I hadn't--she didn't know the

24  content of the e-mail.  She didn't know that it had actually

25  gone out at that point.  She didn't know that there was

1   actually--she didn't--she didn't know any of those details.

2   So I don't think she would have in any way approved of the--

3   of the action whatsoever.  But she didn't--I don't know if

4   that answers your question.

5         REP. LIBERATI:  Well, on the tape, you stated that

6   you actually had discussions with Joe and--and Rep. Gamrat in

7   composing the e-mail, and they actually--I think, quote, was

8   they actually wanted it more bent towards her or more leaning

9   towards her to take more responsibility.  Now, that seems a

10   little more involved discussion than what you've just stated.

11         REP. COURSER:  Right.  Yeah, I--I don't--I don't

12   remember how that all played out.  I just know that I wrote

13   it before.  And when you listen to the tape, I'm not exactly

14   sure what I'm referencing there.  But that was the--that was

15   the segment of conversation that we had as far as the--as far

16   as the communication.  I don't--I can't--I'm sorry.  I wish I

17   could tell you how that all played out in regards to that.

18         With Ben, I was still also--which we haven't talked

19   about, I don't know that it's pertinent--I'm trying to figure

20   out what really is going on around me in the environment

21   around me.  And so I don't know if he's involved in it.  And

22   I've asked him point-blank several times, was he the--you

23   know, was he involved in it?  Did he know?  Did he give

24   information?  Because this was very, very detailed.  And the

25   person knew a lot about me and my whereabouts.  So what I'm

1  telling him in some of those comments is really to try and--

2  I'm trying to figure out, is he actually the person?  And

3  that's--that's where I was at with that.  So it might've been

4  that I'm telling him something that--just laying out a story

5  to try to figure that out with him.

6      REP. LIBERATI:  Okay.  Thank you.  Let's move to

7  the next--the next tape recording, the next--I think it was

8  two days later, when Rep. Gamrat was actually in her office.

9  I think that--that tape took place in her office.  Discussing

10  the e-mail and she doesn't seem to question any--anything.

11  She's--she's--she's going along.  When you're apologizing to

12  Ben, she apologizes to Ben.

13      I'm just having--I'm trying to pinpoint the

14  difference in your composing the e-mail, whether you composed

15  it, and her knowing.  How much did she know about the e-mail?

16  You said you believe--now, that's your opinion--but you

17  believe that she would've objected to some of the content of

18  that e-mail.  Is that what you just said?

19      REP. COURSER:  Well, my looking back, I object to

20  the content of the e-mail or sending it myself.  So I don't

21  think any person in good conscious would--would, you know,

22  accept the idea that it was happening or the way that it

23  happened.  And in those moments, I--

24      REP. LIBERATI:  She was in those moments, too.

25      REP. COURSER:  Yeah.  No, I'm--

1          REP. LIBERATI:  Did she go--she went along with it?

2          REP. COURSER:  Well, she didn't actually know--my

3     understanding is she didn't actually know or didn't see the

4     actual e-mail and didn't know that it had actually gone out

5     until the 21st.  I think she was--it was shown to her by a

6     reporter, if I remember correctly.  But I wasn't there.

7          REP. LIBERATI:  The 21st of May?

8          REP. COURSER:  I think so, yeah.  I think in the

9     afternoon.  I don't think she saw much of it, just that there

10    was--some of the content.  The person was saying--what we did

11    find out at that moment what--what--you know, obviously,

12    the--there was lots of things going on that night.  And

13    really, what I was trying to do is do something that the--the

14    person that was sending these texts wouldn't expect and try

15    to get them to do something different to see if they could--I

16    could get them to reveal themselves.

17         So--so just to give you--just to kind of finish

18    that thought, so on the 21st when that happened, then I was

19    approached by a reporter who had a copy of it.  And they said

20    that they had it from a confirmed source that I was the

21    author of the e-mail.  So there's only one person in that

22    situation.  So I was trying to drive back in some weird way,

23    not knowing if it's the people around me or who was involved

24    in it, what actually was going on in the background.  But she

25    didn't have any of the content, I would say, until it was

sometime in the afternoon on May--and I don't know how much she even read then.  She just--you'd have to--I mean, obviously, what was the understanding or whatever.

REP. LIBERATI:  So your comments during that phone call, while you were on the line, were not necessarily accurate to Ben when--when you were saying, yeah, she's--you were talking to her about the e-mail.  I'm trying to get Ben to send it.

REP. COURSER:  Yes.

REP. LIBERATI:  It's over the top.  She knew it was gonna be an over-the-top e-mail, she just didn't know the exact wording?

REP. COURSER:  Yeah.  I don't even know how much of my comments she heard because, like I said, I'm waiting to hear from her, you know.  Is that all right?  But it's a broken signal in regards to that.  It was a very short conversation, and then it just ended.

REP. LIBERATI:  Okay.  One more question at this point.

CHAIRMAN MCBROOM:  Is it in the same line?

REP. LIBERATI:  Yes, actually it is--it is in the same line.

CHAIRMAN MCBROOM:  Okay.

REP. LIBERATI:  Why I'm asking these to you is I'm trying to determine--well, let me just ask you.  You have

1    asked for censure.  Rep. Gamrat has asked for censure.  The

2    House Counsel, Majority Counsel has recommended expulsion for

3    you and censure for her.  I'm just wondering, do you--do you

4    think that's fair?  Do you see differences in your actions,

5    yourself?

6                REP. COURSER:  Well, obviously, I--I would--I think

7    I've kind of explained my actions as best I can, looking in

8    reverse.  Some of them are explainable.  Some of them are not

9    explainable in any sort of rational or reasonable sense.  And

10   I'm trying to give you folks the best testimony that I can.

11   I really am trying to do that.

12               You know, I think in--in her situation, obviously,

13   she--you know, she's been allowed the censure or there's a

14   movement to try and recommend censure.  You know, you guys

15   will have to kind of wrestle with are there differences

16   between our actions in regards to that?  I--you know, I can't

17   really comment to that.  I think that censure is appropriate

18   for her.  I think it--I would ask for it from--from you folks

19   as well.  I think it's an appropriate step in my regard as

20   well.  I can see why there's some real question as far as

21   the--the expulsion option and the way that that works.  I

22   can't really speak to the intricacies of how they arrived at

23   censure versus expulsion for her.

24               I--I think it's--to me, I look back and I say, what

25   is it?  You have some conversations in the State House that

1   amount to misuse of taxpayer funds.  And I've said I would

2   certainly reimburse the State if they want to calculate how

3   much that is.  And you have a ridiculous e-mail sent out by a

4   guy in a desperate moment.  And does that amount to enough

5   to--to censure or expel?  I mean, you have to look at sort of

6   the way those things have played out with other members.  And

7   you folks have to wrestle with, as a legislature, to decide

8   what is the standard for qualifications for expulsion versus

9   censure.

10          And I think that that's the situation.  So, Rep.

11  Liberati, I can't--I--I really can't tell you the distinction

12  that was made for House Counsel determining the censure

13  option versus the expulsion option.

14          REP. LIBERATI:  Thank you.

15          CHAIRMAN MCBROOM:  Representative, I would like to

16  go back to a question from Rep. Liberati on the e-mail and

17  the conversation with Rep. Gamrat that evening.  It seems

18  very obvious from the conversation on the phone that you had

19  at least at some point already talked with her about doing an

20  e-mail.  Maybe not the content, but that there would be a

21  false flag e-mail.  When did that occur?  When was that

22  previous conversation?

23          REP. COURSER:  I think it was--I think it was

24  earlier that day, but I--and now we're thinking back and

25  doing it in retrospect.  But he was asking about the content,

Michigan Department of State
Legal Services Administration

45

1  knowing it.  I'm assuming that--I'm working with somebody,

2  I'll--you know, it was a conversation [unclear] try and

3  connect with Ben and see about--about doing something to take

4  a step in that direction.  I--I really can't remember the--

5  the details in relation to that.  But--but I think she knew

6  that I was attempting to put something in motion.  But I

7  don't know that--well, I know there is no way that she could

8  know the actual content at that point, so.

9          CHAIRMAN MCBROOM:  Vice-Chair Heise.

10          REP. COURSER:  And I think I noted that in the

11  thing, you know.  I think even inside of it, I think I noted

12  that.

13          VICE-CHAIR HEISE:  You were investigated by the

14  House Business Office, correct?

15          REP. COURSER:  Yes.

16          VICE-CHAIR HEISE:  And you were interviewed by

17  them?

18          REP. COURSER:  I was.

19          VICE-CHAIR HEISE:  Okay.  Did you--did you--at any

20  time, did you ever lie to the House Business Office?

21          REP. COURSER:  I don't--I don't--I don't think so.

22  I mean, there might be a clarification you want to make

23  specifically.  I'd be happy to clarify.

24          VICE-CHAIR HEISE:  I'm just asking.  Have you taken

25  any steps to delete any evidence relative to this case or

1    destroy anything connected to this matter since--since it

2    first came to light?

3            REP. COURSER:  I don't really delete anything, so I

4    just--it's a bad habit of mine.  I don't think I have any

5    texts deleted.  Or if they are, it's inadvertent.  I don't

6    have a habit of--of deleting anything.

7            VICE-CHAIR HEISE:  I'm confused about your

8    relationship with your former staffers.  You've described

9    them as brothers, frat brothers, almost like family.  But

10   yet, in your answers to Rep. Liberati, it--it--it seemed to

11   me that you still think that these two or one of them is

12   the--the extortion texter that you've--that you've been

13   concerned about.  Could you elaborate on that?

14           REP. COURSER:  Well, I think the--that's the

15   difficulty.  I mean, it really is something that is difficult

16   for myself in regards to just dealing with personally.  If

17   these guys knew and how they knew and how early they knew.

18   My hope and prayers that they're not involved--

19           CHAIRMAN MCBROOM:  Excuse me, Representative,

20   there's a point of order.

21           Turn your microphone on, Representative.

22           VICE-CHAIR CHIRKUN:  You know, nowhere--I mean,

23   we're not investigating the texter.  We're trying to do the

24   qualifications of both of them.  There's nothing to do with

25   that in the report.

1        CHAIRMAN MCBROOM:  All right.  I agree,

2    Representative.  We'll move on from that.

3        VICE-CHAIR HEISE:  Pass for now.

4        CHAIRMAN MCBROOM:  Thank you, Vice-Chair Heise.

5        Rep. LaFontaine.

6        REP. LAFONTAINE:  Thank you, Mr. Chair.

7        Okay.  So this Committee was established to

8    determine your fitness and if you're able to continue to hold

9    the office that you have today.  And as I'm sitting here,

10   what I'm hearing from you are a lot of excuses.  And I have

11   read through this report, but I want to talk a little bit

12   about your conduct and your presentation today.

13       First off, you showed up late.  That was a little

14   bit disrespectful to the Committee.  And you showed up late

15   coming in here.  You, in explaining stuff, describe yourself

16   as desperate, that you have a hard life, that you acted

17   emotionally when posting certain things online.  You

18   described your berating e-mail as a moment that you had with

19   your staffers.  I don't care.  As a staffer--well, I

20   previously was.  I don't care if it was a moment.  I don't

21   care if it was a minute.  I don't care if it was a month.  It

22   was unacceptable.  You do not treat staff like that.

23       You also claim you were under pressure in sending

24   the ludicrous e-mail and you didn't recognize yourself.  So

25   in all of this, do you personally feel that you are fit to

1  continue representing the 90,000 people or so that reside in

2  the 82nd District?

3      REP. COURSER:  Yeah, I appreciate the--obviously,

4  this morning, dealing with my own testimony as I came in,

5  obviously, is a huge issue.  Out at my truck, trying to

6  collect myself emotionally and try to get myself together.

7  And to come in to even be able to face you folks and walk

8  through these steps.

9      So I think there's--you have to look at the

10  character and fitness and what those qualifications are.

11  When I look at it, I was elected by the people of Lapeer

12  County.  And you know, they saw that I was fit to serve.  I

13  believe that this is a--obviously, a moment.  It is certainly

14  a difficult one in my life.  And I'm not trying to make

15  excuses today.  That wasn't my intention.  I was trying to

16  provide clarification.  That's all I'm trying to do.  And I

17  apologize if it comes off as being excuses.  I wanted to give

18  you folks the background and try to answer as honestly as I

19  could in relationship to all of those issues.

20      I don't blame the difficulties in my life for any

21  of the--the failures of responsibility that I have.  They're

22  my failures.  I--I think I've tried to say that.  If I

23  haven't, I'll say it again.  They're failures of mine and

24  they're failures of my responsibility.  Going to the

25  underlying question, you know, what--what's the measurement

1   of fitness?  You know, the measure of fitness of trying to

2   serve, I think the responsibilities that lay before me, one,

3   to my family, to the people of my district.  And then, you

4   know, as a believer in Christ, I mean, there's no measurement

5   by which that failure doesn't, you know, where I don't fall

6   short.  I think that that's the case.

7          And you folks have to--to wrestle with, is that a

8   pattern?  Did that happen?  Are there, you know, other

9   extenuating circumstances or not or is this really a

10  momentary--sort of a momentary situation with some really

11  bizarre influences that--that caused it to happen?  And I

12  don't--I don't believe the--this other person, this anonymous

13  person.  I set all of those in motion by the relationship

14  that I had, which was--which has been well documented and,

15  obviously, played out over the last 30 days all over the

16  world for people to see.  So I--I apologize for showing up

17  late in regards to that.

18          REP. LAFONTAINE:  Thank you.

19          CHAIRMAN MCBROOM:  Thank you, Representative.

20          Vice-Chair Chirkun.

21          VICE-CHAIR CHIRKUN:  Thank you.

22          I have a few questions.  The first one being the

23  inoculate the herd e-mail.  Who--who did you send that out to

24  and where did it go?

25          REP. COURSER:  It ended up--it was--I started--I

1    have a very large e-mail list of--of people.  I think it's--

2    it might be as many as 40,000 people that the e-mail list is

3    for.  It didn't go out to all those folks.  I started with

4    just a--I started out sending it, and it was in small

5    batches.  And so it was a batch and then another batch and

6    another batch, in the hundreds.  And I was doing it until the

7    texter did something.

8         So the idea was it starts on the 20th.  It goes out

9    the 21st.  By the time we get to the 21st, in that situation,

10   the texter responded and said, I know that you're the one

11   that did it.  So he said, change your password.  You can see

12   the text.  Change your password.  At that point, I stopped it

13   because I knew either, one, he was my inbox or, two--and at

14   that point, changing passwords again, going through that,

15   having the phone swept again, working through that, trying to

16   come up with what were those situations?  All of that,

17   obviously, is peripheral stuff.  And maybe it doesn't make

18   any difference to the qualifications.  But that's really the

19   situation.  So it stopped at that point.  So it was--I don't

20   know how many hundreds it was that it went out to.

21        VICE-CHAIR CHIRKUN:  Did any of the representatives

22   in the House or the Senate get this e-mail?

23        REP. COURSER:  I don't know.  You'd have to ask

24   them.  It got forwarded around quite a bit after it went out

25   to those folks.  So--I know most people, when you get an

1    e-mail like that, it goes to spam anyway.  But I couldn't

2    tell you if any actual representatives received it or not.

3         VICE-CHAIR CHIRKUN:  There has been some notations

4    in here.  And you might have turned it in.  But you have

5    a--you had a computer.  And I know Sgt. Dixon [phonetic] went

6    to your office and your home to try to retrieve it.  Did that

7    computer ever find its way back to the House Business Office?

8         REP. COURSER:  I'm unaware of the situation with

9    Sgt. Dixon tried to retrieve a computer at my house or my

10   office.

11        VICE-CHAIR CHIRKUN:  Okay.  Well, then my follow-up

12   question is, do you have any property that still belongs to

13   the House of Representatives?

14        REP. COURSER:  I do not.  As a matter of fact,

15   there were two--two laptops that were in the back of my--they

16   were in my truck.  I didn't know the House Business Office

17   was--was--you know, that they needed those back.  I returned

18   them as soon as I--I found that out.  I rarely used either

19   the laptop or that surface.  It didn't work very well when it

20   came to administration.  That's not to the technology part.

21   It was just probably the operator on my end.  But there was

22   very little that I did, actually, on either one of those

23   units.  And I informed the House Business Office when I

24   handed those off to Tim Bolin.  And whatever they did to try

25   and retrieve the information that was on there, one was used

1   by—I think it was used by Mr. Allard, and the other one was

2   used by Mr. Graham.  I really didn't use the House

3   technology—the technology apparatus that was there.

4          VICE-CHAIR CHIRKUN:  You, yesterday, gave us a

5   letter.  Rep. Gamrat came in and gave us a letter.  And you

6   both basically—she, in my own words, is she pled guilty.

7   She fell on the sword.  Have you had any conversations with

8   Rep. Gamrat within the last 10 days other than anything

9   pertaining to the legislation portion of our jobs?

10         REP. COURSER:  No.  My—the conversations in

11   regards to—you're talking about the letter as far as

12   stipulating to—

13         VICE-CHAIR CHIRKUN:  Well, you—you gave us a

14   letter.  She gave us a letter.  And my question is, did—have

15   you had any conversation with her in the last 10 days?

16         REP. COURSER:  Not related to anything other than

17   the—the—you're talking about the legislative stuff that's

18   going on?

19         VICE-CHAIR CHIRKUN:  I mean, other than that, you

20   might've talked to her about legislative stuff.  But did you

21   have any other personal conversation with her?

22         REP. COURSER:  No.  I—I can't really recall the

23   last 10 days.  I've really been focused on this as far as

24   the—as far as the letter.  This was prepared as we were

25   trying to work with—work in to try and come up with what

1    would a censure option even look like?  And I wanted to

2    present this to you folks in regards to that.  So the--the

3    letter was prepared with my counsel, who were attempting,

4    obviously, to inform you folks that I would like a censure.

5              VICE-CHAIR CHIRKUN:  I have one last question.

6    And--and--and it's in the book.  But when--I want to verbally

7    hear it from you.  When did you know that you were being

8    taped by your staff?

9              REP. COURSER:  I--I--as far as my understanding of

10   it--well, I knew on August 3rd when Chad Livengood came to my

11   office at that point and played a short clip of it that Ben

12   Graham had then taped me back as far as May 19th.  There was

13   a sense inside of that that it had been going on in the

14   office for some time because of the way that there was an

15   almost interrogation type style by the staff that was in the

16   office.

17             And they also had noted to the other staff members,

18   Ann Hill and--and Karen Couture, who now--who now has a

19   married name, that the offices were bugged.  Now, I don't

20   know what that related to or whatever.  Now we know that

21   actually there were some taping going on inside the office.

22   I don't know that it was wiretapping or whatever.  But they

23   made comments to other staff in regards to that, that they

24   were bugged.  So I got the sense of that.

25             Obviously, the personal relationships overshadowed

1   all of that.  Like, would they really be involved in this?

2   Would they be involved in the background in doing these types

3   of things?  And--and so I--it was difficult to be able to

4   reconcile those two things with the personal relationships I

5   had with them.

6         VICE-CHAIR CHIRKUN:  Okay.  Thank you very much,

7   sir.

8         Mr. Chairman, that's all I have.

9         CHAIRMAN MCBROOM:  Thank you, Vice-Chair Chirkun.

10         Rep. VerHeulen.

11         REP. VERHEULEN:  Thank you, Mr. Chairman.

12         Representative, in response to Vice-Chair Heise's

13   question, you--you indicated that you believed you were being

14   truthful when interviewed on August 17th by the Business

15   Office.

16         REP. COURSER:  Yeah.  I can't remember.  They took

17   notes of that.  And then I came back and did a--some

18   adjournments to that with--with Doug and walked through that.

19   But I didn't see the final copy.  I never did see the final

20   copy in regards to that.  I asked for it.  But I think just

21   administratively, I never did see the final.

22         REP. VERHEULEN:  And let me--let me ask you this.

23   The report indicated that you said that Rep. Gamrat did not

24   know about the e-mail cover-up until she was shown a copy of

25   the e-mail on the House floor by a reporter.  Is that what

1    you told the House Business Office?

2         REP. COURSER:  Right.  I don't know how I--I mean,

3    obviously, the--to expand on that, she knew there was a

4    meeting.  That's on the tape, which we knew at that point.

5    She didn't know the--I don't think she knew sort of the--

6    well, she didn't know the content in regards to that.  And I

7    think that's what I'm speaking to.

8         REP. VERHEULEN:  No, no.  Your statement to the

9    Business Office was that she did not know about the e-mail

10   cover-up until she was shown a copy on the House floor by a

11   reporter.  And I think we've just heard her call in on the

12   audio of May 19th.  And there was a second audio of a meeting

13   with you and Rep. Gamrat present where it was very, very

14   obvious that she knew.  She may not have known the specifics,

15   she may not have read the e-mail, but it was very clear, at

16   least to me, that she was aware of the--of the e-mail going

17   out and what I would characterize as a cover-up.

18        So I'm having difficulty reconciling your statement

19   of August 17th to the House Business Office with the two

20   tapes.  So I guess I'm asking you to clarify in response to

21   Rep. Heise or maintain it.

22        REP. COURSER:  Yeah.  No, I--I would simply say,

23   she--you know, obviously, she knew about--that we were

24   putting some plan in motion.  She knew the generalities in

25   regards to that.  I would say sometime on May 19th somewhere.

1   Did she know the content and that it actually had happened?

2   She didn't--I don't think she knew that until the second

3   tape.  But even at that point, she still had not seen the

4   content until we went into session that day.  And it was

5   shown to her, I think, by a reporter.  But I can't remember

6   on that.

7          REP. VERHEULEN:  You are comfortable in--in--in

8   reconciling that with your statement that she did not know

9   about the e-mail cover-up until she was shown a copy on the

10  House floor by a reporter?

11         REP. COURSER:  What I was--

12         REP. VERHEULEN:  In view of those--the tape

13  recordings that we've all listened to, you believe that that

14  would--that statement made on August 17th to the House

15  Business Office was truthful?

16         REP. COURSER:  Yes.  I--obviously, the House

17  Business Office is a compilation.  If I looked at it further,

18  you know, to clarify, I could've clarified everything that we

19  just talked about again.  But in regards to what she knew

20  about the content, I didn't say content at the House Business

21  Office.

22         REP. VERHEULEN:  Let me ask you this.  If I asked

23  you, and I am asking you, did Rep. Gamrat know about the

24  e-mail cover-up prior to being shown a copy of the e-mail on

25  the House floor by a reporter, what would your response be?

1    REP. COURSER:  She knew that I had met with Ben
2    Graham and that I was putting something in motion.  Ben left
3    that night.  Ben had refused to do it.  Her assumption at
4    that point is that it didn't happen.
5            REP. VERHEULEN:  So--
6            REP. COURSER:  So there was no--she didn't--so,
7    essentially, at that point, it kind of failed.  And then it
8    was renewed the next day.  I think it was the next day.  And
9    then at that point it was put in motion.  I reaffirmed to her
10   in the--on the 21st.  I don't know what she--what she
11   understood as far as the content.  What I'm trying to tell
12   you is that I don't think she knew that until we actually
13   came to the floor that day.
14           REP. VERHEULEN:  You are comfortable saying that
15   both on August 17th and today that you believe the statement
16   that she did not know about the e-mail cover-up until she was
17   shown a copy on the e-mail--of the e-mail on the House floor
18   by a reporter is an accurate statement, a truthful statement?
19           REP. COURSER:  Well, yes.  On--on the 19th, what
20   I'm trying to tell you is that--
21           REP. VERHEULEN:  I'm asking you, you told the House
22   Office--Business Office on the 17th that Rep. Gamrat did not
23   know about the cover-up until shown a copy of the e-mail on
24   the House floor.  And I'm having great difficulty reconciling
25   that statement with the May 19th and the May 20 or 21st audio

1    recording.  And you know, your testimony is your testimony.

2    But when I hear her participating in a discussion with you

3    and staff members, I can't reconcile that with your statement

4    to the Business Office.  And it's not for me to reconcile.

5    If you're--if you're comfortable that that statement was true

6    on the 17th and you're standing by it today, that's your--

7    that's your statement.

8         REP. COURSER:  Yeah.  Thank you, Rep. VerHeulen.  I

9    would just say what I was speaking to in my mind when I was

10   talking to the House Business Office is the content or the

11   severity or where that was at.  I tried to correct those

12   statements.  Like I said, I didn't see the finals of those.

13        REP. VERHEULEN:  Well, if you had an opportunity

14   today to correct that statement, would you revise the

15   statement you made or you were reported to have made to the

16   House Business Office on August 17th?

17        REP. COURSER:  Yeah.  I would say that it was the

18   content that I was speaking to.  I'm not looking at the

19   statement that you're talking about.  But I would go through

20   and actually try to explain the steps that we've tried to

21   talk about here today in regards to what happened on May 19

22   in regards to all of the various issues related to that

23   through the 21st.  It was my understanding she didn't see the

24   content or what really had happened until she got to the

25   House floor.

Michigan Department of State
Legal Services Administration

59

1    REP. VERHEULEN:  Thank you.  Thank you, Mr.

2  Chairman.

3    CHAIRMAN MCBROOM:  Thank you, Representative.

4    At this time, in order to fulfill the House rules

5  to not be in Committee without a leave from the session, we

6  will recess until we're granted leave by the House.

7    (At 1:00 p.m., Recess Begins)

8    (At 4:30 p.m., Recess Ends)

9    CHAIRMAN MCBROOM:  The Committee will come to

10  order.  We'll continue on with where we left off before

11  recessing, if Rep. Courser and his legal counsel would please

12  come back forward to their seats.

13    Thank you very much.  And I'd just remind you,

14  Representative, that you remain under oath.

15    We'll move on with questioning.  Rep. Liberati.

16    REP. LIBERATI:  Thank you, Mr. Chair.

17    Welcome back.

18    REP. COURSER:  Thank you.

19    REP. LIBERATI:  I've got three questions.  We can

20  break them up, take somebody in between or however you see

21  fit, Mr. Chair.

22    Okay.  First question, when--on the first

23  audiotape, you--when you asked Ben to send it, you--I'm not

24  sure exactly how--he was supposed to send it at night.  That

25  night you asked him to send it.  And you said, you can take

1   the next day off, take tomorrow off, be sick.  And he said

2   paint the room or something, paint the garage.  I don't know

3   what he was saying.  But I'm just kind of curious, if--if the

4   e-mail was to be sent at night off State property with his

5   own computers, why did you say take the next day off?  Just--

6   I didn't quite understand that.

7           REP. COURSER:  Inside of that, I--I mean, I'm going

8   back and trying to recollect the conversation of what was

9   going on at that point.  Again, in all of this, trying to--

10  trying to explain.  But inside of that, the conversation that

11  we were having was referring to, one, we had talked about his

12  family and we had talked about him and, you know, that sort

13  of thing.

14          And I didn't understand at that point the paid idea

15  versus the unpaid, you know, that, hey, some of these days

16  are paid with--I've never been in the public sector before.

17  So I wasn't really referring to the idea that he's taking

18  paid days off in that regard, at least in my mind, when I'm

19  looking back.  No, I just heard the audio, its entirety, this

20  past week.  So I'm also trying to--trying to understand and

21  go back and, you know, sort of recollect inside of that.  So

22  I can't really speak entirely to that.  I--I just didn't know

23  the process that it would take on the overnight.  I didn't

24  know how that all worked out.  He didn't end up taking that

25  day, nor did he end up sending the e-mail out.

1      CHAIRMAN MCBROOM:  Okay.  Thank you.  Continue.

2      REP. LIBERATI:  Karen--I'm not sure if I'm

3  pronouncing her name right.  Couture--Coulter?

4      REP. COURSER:  I pronounce it Couture.

5      REP. LIBERATI:  Couture.  Okay.

6      REP. COURSER:  Couture, yes.

7      REP. LIBERATI:  Karen Couture, did she work at your

8  law firm?

9      REP. COURSER:  She did, yes.

10     REP. LIBERATI:  She did.  Now, did she work there--

11 did she work for you part time in the House?

12     REP. COURSER:  She did temporarily at the

13 beginning.  She would work a few hours at my law firm.

14 Sometimes when things got--got busy, she would work more.

15 She's a very, very detail-oriented, very process-oriented

16 lady.  Takes care of file management.  And so she--obviously,

17 inside of that, we brought her over, because we had at the

18 beginning.  We didn't have--you know, she wanted to come

19 over.  She's worked in--in--in government before.  I think

20 she worked for the EPA at one time as well.  And so she

21 wanted to come over and work in the State House.  And so we--

22 we took that step.

23      And she started initially part time--or tried to,

24 you know, sort of put in time at the beginning.  And then it

25 became clear--and I talked to Mr. Sorry about it, to make her

1    full time and bring her over here completely and allow that

2    to happen.  And that's what we did.

3         REP. LIBERATI:  Okay.  In the meantime, before

4    that, I've never had a staff member work outside, so I'm not

5    familiar with the form.  But there is--there is approval we

6    need from the Speaker's Office if one of our staff members

7    are going to have--or they need and we have to okay it, as

8    the representative, for them to work somewhere after State

9    time.  To have a second job, I guess, to say.  So I believe

10   you filled one out for one of the employees, because--because

11   Keith and Ben, you have said, had somewhat of an operation, a

12   political operation at your office.  So I'm just wondering,

13   did any of the three, did you do that form?  Or just one of

14   them?  I'm not sure.

15        REP. COURSER:  I actually several times visited

16   with Mr. Sorry on the House floor concerning the situation

17   with--with Karen in trying to move her over here and

18   explaining the situation.  And so we--we--there was a form

19   that we filled out--and I can't remember the exact details of

20   it--to disclose her working at the law firm.  Once we figured

21   out there was more than enough on this side, really, she

22   just--essentially, that became her work.  And--and we've

23   eliminated her from--from the office on the other side in the

24   legal office.

25        So she does--does a great job.  I never have an

1   issue of whether or not something has been followed up and

2   documented.  So that was really my need at the moment, to

3   really feel like we were answering every constituent issue

4   and non--non-issue--or non-constituent issues for people that

5   were calling in and around the State.  We just felt like we

6   needed to make sure that we were doing a good job on--on

7   following up with those folks.

8           REP. LIBERATI:  Okay.  So--but you did not fill out

9   that form for Josh or Ben?

10          REP. COURSER:  I don't remember, because that was

11  at the beginning.  And what they did for me was contract.  So

12  I can't remember going--now we're going back into December.

13  We probably should have in regards to--I know they're suppose

14  to disclose political operations that they were involved in.

15  I honestly can't remember.  It was all--it's all really sort

16  of fuzzy at that point, so.

17          REP. LIBERATI:  Okay.  One more line of

18  questioning, if I may.

19          CHAIRMAN MCBROOM:  [no verbal response]

20          REP. LIBERATI:  Okay.  Thank you, Mr. Chair.

21          REP. COURSER:  One follow up on that?

22          REP. LIBERATI:  No.

23          REP. COURSER:  Is it okay?

24          REP. LIBERATI:  That's fine.

25          REP. COURSER:  You're good?

1    REP. LIBERATI:  Yeah, I'm good.

2    REP. COURSER:  Okay.  Thank you.

3    REP. LIBERATI:  Okay.  I'm gonna try to get back

4    into something I asked some of the other people testifying

5    about the time line on the firing of your staff.  Okay.  Now,

6    I've got Josh--Josh Kline resigned from your office.

7    UNIDENTIFIED SPEAKER:  Mr. Chair, we've got

8    construction workers outside the window right now.  We're

9    gonna have to--

10   CHAIRMAN MCBROOM:  Stand at ease [inaudible]

11   (At 4:37 p.m., Stand at Ease)

12   CHAIRMAN MCBROOM:  The Committee will come to

13   order.  Thank you, Mr. Clerk.

14   Rep. Liberati, please continue.

15   REP. LIBERATI:  Thank you, Mr. Chair.

16   CHAIRMAN MCBROOM:  But expediently.

17   REP. LIBERATI:  Okay.

18   Josh Kline resigned from your office March--I've

19   got two different dates.  March 27th or April 15th.  Is that

20   correct?

21   REP. COURSER:  I can't remember the exact date.  It

22   seems like it was--

23   REP. LIBERATI:  Okay.  But he did--

24   REP. COURSER:  Yeah, I can't--

25   REP. LIBERATI:  --resign approximately--

1      REP. COURSER:  He did.

2      REP. LIBERATI:  --at that time.  Okay.  Now,

3   May 1st--I guess I could ask you this--this, also.  Did you

4   know on May 1st that they--they, being Ben and--I don't know

5   if Keith, Ben for sure informed Brock slash/Norm about

6   unethical behavior in yours and Rep. Gamrat's office.  You're

7   aware that that happened on May 1st?

8      REP. COURSER:  I was not aware of that.

9      REP. LIBERATI:  Okay.  That is in the--in the

10  report.  That May 1st, Ben had a meeting with Brock and Norm.

11  Now, on May 19th is when you asked them to send that special

12  false flag e-mail.  Okay.  That was on the 19th.  They did

13  refuse to do that--or Ben refused to do that.  Now, on the

14  21st is the second tape with you apologizing to Ben for

15  asking him to do--do such a thing.  That was on the 21st, so

16  two days later.

17      Now, on the 25th is when both Ben and Keith

18  received pay raises.  Okay.  And that was on the 25th.  Now,

19  on July 2nd, Graham and Allard took Ann Hill for a walk.  I

20  don't know if you've read this in the report or if you're--if

21  you're even familiar with this.

22      REP. COURSER:  I am familiar with that incident.

23      REP. LIBERATI:  Okay.  With that conversation.  So

24  basically, they spilled their guts about everything they

25  thought was happening in your offices and asked her, what are

1    you going to do?  What's--what's happening now?  Ann has said

2    that she mentioned this to you and Rep. Gamrat after the

3    fact.  Now, on July 6th, Ben and Keith were fired.  To me,

4    the time line--because there are documentations that you are

5    unhappy with some of their performance from January.  Now, to

6    me, it seems from January to May 25th, when you gave them

7    raises--I mean, you had all that opportunity.  And now four

8    days after you find out they're talking to another staffer

9    about indiscretions in your office, they're fired.  I need to

10   ask you straight out.  Did that have any bearing on their

11   termination?

12        REP. COURSER:  As far as the conversation they had

13   outside of the office--

14        REP. LIBERATI:  Correct.

15        REP. COURSER:  --with Ann Hill?  I would say that

16   was the catalyst, but the--what happened in that incident as

17   far as the conversation is that they were really trying to

18   push Ann Hill out of the--out of the State offices.  And so

19   there was a sense that there was intimidation going on.  And

20   we asked them to kind of explain that situation.  To remove

21   her from, obviously, the offices and then telling her that

22   the--the offices were bugged and they had to go out on the

23   capital--you know, out on the capitol lawn to be able to

24   speak with her.  That was the situation in regards to that.

25   We couldn't reconcile that with the idea of all the other

1    issues that were going on inside the office to say, hey, you

2    guys--we've got a really good staffer in Ann.  We've got a

3    really good staffer in Karen.  And now they're trying to push

4    this lady--push this lady out.  And it didn't really make

5    sense what they were--what they were attempting to do.

6         And so at that point, it just became--there wasn't

7    really anything else we could do.  And we informed Tim Bolin

8    that--that it was time to go.  I think that's what you're

9    asking.  But the--the situation was we were--we were trying

10   to replace the--or not replace, but replace the missing two

11   people with people who were good clerical people and people

12   who administered and loved administering.

13        And you know, Karen was doing a fantastic job in

14   that.  And so was Ann.  And they were coming up to speed

15   inside of that.  And they knew they, obviously, couldn't get

16   rid of Karen.  She'd been with me for, I think, five or six

17   years at that point and--and had seen Ben and Josh and their

18   failings because they worked--she worked at the next desk

19   next to them for going on three years before she came to the

20   State House.  So her interpretation of--of Ben and Keith and

21   Josh was totally different, obviously, than, you know, than--

22   than what their interpretation of what their work performance

23   and that sort of thing was.  So you can look at the staff in

24   regards to that, but--I don't know if I'm answering your

25   question or not.

1    REP. LIBERATI:  You did off the bat.  You said that

2  might've been the catalyst.

3    REP. COURSER:  All right.  So I ran off again on

4  another tangent.  Sorry about that.

5    REP. LIBERATI:  Thank you.

6    REP. COURSER:  Yeah.  Sorry about that.

7    REP. LIBERATI:  Thank you, Mr. Chairman.

8    CHAIRMAN MCBROOM:  Thank you, Rep. Liberati.

9    Vice-Chair Heise.

10    VICE-CHAIR HEISE:  Thank you very much.  I'd like

11  to follow up on some questions that were raised by Rep.

12  VerHeulen before the break.  During the investigation with

13  the House Business Office, you stated that Rep. Gamrat did

14  not know about the e-mail cover-up until she was shown a copy

15  of the e-mail on the House floor by a reporter.  Is that

16  accurate; yes or no?

17    MR. RANDAZZO:  I'm going to object to the question.

18  I think that was the exact question that--

19    CHAIRMAN MCBROOM:  I can't hear you.  Sorry.

20    MR. RANDAZZO:  I'm going to object to the question

21  because I think that question has been asked and answered.

22  That's the exact same question that Rep. VerHeulen asked

23  before the break.  And I think it was asked and answered.

24    VICE-CHAIR HEISE:  I don't know if it was answered.

25  I--I thought we--I thought that was right before the break

1     there.

2              MR. RANDAZZO:  No.  I believe he did tender an

3     answer to that.

4              VICE-CHAIR HEISE:  Well, Todd, do you want to--I'm

5     sorry, Rep. Courser.

6              CHAIRMAN MCBROOM:  Mr. Vice-Chair, go ahead and

7     move forward with your next question.

8              VICE-CHAIR HEISE:  Okay.  Because I'm looking at

9     Rep. Gamrat's statement to the Select Committee from

10    yesterday.  And she says, Rep. Courser and I discussed a

11    number of options, including an over-the-top e-mail to

12    identify the source and also mitigate the potential negative

13    publicity.  So is she telling the truth or is she lying?

14             REP. COURSER:  What I was speaking to in the House

15    Business Office, I think, when we were talking--Rob, when you

16    asked the same question before the break is the content of

17    the e-mail.  And I know that was transcribed by people in the

18    House Business Office.  And I corrected those.  I didn't see

19    the final report as far as what they had written down for my

20    testimony.  But it wasn't from tape that I remember that--

21    that that actual comment happened.

22             So at that point, in the House Business Office we

23    were having a conversation.  I don't know that that--that

24    statement is the totality of all of it.  I was speaking to

25    the content, if I remember and recollecting now to those--

1   VICE-CHAIR HEISE:  Okay.  So you didn't--

2   REP. COURSER:  --conversations.

3   VICE-CHAIR HEISE:  --you didn't lie to the House

4   Business Office?

5   REP. COURSER:  I--I don't think so, no.  I didn't

6   intend to in any way deceive them.

7   VICE-CHAIR HEISE:  Okay.  Thank you for now.

8   CHAIRMAN MCBROOM:  Thank you, Mr. Vice-Chair.

9   Any further questions from members?

10  [No Verbal Response]

11  CHAIRMAN MCBROOM:  I will ask my last one.  It's

12  similar to what I led off with.  But I think, you know, I'd--

13  I would like to pose it to you a little differently here at

14  the end after going through this process today.  With such

15  huge examples of failure, misjudgment, character flaws, can

16  you really believe that you remain qualified to serve?  How

17  can--how can we be sure that, you know, a similar situation

18  doesn't arise when you're under pressure?  Because you blamed

19  a lot of this to having been under duress, under extreme

20  pressure.  How do we know that circumstances won't once again

21  lead to all of these problems, these misjudgments happening

22  again?

23  REP. COURSER:  Well, I appreciate the question, to

24  bring it back again.  You know, I think it's hard to--it's

25  hard to go back and explain to people what was going on at

1    that moment.  I would just say that first and foremost.  And

2    you know, I'm just here to try and explain that as best I can

3    and give you the testimony as best I can.

4         And I know you folks are wrestling with the idea of

5    qualification and what that means for this legislative body.

6    I understand that.  I felt it was important for me to come

7    and testify and to give you as much clarity.  And I know I've

8    run on in some of my questions or answers, trying to answer

9    what I think you're asking, but yet give information around

10   that.

11        But I would just say it was a very unique

12   situation.  It was incredibly--it was incredibly unique.  And

13   I wanted to come and explain that.  Does it amount to a

14   series of, A, character failures or the moment--is it a

15   moment that it happened and sort of everything precipitated

16   from that?  My sense is, you know, when I look at it, I'm

17   saying, you know, that moment was a really difficult time.

18   It isn't the totality of who I am.

19        And I think that taking steps in a positive

20   direction, one of them is this, and sort of acknowledging and

21   saying, you know, yeah, I screwed up.  I can't--there's no

22   way I can really, you know, call it anything other than that.

23   There's no question about the failure, no question about the

24   situation with the e-mail.  At that time, those things were

25   going on and, you know, trying to, obviously, straighten--

1    straighten those things as we go along.  I think I can serve,

2    and I think I'm able to contribute to this body and

3    contribute to efforts to try to make this State, you know,

4    great.  And so I would just ask inside of that--I think

5    myself, looking at it, it was just a very unique situation.

6    I don't explain the circumstances because I'm trying to

7    deflect; I'm just trying to give you sort of the totality of

8    everything that was happening in those moments.  I know you

9    folks are going to be the ones wrestling with the

10   qualifications.  And I understand that.

11          I put forward the censure resolution.  And I

12   understand that you folks are, you know, wrestling with

13   whether it's expulsion or censorship.  I, you know, I fully

14   appreciate that.  So my effort was to try and just explain

15   the uniqueness of all of that and explain, really, what was

16   going on in those moments with me.

17          CHAIRMAN MCBROOM:  Thank you.

18          Seeing no further questions from the Committee--

19          VICE-CHAIR HEISE:  I do.

20          CHAIRMAN MCBROOM:  All right.  One more, Vice-Chair

21   Heise.

22          VICE-CHAIR HEISE:  All right.  Thank you.

23          I want to talk about the false flag e-mails again

24   or e-mail.  You called your e-mail a controlled burn, which

25   you described as a little bit of the truth mixed in with a

1   lot of lies.  So the false flag e-mail does have some truth

2   to it; yes or no?

3        REP. COURSER:  Well, I mean, I guess inside of

4   that, I'd have to go back and look at the e-mail myself to

5   figure out what part was truth.  I mean, she was kicked out

6   of caucus.  I wasn't in caucus.  I guess there's--there's a

7   little bit of truth.  I don't know past that what you'd call

8   truth.  I'd have to, you know, kind of think about it.  It

9   was a really difficult moment, as I've explained, you know.

10  So I don't know if there's anything that I can really add to

11  the--the idea of the false flag e-mail.

12       VICE-CHAIR HEISE:  And--and your e-mail also states

13  that Rep. Gamrat knew about it all along and has helped cover

14  your actions.  Is--is that a true statement?

15       REP. COURSER:  No.  I mean, the--inside of--I guess

16  I'm not sure what you're referring to.

17       VICE-CHAIR HEISE:  I'm talking about your e-mail.

18  Rep. Gamrat knew about it all along and has helped cover your

19  actions.

20       REP. COURSER:  Well, I think it's--it's all of

21  those bizarre things I said about myself before that is what

22  I was referring to, so.

23       VICE-CHAIR HEISE:  Okay.  And again, the--the--this

24  was--this was a moment in time, I think you described it this

25  morning, but you had nothing to do with the 2014 campaign

1    flyer that was very similar in its tone?

2              REP. COURSER:  Are you asking a question?

3              VICE-CHAIR HEISE:  Yeah.

4              REP. COURSER:  No, I did not.

5              VICE-CHAIR HEISE:  Okay.  And so any reference,

6    also, in the tape that we heard today that when you said to

7    your staff that two or three years ago, the last time we did

8    this, do you know what that means?

9              REP. COURSER:  The last time we did this in

10   campaigning.  I was involved, I think, in six campaigns in

11   seven years.  So I think we were referring to--and I don't

12   know how that fit into the rest of the context.  There's a

13   lot of brokenness inside of that as far as where I was at

14   personally.  I--I can't tell you specifically.  I heard it in

15   totality just this past week from four months ago.

16             VICE-CHAIR HEISE:  Also, in your--in your comments,

17   you have--you make the comment, quote, they want us dead.  I

18   heard that again this morning.  They want us dead.  Who--who

19   is the they in that comment?

20             REP. COURSER:  I'm not--I'm not really sure.

21             VICE-CHAIR HEISE:  Okay.  So do you think that

22   there are still people, either in this building or elsewhere

23   outside of this building, who--who want to do you harm?  Do

24   you feel like you're still being exploited in some way or

25   extorted in some way?

1       REP. COURSER:  The last text that I received was

2   August 7th.

3       VICE-CHAIR HEISE:  And you felt that that text had

4   an extortion element to it?

5       REP. COURSER:  Well, I mean, I--I released, you

6   know, those--the police--law enforcement is looking into it.

7   I--I don't think there's anybody in this building--I would go

8   back and tell you.  I don't think there's anybody here in

9   this Committee or in the leadership that is trying to--trying

10  to come after me in some way.

11      VICE-CHAIR HEISE:  What assurance do we have--and

12  this is my last question, Mr. Chair.

13      What assurances can I get from you that you're not

14  going to have another moment in the future?

15      REP. COURSER:  Well, I mean, inside of this--I

16  mean, obviously, there's no--the extortion plot, whatever it

17  is, is no longer happening.  It's been exposed.  Obviously,

18  the details of the relationship have been exposed and, you

19  know, all of that sort of thing.  So coming forward in

20  explaining it, you know, the best I can give is to come and

21  give the testimony that I have and try to correct the wrongs

22  that I've done and move forward from here.  I can't correct

23  the past.  The past is the past.  I just need to--need to

24  explain it and move forward from there.

25      CHAIRMAN MCBROOM:  Thank you, Mr. Chairman--Mr.

1    Vice-Chair, pardon me.

2              One quick one?  All right.  I'm trying to get us

3    all--

4              REP. LIBERATI:  Thank you, Mr. Chairman.

5              CHAIRMAN MCBROOM:  --home for the evening.

6              REP. LIBERATI:  In that first tape, the audio

7    recording, you tell Ben--or you state, I thought--or yeah, I

8    thought I was going down before.  I'm wondering if you can

9    explain that or if you remember that.  You were talking about

10   this e-mail.  You've been thinking about it.  Well, I've

11   thought about it.  I thought it was going down before, like

12   years ago is the way it made it sound to me.  I'm--just, if

13   you remember that comment, if you have any--any thoughts on

14   it.

15             REP. COURSER:  Again, it's tough to--it's tough to

16   go back.  Like I said, I don't recognize myself in those

17   moments.  I would say inside of that, is that, you know, when

18   you lose the number of elections that I have--I think only

19   Lincoln has lost more than I've lost, you know.  And I'm

20   joking there, but I think it's pretty close.  I don't--I

21   don't really remember the context of--of what that was about.

22   There was a lot of choppiness to the conversation as far as

23   my responses to it.  So I can't--I can't give you--I can't

24   give you where there was at.

25             REP. LIBERATI:  Thank you.

1              Thank you, Mr. Chair.

2              CHAIRMAN MCBROOM:   Thank you very much,

3     Representative.

4              And one more did come in, but this will be our last

5     one.

6              Rep. VerHeulen.

7              REP. VERHEULEN:   Thank you, Mr. Chairman.

8              Thank you again for being here.   This is--this is

9     an easy one.   I just wanna make sure that you feel that this

10    process has been fair, that you've had an opportunity to

11    speak to the Committee, address the facts.   And I've--I've

12    gone through it, as we all have.   And I'm sure you have as

13    well.   But I just wanted to ask you to comment on that.

14             REP. COURSER:   Yeah.   Can I ramble a little bit

15    here?   No.   My attorney said, no, absolutely not.

16             REP. VERHEULEN:   No, you may not.

17             REP. COURSER:   I think it's--

18             REP. VERHEULEN:   Follow the instructions of your

19    counsel.   Don't ramble.

20             REP. COURSER:   Thank you.   I would just say inside

21    of that, I have tremendous respect for you folks for doing

22    this.   And I'm really sorry to put all of you in this

23    situation, first and foremost.   I'm sorry for the disrepute

24    that I've brought to, you know, the House.   And you know,

25    commenting, you know, on where, you know--I don't even know

1    how to answer for you, Rob, other than just to say I'm very

2    thankful for the opportunity to be in the State House.   I'm

3    very thankful for what that's meant.   I would say I think I

4    came in.

5                And I was joking just a few minutes ago and said,

6    if there's one thing I would go back and do and change, it

7    would probably be to go--to go less heavy.   I think I--I

8    think if I've learned something inside of that.   It's to say,

9    hell, not everybody is against you.   And so I--I--I'll do

10   less e-mails and less Facebook posts, certainly, coming out

11   of this whole situation.

12               But in any event, I--I would just say I think it

13   has been an absolute fair process.   And I'm very thankful for

14   you guys and the effort you've put in over your summer.   I

15   know [inaudible] has put in a whole bunch of work and, you

16   know, walked through all of that.   And I know Brock has as

17   well.   So I'm--I would say it's been an absolutely fair

18   process.

19               One other note I would say--and I will have to tell

20   him personally, is to Kevin Cotter, to the Speaker.   And I

21   think it's absolutely essential to--I know there were

22   meetings that happened.   I don't know the content of those.

23   I don't know what you would do in that situation with all of

24   those situations going on.   But I don't think in any way he

25   knew about the texter or he knew about the tapes or any of

1  that sort of thing.  I think that they were trying to figure
2  out what to do with all of that.  I genuinely think that.
3  And so I know that some people are--inside of that, you're
4  looking at how does that--that go forward?  I understand
5  that.  But if I insinuated in any way that the leadership was
6  involved in those parts in the background, I'm--I didn't mean
7  to do that.
8          CHAIRMAN MCBROOM:  Thank you, Representative.
9  Thank you for taking the time to come before the Committee
10 today.  And--and thank you for waiting through the long
11 recess as well.
12         REP. COURSER:  Thank you very much.  I appreciate
13 it.  Thank you.
14         CHAIRMAN MCBROOM:  All right.  Members, seeing no
15 further business before the Committee, I'd just remind you
16 that tomorrow morning we will reconvene at 9:30.
17         Vice-Chair Heise moves that we adjourn.  Hearing no
18 objection, we're adjourned.
19         (At 4:39 p.m., Proceedings Adjourned)
20
21                    —        —        —
22
23
24
25

STATE OF MICHIGAN      )
                       ) ss
COUNTY OF INGHAM       )


I HEREBY CERTIFY that this transcript, consisting of 81 pages, is a complete, true and correct transcript of the testimony of Rep. Todd Anthony Courser at the Michigan House Special Committee Meeting recorded on Wednesday, September 9, 2015 in Lansing, Michigan.


DATED:  March 10, 2016              _JoEllen Byrne_
                                   JoEllen Byrne, CER 7242
                                   LEGALLY CORRECT TRANSCRIPTION, INC.
                                   P.O. Box 181, FIRM I.D. #8481
                                   East Lansing, Michigan  48826