## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TODD COURSER

      Plaintiff

Case No. 1:18-cv-00874

v.

KEITH ALLARD, BENJAMIN GRAHAM, and JOSHUA CLINE.

HON. GORDON J. QUIST

      Defendants.

## <u>CLAIM OF CIVIL RIGHTS VIOLATION</u>

## <u>JURY TRIAL DEMANDED</u>

---

### <u>PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND</u>

**THERE ARE FIVE (5) OTHER PENDING AND UNRESOLVED CIVIL ACTIONS ARISING OUT OF THE TRANSACTIONS OR OCCURRENCE ALLEGED IN THIS COMPLAINT:**

1. *Cindy Gamrat v Joshua Cline, Joseph Gamrat, and David Horr*, United States District Court for the Western District of Michigan, Southern Division, Case No. 1:16-cv-1094

2. *Todd Courser v Michigan House of Representatives, Kevin G. Cotter, Tim L. Bowlin, Brock Swartzle, Norm Saari, Edward McBroom, and Hassan Beydoun*, United States District Court for the Western District of Michigan, Southern Division, Case No. 1:18-cv-00882

3. *Todd Courser v Chad Livengood and The Detroit News, Inc.*, Washtenaw County Circuit Court, Case No. 18-831-CZ

4. *Todd Courser v Radisson Hotels Internation, Inc., Radisson Group, Inc., Carlson Rezidor Hotel Group, Block 100 Limited Partnership, Winegardner & Hammons, Inc., Winegardner & Hammons Hotel Group, LLC, and Vincent Krell*, Western District of Michigan, Southern Division, Case No. 1:18-cv-00882

5.      *Todd Courser v Joseph Gamrat and David Horr*, Kalamazoo County Circuit Court, Case No. _2018-0469-CZ

### PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, TODD COURSER ("COURSER"), by and through his attorneys, DePERNO LAW OFFICE, PLLC and for his Complaint against KEITH ALLARD; BENJAMIN GRAHAM; and JOSHUA CLINE, states the following:

### NATURE OF ACTION

1.      This is an action pursuant to 42 U.S.C. §§ 1983 and 1985, 18 U.S.C. § 2511, and the due process clause of the Fourteenth Amendment to the United States Constitution and similar provisions of the Constitution of Michigan of 1963, including Fair and Just treatment, seeking to redress the wrongful actions and the immediate consequences of the Defendants and other related torts under applicable state law.

2.      This action also arises out of COURSER's claims to enforce their rights arising out of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*, as amended.

### JURISDICTION and VENUE

3.      This Court also has original jurisdiction pursuant to 28 U.S.C. Section § 1331 (as this action involves a federal question and the laws of the United States) and 28 U.S.C. Section § 1343 (as this action involves the right to recover damages for injury and the deprivation of rights and privileges.)

4.      Jurisdiction is also conferred upon this Court by 28 U.S.C. § 1343(a)(3) and (4), 28 U.S.C. § 2201 & 2202, and 42 U.S.C. § 1983, 1985, and 1988, this being an action for declaratory judgment and equitable relief authorized by law to redress deprivations and

2

violations under color of law of rights, privileges, and immunities secured by the United States Constitution and Michigan Constitution of 1963, as amended.

5.      Defendants' actions, as state actors, violated COURSER's due process rights under the 14th Amendment, equal protection rights under the 14th Amendment, and 4th Amendment rights.

6.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over COURSER's state-law claims that are related to, and form part of, the same case or controversy. It is appropriate that this Court exercise supplemental jurisdiction over the state law claims because they involve the same parties and operative facts as the federal claims. Therefore, the Court's exercise of supplemental jurisdiction will further economy, convenience, and fairness to the parties.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

8.      COURSER requests trial by jury, pursuant to Fed. R. Civ. P. 38.

**PARTIES**

9.      Plaintiff TODD COURSER ("COURSER") is an individual residing in Lapeer County, Michigan. COURSER was the duly elected State Representative for the 82nd District and, as such, a member of the Michigan House of Representatives ("the House"), until he was unlawfully forced to resign his position on September 11, 2015.

10.     Upon information and belief, Defendant KEITH ALLARD ("ALLARD") is a resident of Kent County, Michigan. ALLARD was COURSER's chief of staff until the Michigan House of Representatives terminated his employment on July 6, 2015 for poor performance and workplace issues. As an employee of The House, ALLARD acted to some extent as an agent of The House and under color of law.

3

11.     Upon information and belief, Defendant BENJAMIN GRAHAM ("GRAHAM") is a resident of Genesee County, Michigan. GRAHAM was a staff member for the 82nd District until the House terminated his employment on July 6, 2015 for poor performance and workplace issues. As an employee of The House, GRAHAM acted to some extent as an agent of The House and under color of law.

12.     Upon information and belief, Defendant JOSHUA CLINE ("CLINE") is a resident of Lapeer County, Michigan. CLINE was a staff member for the 82nd District until he resigned his position on or about April 14, 2015. As an employee of The House, CLINE acted to some extent as an agent of The House and under color of law.

13.     ALLARD, GRAHAM, and CLINE may be collectively referred to as "Defendants".

14.     The transactions that give rise to this cause of action occurred in the State of Michigan.

15.     Jurisdiction and venue are appropriate for this court. MCR 600.1621(a).

16.     The amount in controversy exceeds $25,000.

## BACKGROUND

16.     Defendants were State employees, employed by the House and assigned to serve as staff members of COURSER.

17.     Defendants illegally used their status and access as State employees to commit crimes against COURSER. Defendants took these actions in order to benefit themselves personally and in order to benefit the House and its agents politically. The actions by Defendants damaged Plaintiff.

4

18.     In violation of 42 U.S.C. 1983 and 42 U.S.C. 1985 Defendants used their official government positions as State employees assigned to COURSER's office to commit crimes against COURSER and others under color of law included but not limited to:

a.     Title VII. Violation of civil rights against COURSER in violation of Title VII of the federal Civil Rights Act of 1964 and under the Michigan Civil Rights Act.

b.     18 U.S.C. § 1030. Computer Fraud and Abuse Act.

c.     18 U.S.C. §§ 2511. Defendants used listening devices to listen to and record conversations and events of COURSER's that Defendants were not parties to. This violates 18 U.S.C. §§ 2511 which permits damages (including punitive damages and attorney's fees) against any person who intercepts or discloses wire, oral or electronic communications.

d.     18 U.S.C. § 2520. Recovery of civil damages authorized.

e.     MCL 750.539b. Trespassing for purpose of eavesdropping or surveillance. "A person who trespasses on property owned or under the control of any other person, to subject that person to eavesdropping or surveillance is guilty of a misdemeanor."

    i)     On 5-19-15 when GRAHAM entered COURSER's personal office to audio record COURSER. He violated MCL 750.539b.

    ii)    On 6-23-15 ALLARD's transmission of sexual activities of COURSER to GRAHAM and others shows a clear violation of MCL 750.539b.

f.     MCL 750.539c. Eavesdropping upon private conversations. "Any person who is present or who is not present during a private conversation and who willfully uses any device to eavesdrop upon the conversation without the consent of all the parties thereto, or who knowingly aids, employs or procures another person to do the same in violation of this section is guilty of a felony punishable by imprisonment in a state prison for not more than 2 years or by fine of not more than $2,000, or both."

    The Defendants violated this statute when they recorded conversations of COURSER.

g.     MCL 750.539d. Installation, placement, or use of a device for observing, recording, transmitting, photographing or eavesdropping in private place. This section states in part that a person shall not:

5

<u>"(a)</u> Install, place or use in any private place, without the consent of the person or persons entitled to privacy in that place, any device for observing, recording, transmitting, photographing, or eavesdropping upon the sounds or events in that place.

<u>(b)</u> Distribute, disseminate, or transmit for access by any other person a recording, photograph, or visual image the person knows or has reason to know as obtained in violation of this section.

The Defendants violated this statute when they used listening and recording devices to record conversation of COURSER.

h.     <u>18 U.S.C. § 2511. MCL's 750.539b, 750.539c, 750.539d</u>

    i)     Among other instance, on 6-23-15, Defendants used a listening device to intercept audio of COURSER engaged in sex and transmitted this information to others.

       a)     ALLARD to GRAHAM: "they just banged." <u>Exhibit 1</u>, p. 181 See also <u>Ex 2</u>, p. 21.

       b)     ALLARD to GRAHAM "Needed to stop for some road head." Ex 1, p. 181. See also Ex. 2, p. 21.

    ii)     Defendants used their access granted to them by virtue of their status as State employees in COURSER's office to violate 18 U.S.C. § 2511 against COURSER and others. These actions were done under color of law.

i.     Defamation; Defamation by Omission; False Light

j.     Invasion of Privacy

    i)     Intrusion upon seclusion or solitude, or into his private affairs.

    ii)     Public disclosure of embarrassing private facts about the plaintiff.

    iii)     Publicity which places the plaintiff's in a false light in the public eye.

    iv)     Appropriation, for the defendants' advantage, of the plaintiff's name or likeness.

k.     Negligence and Negligent Infliction of Emotional Distress

l.     <u>MCL 750.479c</u>. Person informed of criminal investigation by peace officer; prohibited conduct; violation; penalty; exception; definitions. This statute states that a when a person is informed by a "peace officer"

6

that there is a criminal investigation, that person shall not "(a) . . . conceal . . . any material fact related to a criminal investigation, (b) make any statement . . . that the person knows is false or misleading . . . , (c) . . . provide any writing or document . . . that the person knows is false or misleading . . . ."

    i)      Defendants concealed evidence that was related to a criminal investigation,

    ii)     Defendants lied to the MSP, House, and the Attorney General investigators regarding the authenticity of evidence,

    iii)   Defendants made false statements and provided false information, including a modified and edited recording.

m.    <u>MCL 750.422</u>. Perjury committed in courts. This statute states in part that "[a] person who, being lawfully required to depose the truth in any proceeding in a court of justice, shall commit perjury shall be guilty of a felony . . . ."

    i)      Defendants lied during preliminary hearings in criminal matters brought against COURSER.

n.    <u>18 U.S.C. § 2261A; MCL 750.411h and 750.411i</u>. Stalking. Defendants violated these statutes when they followed COURSER and placed him under surveillance with the intent to injure, harass, and intimidate COURSER.

o.    <u>18 U.S.C. § 1875(d)</u>. Threats in Interstate Communications (Extortion). Defendants violated this statute when they transmitted communications to COURSER and his family with the intent to extort money or other things of value and when these communications contained a threat to injure COURSER's property, reputation, or reputation of another, or a threat to accuse COURSER of a crime.

p.    <u>47 U.S.C. § 223</u>. Obscene or harassing telephone calls in interstate communications. Defendants violated this statute when they made threatening and extortive text messages that were obscene with the intent to abuse, threaten, or harass COURSER.

q.    <u>MCL 750.213</u>. Malicious threats to extort. Defendants violated this statute when they sent text message, alone or in concert with others, and threatened injury to COURSER or his property, with the intent to compel COURSER to do or refrain from doing any act against his will.

r.    <u>18 U.S.C. § 96 RICO and MCL 750.159i. (Michigan RICO)</u>. Defendants violated this statute when they engaged in racketeering activities with a common criminal enterprise.

7

s.    MCL 750.157a. Defendants violated this statute when they conspired to commit an offense prohibited by law or to commit a legal act in an illegal manner.

t.    MCL 750.483a. Defendants violated this statute when they removed, altered, concealed, or destroyed, other otherwise tampered with evidence to be offered in a present or future official proceeding.

u.    MCL 752.795. Fraudulent access to computers. Defendants violated this statute when they accessed COURSER's emails, texts, voicemails, passwords, and electronic accounts.

v.    MCL 750.540. Illegal use of another person's electronic communications. Defendants violated this statute when they made unauthorized connections to COURSER's emails, texts, voicemails, passwords, and electronic accounts. Defendants also violated this statute when they read and copied COURSER's emails and text messages without authorization. Defendants also violated this statute when they made unauthorized connections to COURSER's computers, email, text messages, or voice messages.

w.    MCL 750.505c Misconduct in office

19.    Defendant CLINE has now given sworn testimony that the recording being used in this case is not an original copy or original version. CLINE now corroborates much of this complaint. Exhibit 3.

Q:    And so when you said which version of it, the recording, what were you talking about?

A:    Because I know that the original recording I heard that night, then there's the version where that portion is cut out, that 20 minutes, so what was played, I think, in the criminal case, that was the version, I think, that they played in the criminal case without the wife. I can't remember. It was either the House Business House, or the criminal case, which one they played that the excerpt was cut out.

*Transcript,* 150:14-32(11/07/2018). This verifies that the recording was edited. It wasn't the original. See also Ex 1, pp.146-153.

20.    CLINE has given sworn testimony that there were several versions of this recording and that the original was never released. Ex 1.

8

21.     CLINE has also sworn that a person named John Truscott ("Truscott") was coordinating the actions of The Detroit News in passing off the recording as authentic, *Transcript,* 210:9-16. Ex 1.

22.     CLINE's testimony is supported by the emails between ALLARD and Chad Livengood ("Livengood") (The Detroit News reporter) who published the edited recording and never disclosed to the public that it was edited. The recording was published to the world as one continuous recording was actually received by Livengood as 13 clips. Exhibit 4.

23.     Defendants' texts clearly show that the recording was not a true copy of one continuous recording. Exhibit 5

      a.     On 8-19-15 GRAHAM texted, "Nah its never been released in its entirety." Ex 5, p. 21.

      b.     This is stated dozens of times between Defendants and others – this is documented throughout this complaint.

24.     During a criminal proceeding against COURSER in April of 2018, Defendants were finally forced to turn over the native copy of the recording. Exhibit 6. However, they failed to turn over a native copy because it was intentionally deleted.

25.     Nevertheless, a copy of the recording has now been fully examined by audio expert, Edward Primeau ("Primeau"), who has stated in an affidavit that the recording is not authentic. Exhibit 7.

26.     Primeau then conducted an end-to-end review of the recording and has completed a report confirming the recording is not authentic. Exhibit 8.

      a.     This edited recording was not recorded on the night in question;

      b.     Primeau found pausing present in the recording;

      c.     Primeau found that the timestamps did not match the phone claimed to be the recording device.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

27.     In this case, Defendants acted to remove COURSER, a sitting legislator, from office. This was not done for any legislative purpose. Instead, it was done to remove an enemy from within the Republican causes. Defendants, as state actors under color of law, conducted illegal surveillance, wiretapping, and eavesdropping and illegally accessed COURSER's computers. Defendants recognized that in order to remove COURSER, they had to also seek criminal charges. To this end, Defendants engaged in illegal acts, which included editing, modifying, and fabricating certain audio recordings. This then formed the basis for the criminal charges. Then, Defendants engaged in a systematic process to destroy evidence. See *infra*.

28.     None of these actions were taken "within the legislative sphere". Instead, they were performed as part of a systematic process to violate COURER's constitutional rights. These actions all occurred before Defendants started any investigation into COURER's qualifications. Indeed, the entire process from January 2015 through August 2015 was simply intended to "dig up dirt" on COURSER in order to force him to comply with the Caucus Pledge. "Digging up dirt" on another legislator, when there is no reason to do so, cannot be said to be an investigative or legislative function.

29.     Further, Defendants are not entitled to qualified immunity in this case. All Defendants' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." See *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). Every reasonable official would have understood that what they were doing violated that right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

## COMMON ALLEGATIONS

*NOVEMBER 2015 ELECTION*

30.     In 2014, COURSER ran for the office of State Representative in the 82nd District.

31.     During the general election campaign for Michigan State Representative in the fall of 2014, ALLARD volunteered and served on COURSER's political campaign after losing his own campaign for State Representative.

32.     During the general election campaign for Michigan State Representative and beyond, GRAHAM and CLINE acted as paid political consultant and served on COURSER's political campaigns.

33.     In or around October 2014, CLINE recommended to Cindy Bauer f/k/a/ Cindy Gamrat ("Bauer") (State Representative in the 80th District) and COURSER to consider a "joint staffing arrangement," referencing other legislative offices using this arrangement, which would overlap duties of staff, decrease overhead costs, save taxpayer dollars, and allow the staff to be compensated at a higher rate.

34.     On October 15, 2014, ALLARD requested that he be permitted to serve as both the political campaign liaison for COURSER and Bauer and also as the "District Office Chief of Staff" for both COURSER and Bauer.

35.     On October 15, 2014, ALLARD sent an email to Bauer, COURSER, GRAHAM, and CLINE laying out what he felt would be the appropriate political and official duties and expectations of the staff under a joint staffing arrangement.

36.     Defendants assured COURSER and Bauer that they wanted to assist politically as well as work as staff for the House officially, and that they would not overlap political and official work during State time or on State property.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

37.     On November 4, 2014, Bauer won the general election for the State Representative seat for the 80th District with 63% of the vote.

38.     On November 4, 2014, COURSER also won the general election to serve as State Representative for the 82nd District with 55% of the vote.

39.     In December of 2014 Defendants GRAHAM and CLINE met secretly with A. Wayne Bennett ("Bennett"), personal friend of COURSER. GRAHAM and CLINE informed Bennett that he needed to get COURSER under control and that COURSER had better start doing what they told him to or his time in the House would come to a very quick end and that neither he, Bennett, or COURSER would like it.

40.     Defendants were officially employed by the House on or about January 2, 2015.

41.     On January 2, 2015, the House assigned ALLARD to Bauer's office, which was located on the 10th floor on the north side of the House Anderson Building.

42.     On January 2, 2015, the House assigned GRAHAM and CLINE to COURSER's office, which was located across the street from Bauer's office on the 11th floor on the south side of the House Anderson Building.

### SWEARING-IN AND CAUCUS PLEDGE

43.     On January 15, 2015 (COURSER's first day after being sworn office) Kevin Cotter (the then Speaker of the House) ("Cotter") directed COURSER and the other Republican State Representatives to sign a "Caucus Pledge" that required him to pledge his votes on important issues to caucus (i.e. Cotter) instead of voting based on the desires of the constituents in his district. Exhibit 9.

44.     Cotter required this Pledge to be signed or the Representatives would lose their committee assignments.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

45.     Cotter required this Pledge to be signed or the Representatives would not be allowed to attend caucus meetings; effectively making it a requirement to have to a voice in the legislative process.

46.     Cotter required the State Representatives to keep this Caucus Pledge and its contents confidential. If the agreement or its contents were revealed Cotter would then remove the legislator from the Republican Caucus.

47.     Cotter's actions eliminated any representative governance and were a violation of MCL 750.505c (misconduct in office).

48.     COURSER felt that Cotter's actions, along with the Pledge itself, were illegal misconduct in office and unethical, and he refused to sign the Pledge as written.

49.     COURSER felt that this pledge totally abused the citizen's voice to representative government and hiding the Pledge from the public was an illegal act by Cotter and abuse of the public trust.

50.     Shortly thereafter, Cotter and Brock Swartzle[1] ("Swartzle") demanded that COURSER sign the Pledge as a requirement of membership in his Republican Caucus.

  a.     These actions by Cotter and Swartzle were intended to steal the voting power of the people's choice for representative.

  b.     These actions by Cotter and Swartzle violated U.S.C. 1983 / 1985, 18 U.S.C. 1875, MCL 750.213, MCL 750.505c (misconduct in office), MCL 750.157a, 18 USC 96 / MCL 750.159i RICO.

  c.     This was done in their official positions under color of law

51.     Norm Saari ("Saari") would later state to MSP on page 25 of the transcript, "And just, you know, and Kevin Cotter, from day one, tried to put a lasso around Courser and Gamrata, and get them to be functional members of the caucus." Exhibit 10.

---

[1] The appointed Chief of Staff/General Counsel to Cotter.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

a.     These actions by Cotter were intended to steal the voting power of the people's choice for representative.

b.     These actions by Cotter violated U.S.C. 1983 / 1985, 18 U.S.C. 1875, MCL 750.213, MCL 750.505c (misconduct in office), MCL 750.157a, 18 USC 96 / MCL 750.159i RICO.

c.     This was done in their official positions under color of law

52.     Immediately, members of Cotter's team, including Norm Saari[2] ("Saari"), and Swartzle began meeting with Defendants in order to direct them to gather information against COURSER.

a.     This was an effort to stop COURSER from being an effective Representative for the 82nd District.

b.     These actions by Cotter violated U.S.C. 1983 / 1985, 18 U.S.C. 1875, MCL 750.213, MCL 750.505c (misconduct in office), MCL 750.157a, 18 USC 96 / MCL 750.159i RICO.

c.     This was done in their official positions under color of law

d.     Jessica Jeurink, coordinator for Defendants from the Speaker's Office in April of 2015, wrote CLINE, "Keep me posted on all fronts" Exhibit 11 and 12. Jeurink, Cotter's employee, asked CLINE to keep her and Saari informed.

a.     These actions by Cotter were intended to steal the voting power of the people's choice for representative.

b.     These actions by Cotter violated U.S.C. 1983 / 1985, 18 U.S.C. 1875, MCL 750.213, MCL 750.505c (misconduct in office), MCL 750.157a, 18 USC 96 / MCL 750.159i RICO.

c.     This was done in their official positions under color of law

53.     Surveillance began on COURSER and Bauer immediately by the House and by the Defendants who were employees of the House.

---

[2] The appointed Chief of Staff to Cotter.

14

54. Defendants began to issue reports to Saari and Swartzle about COURSER after the meeting in January 2015 between Cotter and COURSER.[3]

55. These reports were part of an ongoing effort to assemble allegations to be used to injure and erode COURSER's credibility and effectiveness as a State Representative, and to force his vote according to Cotter's wishes.

56. After these meetings, Defendant's texted: "we need to find a way to get COURSER impeached." <u>Exhibit 13</u>.

      a. Defendants set out with others to find a way to get COURSER impeached. This included wiretapping, illegal access and dissemination of private emails, texts, voicemails, illegal surveillance, criminal conspiracy and extortion.

      b. Defendants violated MCL's 750.505c, 750.540, 752.795, 750.157a, 750.159i, 750.213, 750.539j, 18 U.S.C. 1510, 18 U.S.C. 96, 18 U.S.C. 1875, 47 U.S.C. 223, and U.S.C. 875.

      c. These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

      d. These actions by Defendants could not have been done but for their access thru their state employment.

      e. This was the use of the official position under color of law to commit criminal conspiracy

57. The Michgian Constitution requires felony crime; which in 2 of the prior expulsions the criminal cases had concluded, Dawkins and Geralds. In the Jaye expulsion Jaye had criminal allegations made against him but was never tried before or after his expulsion.

58. Defendants used their access as state employees under color of law, without Courser's permission, to create recordings of Courser; then edit those recordings. The May 19th

---

[3] The HBO Report is over 800 pages long, and due to its length it is not attached as an exhibit to this Complaint. However, a copy of the HBO Report can be found online at https://www.scribd.com/document/279727022/Michigan-House-report-on-investigation-into-Reps-Todd-COURSER-and-Cindy-Gamrat.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

2015 recording was then used by the Michigan House of Representatives to remove Courser from office. To do this the House Leadership had to create the impression that a crime had been committed. At the expulsion vote the House used the fabricated recording to call for the Attorney General to investigate Courser; the recording was never authenticated. Nearly 3 years later Courser was granted access to the native copy of the recording by court order. The native copy was held by Allard and Graham's attorney and was immediately examined and found to be a fabrication. This recording was used as the bais of the House removal and the criminal charges against Courser.

***EXTREME PROBLEMS WITH DEFENDANTS' WORK PERFORMANCE***

59.     After being hired Defendants refused to follow directions. On some days, they refused to work or come to work.

60.     In fact and in hindsight, on some days Defendants were too busy to work because they were engaged in illegal activity as mentioned above and below; which includes (but is not limited to the following:

   a.    Illegally recording COURSER, following COURSER and taking pictures, editing recordings of COURSER, illegally accessing COURSER's private emails and texts with his family and distributing them, illegally accessing his voicemails and distributing them, planting listening devices, listening to him having sex and sharing the details with each other and others.

   b.    Drawing pornographic cartoons that were left for female staff members.

   c.    Assisting in a criminal conspiracy to remove COURSER from office without due process..

   d.    These events and actions occurred on State time while Defendants were State employees for the House.

   e.    6-23-15 ALLARD texted to GRAHAM, "they just banged." Given he wasn't in the hotel room when this happened we probably can assume it was by wiretapping of COURSER. See Ex. 1, p. 181.

16

f.  In 6-23-15 text ALLARD to GRAHAM (State Employees) and CLINE, ALLARD: "*Why the fuck did I do this?*" GRAHAM: "*Who the hell knows. Needed to stop for some road head.*" Defendants listening to sexual intercourse of COURSER thru wiretapping / listening device. See Ex 2, p. 21.

g.  6-25-15 ALLARD texted to GRAHAM and CLINE, "Poundtown!!!" Given ALLARD wasn't in the room when this happened we can probably assume it was by wiretapping of COURSER. See Ex. 2, p. 25

h..  On 7-3-15, during the day as State employees, ALLARD with GRAHAM, ALLARD -"*they're freaking out man. I guess they brainstormed about being at the HOB at 9am Monday and stopping us from going in.*" GRAHAM: "*How do you know that?*" ALLARD: "*Bug.*" This is a clear acknowledgement by Defendants they are actively engaged in wiretapping / illegal listening devices. Ex. 1, p. 163.

i.  7-3-15 GRAHAM texted to ALLARD, "we need to hear that recording so we can prepare." GRAHAM is referring to a recording made by Joseph Gamrat of COURSER and Bauer who were in a private conversation where no one else was present and ALLARD, GRAHAM, and Joseph Gamrat confirm in their texts that they heard the conversation. Given none of these 3 men were present in this private conversation in COURSER's truck they heard this by wiretapping of COURSER's conversations. See Ex 1, p. 162.

j.  These actions, including the use of a listening device, violated 18 U.S.C. § 2511, MCL 750.539b, MCL 750.539c, MCL 750.539d, MCL 750.539j, MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, Invasion upon Seclusion / Invasion of Privacy.

k.  These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process and to bring criminal charges against him without due process

l.  The information obtained was then used in an extortion plot to remove COURSER from office. Exhibit 14.

m.  These actions by Defendants could not have been done but for their access thru their state employment.

61.  In January 2015 COURSER and Bauer agreed to try the joint staffing arrangement suggested and advocated by CLINE, but at no time did COURSER and Bauer ever share an office. Defendants (as well as other staff) took turns working out of both Bauer's and COURSER's separate offices.

17

62.     Immediately both COURSER and Bauer realized that the Defendants could not handle two offices. There are dozens of examples of this including testimony from other staffers who witnessed Defendants actions. Exhibit 15, p. 204. See also Exhibit 16. See also Ex. 1, p. 10.

    a.     1-17-15: CLINE is already refusing to go to work on his 2nd week of work in Lansing.

    b.     2-20-15: GRAHAM has waited a week and ALLARD has still not proofed a letter for taxpayers.

    c.     3-4-15: Repeated refusals to answer the phones or to return calls of taxpayers of Michigan. (Literally hundreds of taxpayers didn't get their calls returned from Defendants).

    d.     3-31-15: refusal to do follow up of taxpayer concerns or document contacts.

63.     As a result, both COURSER and Bauer moved to hire added staff. See Ex 15, p. 122.

64.     As a result, both COURSER and Bauer began to express concern that the current situation of a joint office would not work.

65.     Defendants resisted separating the offices. See Ex 15, pp. 32-33. See Exhibit 17.

66.     Defendants, ALLARD and GRAHAM, during staff meetings drew pornographic pictures and left them around the office for others to find including female staffers. Defendants also texted this drawing to others.[4] Exhibit 18. Defendants did this under color of law as State employees.

67.     Defendant GRAHAM's pornography problems spilled into the work place. Exhibit 19.

---

[4] Under Title VII of the federal Civil Rights Act of 1964 and under the Michigan Civil Rights Act, sexual harassment falls under the umbrella of illegal sex discrimination. According to the Michigan statute, sexual harassment of a job applicant or employee happens with "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature." Or the creation of a "hostile work environment."

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

68.     Defendant CLINE's sexual addiction also spilled into the workplace. Exhibit 20.

69.     Defendants ALLARD and GRAHAM, then took pictures of their artwork and forwarded it by text to others. See Ex 15, p. 3

70.     COURSER reported these issues to the House Business Office, but he was ignored. It now appears that the complaints were ignored because Defendants were being used to spy on COURSER and gather information about him that could be used to either remove COURSER from office or force his vote.

71.     Chad Livengood (Livengood) when writing his stories about COURSER left this fact and many others out about Defendants. Exhibit 21.

72.     Defendants, ALLARD and GRAHAM, actually intimidated other staff members and by informing them they knew that the offices were bugged. Exhibit 22. For instance, Defendants attempted to scare Anne Hill by telling her in no uncertain terms that the offices she worked in was bugged. Defendants said they knew it "for fact." Defendants did this under color of law. As State employees, they violated Title VII of the federal Civil Rights Act of 1964 and the Michigan Civil Rights Act.

73.     On 7-3-15, during the day as State employees, in a text message from ALLARD to GRAHAM: "*they're freaking out man. I guess they brainstormed about being at the HOB at 9am Monday and stopping us from going in.*" GRAHAM: "*How do you know that?*" ALLARD: "*Bug.*" See Ex 1, p. 163.

     a.     Defendants, among other crimes, used a listening device in violation of 18 U.S.C. § 2511, MCL 750.539b, MCL 750.539c, MCL 750.539d, MCL 750.539j, MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, Invasion upon Seclusion / Invasion of Privacy.

     b.     These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

     c.     Defendants did this under color of law as State employees.

19

74.     Having experienced abuse and threats in her marriage, Bauer feared for her personal safety and security. Bauer directed the staff to forward all communications they received from family members directly to her. This direction was motivated by Bauer's concern for her own personal protection and also to separate her personal life from her official work. Defendants refused to follow these instructions but instead provided others (including Joe Gamrat) with access to passwords for accounts of Bauer. Defendants did this under color of law and violated MCL 750.41h criminal stalking and violated Title VII of the Fed Civ Rights Act of 1964 and Michigan statute on sexual harassment when they assisted Bauer's estranged husband's actions. This allowed Defendants to conduct illegal surveillance of COURSER in their efforts to remove him from office and have him prosecuted for criminal acts.

75.     Defendants also provided unauthorized users with access to passwords for electronic accounts of COURSER. For example:

a.     On 1-10-15 Defendants provided unauthorized with access to passwords for electronic accounts of COURSER. Exhibit 23.

b.     On 1-20-15 Defendants provided unauthorized users with access to passwords for electronic accounts of COURSER. Exhibit 24.

c.     On 3-25-15 Defendants provided unauthorized users with access to passwords for electronic accounts of COURSER. See Ex 15, p. 118.

d.     On 6-20-15 Defendants provided unauthorized users with access to passwords for electronic accounts of COURSER. Exhibit 25.

e.     On 7-3-15 (upon being fired) GRAHAM acknowledges to ALLARD that he still had illegal access to all of COURSER's electronic accounts. See Ex 2, p. 42.

f.     On 7-29-15 nearly a month after being fired GRAHAM emailed to ALLARD COURSER's House of Representatives email account log in information. Exhibit 26.

g.     On 8-31-15 nearly 2 months after being fired from the House of Representatives Defendants attempted to use COURSER's log in and password to access COURSER's private accounts. See Ex 5, p. 96.

20

h.　　On 7-20-15 GRAHAM acknowledges to ALLARD that he is still logged into COURSER's electronic account. See Ex 2, p. 92.

i.　　Defendants did this under color of law as State employees.

j.　　This was used in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

76.　　Defendants also acted in concert with Joseph Gamrat and others in their efforts to "get COURSER impeached." This access was gained thru Defendants roles as State employees under color of law. These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

a.　　For instance, Defendants provided information to Joseph Gamrat from their "listening devices" and he provided the same in return. See Exhibits 12, 13, 14, 25, and 102 which detail Defendants' accessing and listening to COURSER and also events where Joseph Gamrat provided information from certain listening devices.

b.　　Michigan State Police confirm Defendants had 255 communications with Bauer's estranged husband, Joseph Gamrat, after she had instructed Defendants to not communicate with Joseph Gamrat while extortion plot against COURSER and Bauer was happening. Exhibit 27, pg 19.

c.　　Defendants, among other crimes, used a listening devices and traded this information for each other's benefit in violation of 18 U.S.C. § 2511, MCL 750.539b, MCL 750.539c, MCL 750.539d, MCL 750.539j, MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, Invasion upon Seclusion / Invasion of Privacy.

d.　　This information was then used in an extortion plot to remove COURSER from office without due process. See Ex 14.

77.　　CLINE intended to remove COURSER from office and run to fill the empty representative seat. See Ex 15, p. 120.

78.　　CLINE and GRAHAM were business partners in a political consulting business called Bellwether Strategies.

79.　　On April 14, 2015, CLINE quit his position with the House legislative office without warning.

21

80.     Defendant GRAHAM and ALLARD continued to grant CLINE password access to COURSER's email accounts. This was done even though CLINE was no longer a House employee. This illegal access was granted during at least the following dates:

   a      On 4-20-15. Ex 15, p. 77.

   b.     On 4-22-15. Ex 15, p. 76.

   c.     When Defendants gave unauthorized access to COURSER's passwords after CLINE was no longer a State employee; they violated numerous laws including MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875.

   d.     This was used in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

   e.     This access was gained thru Defendants roles as State employees under color of law.

81.     All Defendants, at a time when they were no longer State employees, illegally accessed state computers assigned to state offices, voicemail, and other computer devices.

   a.     Defendant CLINE continued to access computers when he was no longer a State employee. Exhibit 28. CLINE confirmed this in his deposition. Ex 3.

   b.     On 8-9-15, Defendants ALLARD and GRAHAM, after no longer being employed by the House of Representatives, were still secretly accessing voicemails of COURSER and shared these voicemails with others. Ex 5, 277.

   c.     On 8-24-15, Defendants ALLARD and GRAHAM, after no longer being employed by the House of Representatives, were still secretly accessing voicemails of COURSER and shared these voicemails with others. Ex 5, 279.

   d.     On 4-12-15 Defendants illegally accessed the private emails of COURSER and distributed those emails to others. Defendants entered COURSER's private email account and then harvested an email between himself and his mother concerning his martial struggles and problems with his brother. Exhibit 29.

   e.     On 4-13-15 Defendants illegally accessed the private emails of COURSER and distributed those emails to others. Defendants enter

22

COURSER's private email account and then harvest an email between himself and his brother. Exhibit 30.

f.     On 4-13-15 Defendants illegally accessed the private emails of COURSER and distributed those emails to others. Defendants enter COURSER's private email account and then harvest an email between himself and his sister in law. Exhibit 31.

g.     In preliminary hearing in Lapeer on GRAHAM acknowledged accessing COURSER's private emails and reading his emails and forwarding these emails out to others. Exhibit 32, pg 90-95.

h.     When other Defendants gave CLINE this unauthorized access and when CLINE accessed these computers and accounts, this violated numerous laws including 18 U.S.C. § 1030, MCL 752.795, MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

i.     When Defendants accessed these accounts at a time when they were no longer employees, this violated numerous laws including MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

j.     These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process

k.     This access was gained thru Defendants roles as State employees under color of law.

### *HISTORY OF MAY 19, 2015 FABRICATED RECORDING*

82.     On May 19, 2015, Defendant ALLARD, Chief of Staff to COURSER, advised Defendant GRAHAM to record COURSER without COURSER's knowledge or consent. Exhibit 33. This illegal wiretapping has been confirmed at multiple times:

a.     In 11-2-15 MSP interview with ALLARD, ALLARD says, "So I advised Ben I said, if you go, record it, record the conversation. And that happened." This clearly shows GRAHAM and ALLARD acting in concert on illegal wiretapping of COURSER.

b.     ALLARD later stated in court that he did not advise GRAHAM to record COURSER. This was perjury of ALLARD. See MCL 750.422.

23

c.     GRAHAM later confirmed that ALLARD and CLINE and himself made the decision in concert.

d.     Michigan State Police investigation found, "Josh and Keith both suggested that Benjamin record the conversation." Exhibit 34.

e.     In 11-1-15 interview by Detective Johnson, GRAHAM states "we all talked about it before I went to the initial meeting." Exhibit 35.

f.     In 11-1-15 interview by Detective Johnson, GRAHAM states "Keith, you should record this conversation because I'm tired of doing it and you should." Exhibit 36. This clearly shows GRAHAM and ALLARD acting in concert on illegal wiretapping of COURSER.

g.     Defendants ALLARD and CLINE both lied to the police regarding their involvement in the May 19th 2015 recording. MCL 750.422.

h.     ALLARD and GRAHAM conducted these actions while State employees under color of law.

i.     The actions of Defendants regarding the recording of COURSER on May 19th were in concert.

j.     When Defendants conducted this wiretapping operation of COURSER it violated numerous laws including 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d, MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

k.     These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process

l.     This access was gained thru Defendants roles as State employees under color of law.

83.     Graham lied to police when he stated, "I had done all the recordings." Exhibit 37 shows Allard clearly did at least one of the recordings.

84.     Graham also confirms to police that he and Allard acted in concert in the wiretapping of COURSER when he stated, "So I actually told him, Keith, Keith, you should record this conversation because I'm tired of doing it and you should." See Ex 37.

85.     Graham perjured himself when he stated, "Yes. I didn't have any independent knowledge of Todd –the office being bugged." See Ex 32, pp. 59:12-60:1 This clearly shows he

24

did indeed know of wiretapping operations being conducted against COURSER. Defendants were operating their own "bug" on COURSER as clearly noted in their texts which shows Defendants were repeatedly listening and recounting COURSER in instances of sexual intercourse. This violated MCL 750.422.

86.     Graham perjured himself when he stated he was "feeding him information," he stated "no." And in follow up to "that Mr. Courser wanted to hear?" he stated "no." Graham perjured himself. Exhibit 38. This violated MCL 750.422.

87.     Graham perjured himself in the Lapeer Preliminary Hearing when he was asked, "How did you make those recordings?" he answered "with my cell phone." This was a lie. Exhibits 39. See also Ex 5 and 6. This violated MCL 750.422.

88.     Graham perjured himself in the Lapeer Preliminary Hearing when he gave his account of recording COURSER on May 19, 2015, Graham stated he didn't pause the recorder during the time with COURSER. This was perjury by Graham. See Ex 32, p. 19:1-16. See also Exs 7 and 8. This violated MCL 750.422.

89.     Graham perjured himself in the Lapeer Preliminary Hearing when he stated he was not a part of his political consulting business while he worked in the state house. This was perjured by Graham. See Ex 32, p. 64:15-65:2. See also Exhibit 40. This violated MCL 750.422.

90.     Joseph Gamrat stated in deposition that Allard and Graham discussed with him placing recording devices. Allard and Graham did in fact place recording / listening devices to wiretap COURSER. This shows the concert of action between Allard and Graham. Exhibit 41. See also See Ex 1, p. 162-163. This violated MCL 750.422.

25

91.     Allard clearly states to Michigan State Police that he was receiving wiretapped intel from Joseph Gamrat, stating "He said, well before that, this is what they were doing in the shower. This is what they were doing in the bedroom. Exhibit 42. This violated MCL 750.422.

92.     Allard confirms he received the private emails of COURSER harvested from at least 7 years prior. And private emails between COURSER and his brother. Exhibit 43. See also Ex 5, p. 160. This violated MCL 750.422.

93.     Allard confirms he and Graham were recording together and were fired because they were recording the House leadership. Exhibit 44.

94.     During his deposition (Ex 3), CLINE lies regarding his lack of knowledge about the wiretapping and stated he didn't know about the recording of COURSER until after it happened. Exhibit 45. However, Exhibit 34 confirms CLINE is not being truthful in stating he did not know of the recording. See GRAHAM's statements in Exhibits 34 and 35.

95.     Prior to May 19, 2015, unbeknownst to COURSER, Defendants illegally accessed COURSER's private emails, voice recordings, and also recorded conversations:

    a.     Defendants illegally accessed COURSER's private emails about his marital problems and discussions with his mother and brother. Defendant later acknowledged this in court. See Ex 32, pg 90-95. See also Ex. 29, 30, 31.

    b.     5-19-15: Defendants illegally accessed COURSER's private email archives from 7 years prior in order to find material to leverage COURSER in their conspiracy to extort COURSER. This information was then used in the extortion texts in their attempt to force COURSER to resign from office. See Ex 32, pg 90-95. See also Ex 1, p. 7

    c.     Defendants also illegally gained access to COURSER's private voicemails. Even after no longer being employed by the House, Defendants were still illegally accessing, reading, and recording COURSER's voicemails. See Ex 5, p. 277 and 279.

    d.     In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i,

26

MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

e.  These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

f.  This access was gained thru Defendants roles as State employees under color of law.

96.  On May 19, 2015, Defendant GRAHAM in his meeting with COURSER allegedly recorded a conversation with COURSER. See Ex 32. During this meeting, Defendant GRAHAM recorded a conversation between COURSER and another that he was not a party to. See Ex 5, p. 209

a.  In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

b.  These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

c.  This access was gained thru Defendants roles as State employees under color of law.

97.  Late in the evening of May 19, 2015 or early morning of May 20, 2015, Defendant GRAHAM went to Defendant CLINE's home and played the recording to CLINE, CLINE's wife, and Defendant ALLARD. See Ex 45.

a.  In so doing Defendants violated 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

b.  These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

c.  This access was gained thru Defendants roles as State employees under color of law.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

98.     Following the meeting on May 19, 2015, Defendant GRAHAM forwarded this illegally obtained recording to others:

    a.     5-20-15. GRAHAM forwarded this illegally obtained recording to ALLARD. See Ex 1, p. 214.

    b.     After June 11, 2015, GRAHAM forwarded this illegally obtained recording to others including Defendants ALLARD and CLINE. See Ex 15, p. 27.

    c.     After August 20, 2015, GRAHAM forwarded this illegally obtained recording to others including Defendants ALLARD and CLINE. See text 8-20-15, audio sent to Bowlin in August to his gmail account. See Ex 1, pp. 4-5.

    d.     In so doing Defendants violated 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

    e.     These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

    f.     This access was gained thru Defendants roles as State employees under color of law.

### On the Date of Firing ALLARD and GRAHAM were Tipped Off to this via Wiretapping and Attempted to Hide Evidence of Crimes Noted Through this Complaint by Bringing a Second Phone that would be Handed Over to Investigators.

99.     Defendants attempted to hide their wrong doing on the day they were fired. In fact, the only way Defendants knew of their impending firing was through illegal access to COURSER's data, voicemails, texts, and emails.

    a.     On 7-6-15 GRAHAM texted to ALLARD, "Bring your old iphone. They won't know to look for two phones on us". This shows clear efforts by Defendants to hide their criminal wrong doing at their point of firing. See Ex 1, p. 158.

    b.     On 7-3-15 GRAHAM texted to ALLARD, "Will he (Joseph Gamrat) let us hear that particular recording?" See Ex 2, p. 44 This shows clear coordination between ALLARD, GRAHAM, and Joseph Gamrat on wiretapping and surveillance.

28

    c.      Defendants gained this information from wiretapping and eavesdropping on COURSER.

    d.      In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

    e.      These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

    f.      This access was gained thru Defendants roles as State employees under color of law.

### DEFENDANTS ACTED IN A CRIMINAL CONSPIRACY WITH JOSEPH GAMRAT AND OTHERS AGAINST COURSER, USING INFORMATION GAINED THROUGH ILLEGAL ACCESS

100.    Defendants acted in a criminal conspiracy with Joseph Gamrat and others against COURSER, using information gained through illegal access. This is confirmed in the following allegations:

101.    2-18-15 text between Joseph Gamrat and Vincent Krell (Krell), "Cline emailed in support but that I need to work through these other guys. I'll forward to you." Exhibit 46.

    a.      Defendant CLINE and and unknown co-conspirators violated 18 U.S.C. § 1030, MCL 752.795, MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.213, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

102.    6-3-15 Defendant ALLARD to Joseph Gamrat, "How do you know they were there? Do they know that you know?" ALLARD responds, "They don't know we know. I'll explain when I get a chance." Exhibit 47.

    a.      This shows clear coordination between ALLARD and Joseph Gamrat on wiretapping and surveillance.

    b.      In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

    c.    These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

    d.    This access was gained thru Defendants roles as State employees under color of law.

103.    6-3-15 ALLARD to Joseph Gamrat, "they're not trying to track you though." This stream of texts runs for several pages and shows a long conversation about email / I.P addresses / access to electronic accounts of COURSER that Defendant ALLARD is relaying to Joseph Gamrat. Ex 15, p. 37.

    a.    This shows clear coordination between ALLARD and Joseph Gamrat on wiretapping and surveillance.

    b.    In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

    c.    These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

    d.    This access was gained thru Defendants roles as State employees under color of law.

104.    On 6-19-15, during the day as State employees, GRAHAM to ALLARD and CLINE, *"Wtf do I do? They're going to suspect me… or Joe… hopefully."* Defendants acknowledging their criminal conduct and their desire that COURSER not suspect Defendant GRAHAM but rather Joseph Gamrat. See Ex 15, p. 15

    a.    This shows clear coordination between Defendants and Joseph Gamrat on wiretapping and surveillance.

    b.    In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

    c.    These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

    d.    This access was gained thru Defendants roles as State employees under color of law.

105.    On 6-25-15, during the day as State employees, GRAHAM to ALLARD: "*Lol any more updates? Did joe continue to follow her?*" ALLARD - "*Nothing I've heard.*" GRAHAM: "*Darn, Josh says Joseph should sit on it for a bit and now that he knows their hiding spot try and catch them doing it.*" See Ex 2, p. 25.

    a.    Defendants listened to COURSER thru a listening device in violation of wiretapping or eavesdropping in violation of 18 U.S.C. § 2511 and Michigan Eavesdropping statute 18 U.S.C. § 1030, MCL 752.795, MCL 750.539b, MCL 750.539c and MCL 750.539d. This also violated MCL 750.539j Invasion Upon Seclusion / Invasion of Privacy / Stalking MCL 600.2954 prohibited by 750.411h / MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

    b.    These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

    c.    These actions by Defendants could not have been done but for their access thru their state employment.

106.    On 6-26-15, GRAHAM to ALLARD State Employee, "*Idk I feel like letting it play out for a week or two and seeing if Joe can get real video.*" Defendants were discussing waiting on Joseph Gamrat to get actual video of COURSER for their conspiracy. Defendants were coordinating their criminal actions against COURSER with Joseph Gamrat who was extorting COURSER into resigning from office. See Ex 2, p. 26.

    a.    This shows clear coordination between ALLARD GRAHAM and Joseph Gamrat on wiretapping and surveillance.

    b.    In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

    c.    These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

  d. This access was gained thru Defendants roles as State employees under color of law.

107. 6-30-15 Joseph Gamrat to ALLARD, "I need a picture of the cars or something if he can do it. Thanks. Yes" <u>Exhibit 48</u>. This was transmitted while GRAHAM was conducting surveillance of COURSER following him more than a hundred miles across the state while taking pictures of him and forwarding those pictures to ALLARD who then sent them to Joseph Gamrat.

  a. This shows clear coordination between ALLARD GRAHAM and Joseph Gamrat on wiretapping and surveillance.

  b. In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

  c. These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

  d. This access was gained thru Defendants roles as State employees under color of law.

108. 6-30-15 ALLARD to GRAHAM, "I am on phone with Joe." Also same event, ALLARD asks GRAHAM, "can you get better pic without that screen on it?" See Ex 2, p. 3. See also Ex 2, pp. 34-38. Joseph Gamrat requested a picture ALLARD conveyed the pictures GRAHAM was taking while conducting surveillance of COURSER.

  a. This shows clear coordination between ALLARD, GRAHAM, and Joseph Gamrat on wiretapping and surveillance.

  b. In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

  c. These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

32

    d.    This access was gained thru Defendants roles as State employees under color of law.

109.    On 6-30-15, during the day as State employees, GRAHAM to ALLARD and CLINE, "*Tell him to shut the fuck up!!!! Gonna blow my cover even more then it's already blown.*" GRAHAM texts this to ALLARD while GRAHAM is conducting surveillance of COURSER 100 miles from the State offices where GRAHAM is stationed and while ALLARD is on the phone with Joseph Gamrat to whom he has just sent pictures provided by GRAHAM. Defendants conducting criminal conspiracy against COURSER. See Ex 1, p. 169.

    a.    This shows clear coordination between ALLARD, GRAHAM, and Joseph Gamrat on wiretapping and surveillance.

    b.    In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

    c.    These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

    d.    This access was gained thru Defendants roles as State employees under color of law.

110.    In the deposition of Joseph Gamrat, he was asked, "Do you have anybody that was assisting you as far as we use the term surveillance or taking photographs or doing any recordings on your behalf?" Exhibit 49.

    a.    Joseph Gamrat answered with a lie (see See Ex 2, p. 3. See also Ex 2, pp. 34-38.)," I believe Mr. GRAHAM did a couple, but to answer your questions, no. I believe Mr. GRAHAM did some photos one time that I'm aware of where he followed Mr. COURSER and Mrs. Gamrat."

    b.    The Evidence proves that Joseph Gamrat requested ALLARD to instruct GRAHAM to take pictures while GRAHAM was conducting surveillance of COURSER and GRAHAM on 6-30-15 took and transmitted pictures to ALLARD who then sent the photos to Joseph Gamrat.

33

c. This shows clear coordination between ALLARD, GRAHAM, and Joseph Gamrat on wiretapping and surveillance.

d. In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

e. These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

f. This access was gained thru Defendants roles as State employees under color of law.

111. On 7-7-15, ALLARD texted Joseph Gamrat, "I want to scare the living shit out of them," to which Joseph Gamrat responded, "Nice. I have no idea how to do that but that's all right." This text shows clear coordination between ALLARD and Joseph Gamrat; ALLARD then used illegally obtained information to launch a campaign against COURSER. Exhibit 50.

a. This shows clear coordination between ALLARD, GRAHAM, and Joseph Gamrat on wiretapping and surveillance.

b. In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

c. These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

d. This access was gained thru Defendants roles as State employees under color of law.

112. On 7-4-15 ALLARD relayed a conversation between COURSER and Bauer to GRAHAM that ALLARD had received from Joseph Gamrat "from Joe: Also, before they arrived at the meeting she was trying to tell Todd how to use the voice memo app on the iphone. I am pretty sure he/they recorded the meeting with Ann." See Ex 2, p. 46. This conversation took place privately between COURSER and Bauer no other person was present.

34

a.   This shows clear coordination between ALLARD, GRAHAM, and Joseph Gamrat on wiretapping and surveillance.

b.   In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

c.   These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

d.   This access was gained thru Defendants roles as State employees under color of law.

113.   On 7-3-15 GRAHAM texted to ALLARD, "Will he (Joseph Gamrat) let us hear that particular recording?" See Ex 2, p. 44.

a.   This shows clear coordination between ALLARD GRAHAM and Joseph Gamrat on wiretapping and surveillance.

b.   In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

c.   These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

d.   This access was gained thru Defendants roles as State employees under color of law.

### *MAY 19, 2015 RECORDING IS A FABRICATION*

114.   Defendants also acted in a criminal conspiracy against COURSER, using information gained through illegal access, in order to edit, modify, and fabricate a recording used in a criminal prosecution and used to remove COURSER from office. This is confirmed in the following texts:

a.   5-22-15: ALLARD talking about recording, "*I'm listening to Thursday recording now. Ben you fucking killed it! Its awesome.*" See Ex 15, p. 47.

b.  6-24-15: ALLARD to GRAHAM, "*I say we meet and try and get shit for recording.*" See Ex 1, p. 180.

c.  8-7-15: Goris, a political operative and bundler, to ALLARD, "*One of the things that was missing in the story is WHY you guys felt the need to record. Some are calling it a setup.*" Goris continues, "*You guys should try to clarify and win sympathy.*" See Ex 2, p. 115.

d.  8-10-15: ALLARD telling GRAHAM to start working on a "*second tape so we can move on this shit*" See Ex 5, p. 45.

e.  9-9-15: GRAHAM says to Brandon Hall, "*I was feeding Todd things he wanted to hear the whole time...*" See Ex 38.

f.  Defendants acknowledge through these texts that that recording on May 19, 2015 was a set-up of COURSER.

g.  These texts shows clear wiretapping, eavesdropping, and surveillance by Defendants.

h.  In so doing Defendants violated 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. 2511 / MCL's 750.539b, 750.539c, 750.539d MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875

i.  These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

j.  This access was gained thru Defendants roles as State employees under color of law.

115.  In April of 2018 after 3 years of fighting its release the attorney for Defendants ALLARD and GRAHAM pursuant to a criminal proceeding was forced to provide COURSER with a copy for exam.

116.  The recording has also now been fully examined by Edward Primeau and he has done an end to end examination of the recording. See Ex 7 and 8. Primeau has concluded it has been edited and was not even recorded on the night in question. There was pausing present in the recording. The timestamps do not match the phone the prosecution claims were used in the

36

recording. By allowing this edited recording to be used in a criminal prosecution against COURSER, Defendants have engaged in a conspiracy.

    a.    This violates, MCL 750.479c which prohibits the concealment of any material fact related to a criminal investigation.

    b.    This violates MCL 750.411a which prohibits presenting fabricated evidence used in an official proceeding, lying to House investigators in regards to the authenticity of evidence, and lying to the police in an official investigation.

    c.    This also violates MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, MCL 750.422, MCL 600.2911, and MCL 750.159i.

117.    Defendants ALLARD and GRAHAM also provided the 13 fragments sent to Livengood in the original story for exam by COURSER. Primeau has concluded that these fragments have been intentionally altered with headers removed to make the fragments unplayable. See Ex 7 and 8. By allowing these fragments to be altered and used in a criminal prosecution against COURSER, Defendants have engaged in a conspiracy.

    a.    This violates, MCL 750.479c which prohibits the concealment of any material fact related to a criminal investigation.

    b.    This violates MCL 750.411a which prohibits presenting fabricated evidence used in an official proceeding, lying to House investigators in regards to the authenticity of evidence, and lying to the police in an official investigation.

    c.    This also violates MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, MCL 750.422, MCL 600.2911, and MCL 750.159i.

118.    Defendants ALLARD and GRAHAM also provided a forensic report on the recordings date stamps. Primeau has concluded that ALLARD and GRAHAM had possession of the recording devices and that the originals were deleted while the devices were in their possession. See Ex 7 and 8. By allowing these to be deleted during a pending criminal prosecution against COURSER, Defendants have engaged in a conspiracy.

37

a.  This violates, MCL 750.479c which prohibits the concealment of any material fact related to a criminal investigation.

b.  This violates MCL 750.411a which prohibits presenting fabricated evidence used in an official proceeding, lying to House investigators in regards to the authenticity of evidence, and lying to the police in an official investigation.

c.  This also violates MCL 750.157a, MCL 750.159i, 18 U.S.C. 96, MCL 750.422, MCL 600.2911, and MCL 750.159i.

119.   Defendants have also acknowledged items within the original recording that are not in the released version. The texts below confirm that the recording was indeed altered and that fact was concealed from the public, the police, and the courts

a.  Text 8-16-15, GRAHAM notes that in the recording COURSER and he discuss that the extortion texts were coming from 3 different numbers – this has been deleted from the released version of the recording. GRAHAM says to ALLARD, "*I have him in tape telling me there are three different numbers texting him.*" See Ex 5, p. 66.

b.  Text 8-21-15, ALLARD to Livengood noting that COURSER stated that the extortion texts were coming from 3 different numbers – this is not present in the recording. ALLARD says, "*What about Todd's assertion on recording that 3 different numbers have been texting him?*" Livengood says, "*Was that on full May 19 tape? I gotta go back and lisen to it."* ALLARD says, *"Bens not sure. It's on one of them.*" See Ex 5, p. 87.

c.  COURSER has acknowledged that the statement regarding the extortion texts that he received were coming from 3 different numbers was in the original conversation and it is not present in the recording that was released to the version used by the Detroit News, or the version used by House of Representatives, or finally the version used by the Michigan Attorney General.

d.  In so doing Defendants violated; 18 U.S.C. § 1030, MCL 752.795, MCL 750.422, MCL 600.2911, MCL 750.539d, MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875.

e.  This also violates MCL 750.411a which prohibits presenting fabricated evidence used in an official proceeding, lying to House investigators in regards to the authenticity of evidence, and lying to the police in an official investigation.

38

f.   These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

g.   This access was gained thru Defendants roles as State employees under color of law.

120.   Defendants own texts and emails show the recording was not a true copy. Below is a sampling of the texts that confirm the released version is not a true native copy.

a.   Text 7-6-15, CLINE to ALLARD and GRAHAM, "*Hey can we splice a few quote from TC admitting he had affairs and send it to Anne? That would scare the shit of them.*" GRAHAM answers, "*I told Keith I wanted to do something like that but he said it wasn't smart.*" See Ex 2. p. 54.

b.   Email 7-17-15, ALLARD to GRAHAM splicing recordings. Exhibit 51.

c.   Text 7-18-15, ALLARD to GRAHAM, "*Just sent you the clips.*" See Ex 2, p. 79.

d.   Email 7-19-15, Livengood to ALLARD, "*where do things stand with you guys over releasing those additional audio clips.*" Exhibit 52.

e.   Text 7-19-15, ALLARD pushes GRAHAM to sign off on recordings, "*And Ben for gods sake please sign off on the recordings.*" See Ex 2, p. 82.

f.   Text 7-19-15, ALLARD to GRAHAM, "*And damn dude you want that off the record??? That shit is the hammer!!!*" GRAHAM replied "*Lol yeah I guess we can put that on the record. I just want to discuss what exactly he wants on the record so I know before print.*" See Ex 2, p. 85.

g.   Email 7-19-15, Livengood to ALLARD "*I'll go through the audio tomorrow and get back with you guys.*" Exhibit 53.

h.   Email 7-19-15, GRAHAM to ALLARD showing 9 to 13 clips noting some on the record, some off the record, some being approved and some were only to be used as transcripts. Exhibit 54.

i.   Email 7-30-15, Livengood to ALLARD, "*Can you share with me the minute or so after Ben brings up Cheaters. AddendumOTR3 cuts off*" GRAHAM did the recording but it is ALLARD that is working with Livengood editing the recording. Exhibit 55.

j.   Email 8-7-15, Livengood to ALLARD, "*We're trying to edit a section of the May 21 recording Voice003.m4a, but can't import it, at least on my editors' PC. She's trying someone's MAC. Do you have a different version by chance?*" Exhibit 56.

k.  Text 8-10-15, Brandon Hall says to GRAHAM, "*And who is the guy saying that? Not todd, Right?*" GRAHAM answers, "*Oh no its Todd. Just sounds different than other parts of the recording. Must be a different setting or recording device*" See Ex 5, p. 277.

l.  Text 8-10-15, ALLARD telling GRAHAM to start working on a "*second tape so we can move on this shit.*" See Ex 5, p. 45.

m.  Email 8-10-15, Livengood to ALLARD "*We need to release the full audio tapes. Both of them. Please talk to Ben and Truscott immediately.*" Livengood continues, "*I think we have to name Joe as his suspected secret texter too…*" Exhibit 57. This information was not public knowledge and was not determined by the police until in November of 2015. This text shows an effort by Defendants and Livengood as co-conspirators in their efforts to deflect from their own involvement in the plot to extort COURSER into resigning from office. Livengood never disclosed in his articles that he and Defendants knew the extortion involved Joseph Gamrat or that he himself was involved or the Defendants. This text was in response to COURSER's public acknowledgement that he was being extorted into resigning from office. Livengood was attempting to deflect from his own involvement and that of Defendants in the extortion plot to remove COURSER from office. The phone sending the extortion texts to COURSER was later found to be in Livengood's name.

n.  Text 8-16-15, GRAHAM says to ALLARD and Livengood, "*Imagine if you hadn't condensed them*". See Ex 5, p. 84.

o.  Text 8-19-15, GRAHAM says, "*Nah its never been released in its entirety.*" See Ex 5, p. 21.

p.  Text 8-19-15, GRAHAM to ALLARD, "*He apparently believes the whole thing has been released?*" See Ex 5, -p. 126.

q.  Email 8-28-15, ALLARD to Livengood "*we want to preserve the prior arrangement where portions are considered off the record, until they are approved to be on the record. Again, just because of the chance stuff could be taken out of it.*" Exhibit 58.

r.  Email 8-28-15, Livengood to ALLARD, "*I would mostly be interested in putting on the records portions of the audio that Cotter's office uses as evidence of wasting taxpayer resources. I would think that just the mere use of you and Ben's time having conversations in the House Office Building about their personal lives is a waste of taxpayer time.*" Exhibit 59.

s.  Text 9-9-15, ALLARD to Goris, "*They cut some big sections though.*" See Ex. 2, p. 140.

40

t.  These texts confirm alteration of the recording as such Defendants violated 18 U.S.C. § 1030, MCL 752.795, MCL 750.422, MCL 600.2911, MCL 750.539d, MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875.

u.  This also violates MCL 750.411a which prohibits presenting fabricated evidence used in an official proceeding, lying to House investigators in regards to the authenticity of evidence, and lying to the police in an official investigation.

v.  These actions were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

w.  This access was gained thru Defendants roles as State employees under color of law.

### *DEFENDANTS DELIVER FABRICATED TAPE TO DETROIT NEWS*

121.  After being fired ALLARD and GRAHAM with Truscott provided to The Detroit News fragmented audio recordings of COURSER of what supposedly was from a meeting between COURSER and Defendant GRAHAM May 19, 2015.

122.  Defendant CLINE has now given sworn testimony that the recording being used in this case is not authentic. CLINE's deposition now corroborates much of this complaint. Exhibit 1.

123.  CLINE has given sworn testimony that there were several versions of this recording and that the original was never released. See Ex 3.

124.  CLINE has also sworn that a man named John Truscott (Truscott) was coordinating the actions of The Detroit News in passing off the recording as being authentic. *Transcript,* 210:9-16.

125.  Defendants ALLARD and GRAHAM provided the recording of May 19, 2015 in 13 clips not one continuous recording. See Ex 51.

126.   Defendants provided the recordings as 13 clips not one continuous recording stating clearly some had been edited. See Ex 51.

127.   Defendants provided the recordings as 13 clips not one continuous recording stating clearly some had been off the record. See Ex 51.

128.   The August 7, 2015, The Detroit News published excerpts of the recording to the world in an article titled, "Recordings: State rep asked aide to hide relationship. Information contained in this article was not verified and was false.

129.   On August 7, 2015 Livengood ran the 13 clips as one continuous recording and did not disclose that the recording was in fact 13 clips of recordings or that some had been edited and that some were kept off the record. See Ex 51.

130.   Between August of 2015 and December of 2015 The Detroit News published a series of articles that included excerpts of the recording that ALLARD and GRAHAM broadcast.

131.   In fact, on August 7, 2015, Livengood released the edited recordings and Livengood did not disclose to the public that the tape was in fact a fabrication made by himself and the Defendants. Exhibit 7 and 8.

132.   These recordings were broadcast around the world through every major media outlet worldwide.

133.   The stories written by The Detroit News, based on stories and illegal recordings obtained by Defendants were extremely detrimental to COURSER and were based upon statements from Defendants that were later determined thru expert analysis, Defendants' own texts and emails, and CLINE's deposition testimony to be edited, modified, and fabricated.

134.   The Detroit News stories included false and misleading accusations from Defendants in order to paint a false and misleading persona of COURSER and to hide

42

Livengood's own involvement in the extortion plot to remove COURSER from office. Exhibit 60.

135.    Defendants along with Livengood broadcast this information knowing it was false and that the recordings were done illegally and with malice.

136.    Given the severity and scandalous nature of the claims against COURSER, Defendants were very aware that this story would explode and be picked up around the State and nation.

137.    The secret recordings made by ALLARD and GRAHAM (including the recording allegedly made May 19, 2015) was illegal in that it violated Michigan's wiretapping and eavesdropping statutes being MCL 750.539a, *et. seq.* and specifically MCL 750.539d and 750.539e and other federal laws.

138.    ALLARD and GRAHAM later transmitted the illegal wiretap recordings to other Defendants and The Detroit News in violation of MCL 750.539d and 750.539e.

139.    The transmission of the excerpts of the recording was in violation of Michigan's wiretapping and eavesdropping statutes being MCL 750.539a, et. seq. and specifically MCL 750.539d and 750.539e and federal laws.

140.    The extortion texts, from this extortion phone, revealed information that could only have been learned by accessing COURSER's private hotel rooms, emails, voicemails, live calls and via GPS tracking.

141.    Defendants benefited from the illegal surveillance.

142.    Between August of 2015 and December of 2015 The Detroit News published a series of articles that included excerpts of the recording that ALLARD and GRAHAM broadcast. These articles (based in part on illegally acquired information) were based on the illegally

43

obtained wiretapping and eavesdropping conspiracy by the Defendants including lies embodied in the HBO Report, lies concerning felonious conduct by COURSER, misconduct in office, misuse of taxpayer resources, forced forgery, forcing staffers to lies, retribution against employees, and extortion and blackmail.

143.    Defendants violated the wiretapping and eavesdropping statutes and furthered the extortion conspiracy by using illegally obtained recording of COURSER, that were made by GRAHAM at the direction of ALLARD in a series of media stories. Defendants violated MCL 750.539d and 750.539e.

144.    These recordings were broadcast around the world through every major media outlet worldwide.

145.    Defendants broadcast illegally obtained taped conversations of COURSER to the public, in violation of wiretapping and eavesdropping statutes.

146.    Defendants broadcast this information knowing it was false and that the recordings were done illegally and with malice.

147.    Given the severity and scandalous nature of the claims against COURSER, Defendants were very aware that this story would explode and be picked up around the State and nation.

148.    On August 7, 2015 at 3:59 P.M., COURSER received a text that read, "It went global fast. Resign NOW Todd and Candy has asked...ASKED. You too Cindy, spare the kids and Joe. Resign, both of you, TODAY. Chad has scratched the surface...Ben has lots of audio...intriguing, damning. I have steamy audio, pics, video from DC. Resign, or Chad gets it all."

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

149.    The actions of Defendants and their co-conspirators confirm alteration of the recording and as such Defendants violated 18 U.S.C. § 1030, MCL 752.795, MCL 750.422, MCL 600.2911, MCL 750.539d, MCL 750.540, MCL 752.795, 18 U.S.C. 1510, MCL 750.157a, MCL 750.159i, MCL 157a, 18 U.S.C. 96, 18 U.S.C. 1875, MCL 750.21, MCL 750.539j, 47 U.S.C. 223, 18 U.S.C. 875.

150.    Defendants and their co-conspirators also violated MCL 750.411a which prohibits presenting fabricated evidence used in an official proceeding, lying to House investigators in regards to the authenticity of evidence, and lying to the police in an official investigation.

151.    All actions described herein were done in Defendants' continued efforts to impeach COURSER and/or remove him from office without due process.

152.    All actions described herein were committed through Defendants access and roles as State employees under color of law.

### HISTORY OF EXTORTION SURVELIANCE ADDITIONAL WIRETAPPING INVOLVING DEFENDANTS

153.    At the time of this alleged recording, May 19, 2015, COURSER, Bauer, Wendy Day, and Daniel Courser were receiving anonymous extortion texts requiring COURSER resign from office. The phone was registered to Chad Livengood, a reporter of The Detroit News. Exhibit 61.

154.    Michigan State Police confirm the phone sending extortion texts to COURSER, Daniel Courser (COURSER's brother), Wendy Day, and Bauer was registered in the name of Livengood. Exhibit 62.

155.    The co-conspirators using this phone sent a series of extortion texts to COURSER. These texts declared if COURSER did not resign that Livengood would release a series of stories based on recordings and information gathered by the Defendants. See Ex 14.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

156. The phone that was sending these extortion texts was in Livengood's name, it communicated with Livengood, and the extortion texts required COURSER to resign or Livengood would release audio video and information harvested by GRAHAM. See Ex 14.

    a. On August 7, 2015 at 3:59 P.M., COURSER received a text that read, "It went global fast. Resign NOW Todd and Candy has asked...ASKED. You too Cindy, spare the kids and Joseph. Resign, both of you, TODAY. Chad has scratched the surface...Ben has lots of audio...intriguing, damning. I have steamy audio, pics, video from DC. Resign, or Chad gets it all."

157. The co-conspirators using this phone sent the texts that show the coordination between the Defendants and Livengood. See Ex 14. Defendants were able to gather this information thru their employment as State employees under color of law.

    a. Their actions violated Extortion / listened to COURSER thru a listening device in violation of wiretapping or eavesdropping in violation of 18 U.S.C. § 2511 and Michigan Eavesdropping statute MCL 750.539b, MCL 750.539c and MCL 750.539d. This was also violated MCL 750.539j Invasion Upon Seclusion / Invasion of Privacy/ Stalking MCL 600.2954 prohibited by 750.411h / MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

158. Defendants were providing the private and illegally obtained information for these extortion texts. See Ex 14.

159. The information contained in the extortion texts came directly from the illegal acts of the Defendants thru their access as State employees. See Ex 14.

160. These extortion texts included personal and confidential information such as live call conversations, texts, information from private emails, and locations of COURSER and Bauer and their families. See Ex 14. Defendants gathered this information under color of law as State employees.

161. These extortion texts contained very specific information regarding COURSER's private life and threatened that this information would be revealed if he did not resign. Defendants have been confirmed both police investigations and House of Representative

46

investigations to have been involved in extortion of COURSER into resigning from office. See Ex 14.

a.  Defendants could only do this due to their access granted to them thru their employment as State employees assigned to COURSER's state office.

b.  The information that is contained in these texts show the illegal accesses used by Defendants in their efforts to remove COURSER from office.

c.  Assorted extortion Texts are as follows –

d.  5-19-15: Boo! The phone is a burner...dont bother trying. Cindy sounds like she's great in the sheets. You however, have no stamina. Silence in this case can be VERY detrimental. Careers, political arena and of course families, Georgeann, Joe, Fon, Dan....whew, it could be disastrous really, and of course the kids. Silence in this case can be VERY detrimental. Careers, political arena and of course families, Georgeann, Joe, Fon, Dan....whew, it could be disastrous

e.  5-20-15: DC sucked, thought you two would be alone but you dragged family along...cost me 1200.00 that trip. Todd...have your phone swept. Why do you only know 4 vets, we're everywhere. "COURSER's a "NO" on 4408"? Still think I'm bluffing?

f.  What are they going to do to defeat you when you're an incumbent? They won't need 150k....they have me.

g.  5-20-15: Messages will come from a different number soon. This ones getting dumped. Nobody's asked what my intentions are, what I want. Odd? I have no agenda per se. I have no desire to destroy families. I give a rats ass about politics. Vaupel sucks though. You both now know I hold significant evidence of your affair. Career suicide, can't show your face, empty your office shit. Stay tuned...have a splendid Pure Michigan day! Relax. I'm not leaking anything...yet. Pay people better to keep quiet..I pay them better for info. #Radisson Let me make this CRYSTAL CLEAR. I need some open dialogue. I've heard from you Cindy...better tell Todd to man-up. As long as I'm appeased, my cargo will never reach port so to speak. Can I please get a confirmation.

h.  5-21-15: I can show your whereabouts when not in session, meetings, or together. Those whereabouts DO NOT include seedy alleys in Lansing having sex with men Todd. Grow up. I sell non-fiction...you however spin fairy tales and fiction. That email can't find another inbox....oh, change your passwords too. Dumb shit

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

i.      5-21-15: Good afternoon. Contrary to what you may think, I have other cases I'm working. Todd, go to your weekend retreat...enjoy this last holiday as a State employee. Big changes next week kids, as I change the political landscape. You both can prevent this really....you've never asked how?

j.      5-22-15: Hello? Cindy, Todd, Dan..we all on here?

k.      5-23-15: I'm letting everybody off the hook....on 1 condition only. You resign Todd, Tuesday. Mention your health, your new found family bond. DO NOT mention Cindy, AT ALL. Call me karma....this is for the others too!

l.      5-26-15: Rise and Resign day....Good morning Todd....hope you found your soul-searching weekend peaceful.

m.     5-27-15: I've reached out to an old friend with a little teaser. He's been fact-finding since 11am or so yesterday, building the puzzle, piece by piece. I told him I WILL NOT confirm the names of the woman/women. Rest assured, Tim Skubick will be in touch with you. Confirm the affair(s). NO NAMES.

n.      5-28-15: 517.643.0013 Call it....go ahead, do it. It's a personal cell.

o.      Skubick questioned the authenticity of some of the audio. Not the story per se, rather how either of you let this happen. Not the affair....getting bugged. I drove up to the island yesterday, on your dime. I shared 17 minutes of audio, 9-11 of sexual intimacy and 5-6 of dialogue so he could clearly understand who he was listening too. He's going to label me as an anonymous source, a credible anonymous source. Complete with photographic and video evidence from DC and the Radisson, it was any easy sell. Let Joe and Fon know whats coming please.

p.      6-9-15: Uh oh...good luck. I just got back in the states and heard the news.

q.      7-8-15: Wow! Firing staff...be careful, the boys have A TON on you...they know everything. I saw you recently. Flint then near Great Lakes Crossing later. You guys are easy but idiots. Oh, the Speaker is meeting with me on 8/3.

r.      7-17-15: I was off the last few days and was offered the opportunity to do some surveillance....little did I know you'd drag me all the way to Flint....I used to work out of that Target strip mall and often frequented Barnes/Noble....Keith and Ben were right, as was Joe...the inevitable WILL happen. Careers, families, homes...shattered. We simply have too much on you, the server and police involvement notwithstanding.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (fax)

s.  7-21-15: I've been digging. How was camping Cin? Todd, your wife had an affair before, but then again, so have you...before Cindy. I may need some funding? Offers to help?

t.  7-22-15: I came across this number in this file: 260-504-6649. Its not Dans or Tims or either of yours? Whos is it? Nevermind, I'll text it myself...

u.  8-7-15: Amazing what would have happened had you simply listened. Too late. KABOOM! It went global fast. Resign NOW Todd as Candy has asked...ASKED. You too Cindy, spare the kids and Joe. Resign, both of you, TODAY. Chad has scratched the surface....Ben has lots of audio...intriguing, damning. I have steamy audio, pics, video from DC. Resign, or Chad gets it all.

162.    Swartzle, Chief Legal Counsel and Chief of Staff for the House of Representatives, regarding Defendants stated, "We specifically never said that they were credible witnesses because we think they're not credible witnesses." See Ex 27, p. 20.

163.    Swartzle, Chief Legal Counsel and Chief of Staff for the House of Representatives stated, "Keith Allard is just a piece of crap". See Ex 27, p. 21.

164.    The Speaker of the State House stated publicly that ALLARD and GRAHAM were involved in the extortion plot to remove COURSER and Bauer from office. Exhibit 63. See also Ex 27, p. 19.

a.  "In fact, during the criminal investigation by the Michigan State Police, it became clear that Mr. Allard and Mr/ GRAHAM repeatedly lied to House Business Office Investigators and lawyers about their knowledge and involvement in a convoluted, months-long extortion plot against their own supervisors." The speaker said in a statement.

b.  They did this as State employees under color of law and could not have committed the crimes they committed but for their state employment access.

c.  Their actions violated Extortion / listened to COURSER thru a listening device in violation of wiretapping or eavesdropping in violation of 18 U.S.C. § 2511 and Michigan Eavesdropping statute MCL 750.539b, MCL 750.539c and MCL 750.539d. This was also violated MCL 750.539j Invasion Upon Seclusion / Invasion of Privacy/ Stalking MCL 600.2954 prohibited by 750.411h / MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

49

165.     The MSP Report also found 255 communications between Joseph Gamrat and Defendants before, during, and after the extortion texts were taking place. See Ex 27, p. 19

      a.    Defendants were engaged in a criminal conspiracy with Joseph Gamrat.

      b.    They did this as State employees under color of law and could not have committed the crimes they committed but for their state employment access.

      c.    Their actions violated Extortion / listened to COURSER thru a listening device in violation of wiretapping or eavesdropping in violation of 18 U.S.C. § 2511 and Michigan Eavesdropping statute MCL 750.539b, MCL 750.539c and MCL 750.539d. This was also violated MCL 750.539j Invasion Upon Seclusion / Invasion of Privacy/ Stalking MCL 600.2954 prohibited by 750.411h / MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

## *DEFENDANTS DELIVER FABRICATED RECORDING TO AUTHORITIES*

166.     Investigators for the House did not believe or trust Defendants ALLARD and GRAHAM stating on tape to the Michigan State Police. Exhibit 64, p. 21

      a.    They are "f'ing liars"

167.     Defendants and their co-conspirators then presented this recording in an official proceeding in House Investigation against COURSER. This recording has been shown by audio forensics to be a fabrication. Defendant CLINE has confirmed that the original has never been released. Defendants ALLARD and GRAHAM both have confirmed by text that the original has never been released. See Ex 1, pp. 4-5.

168.     Defendants then presented this May 19, 2015 recording in an official proceeding in Police Investigation Regarding COURSER……as a true copy this was a lie.

169.     Further, Defendants have knowingly transmitted the edited versions of the May 19, 2015 recording or fragments to the Michigan Attorney General who has then used these fraudulent, illegally obtained, and edited recordings in a criminal prosecution of COURSER.

DEPERNO LAW OFFICE, PLLC • 951 W. MILHAM AVENUE, PO BOX 1595 • PORTAGE, MI 49081
(269) 321-5064 (PHONE) • (269) 353-2726 (FAX)

170.    Defendants have done this with the full knowledge that the recordings were edited, are not authentic, and are a fraud and that they would be used for purposes of a criminal prosecution.

171.    In so doing Defendants under color of law as State employees violated MCL 750.479c which states "to conceal…any material fact related to a criminal investigation as well as 750.411a.

172.    Defendants listened to COURSER thru a listening device in violation of wiretapping or eavesdropping in violation of 18 U.S.C. § 2511 and Michigan Eavesdropping statute MCL 750.539b, MCL 750.539c and MCL 750.539d. This was also violated MCL 750.539j Invasion Upon Seclusion / Invasion of Privacy/ Stalking MCL 600.2954 prohibited by 750.411h / MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

173.    These actions by Defendants could not have been done but for their access thru their state employment.

### *Texts Emails and Testimony Confirm Illegal Conduct Against COURSER by Defendants*

174.    On 8-30-15, nearly 2 months after being fired by the House, GRAHAM sent a text message to ALLARD: "*Damnit he said it wasn't joe who gave it to him! We want todd to think it's joe!!*" Exhibit 65. This text demonstrates a criminal conspiracy in violation of MCL 750.157a and RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER. These actions by Defendants could not have been done but for their access thru their state employment.

175.    On 2-10-15, CLINE sent a text stating, "*You are in the clear. You made it out and they did not know a thing*" On the same day Joseph Gamrat illegally accessed COURSER's hotel room and relayed these texts Defendant CLINE texted this. See Ex 15, p. 174.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

a. Further texts and evidence noting illegal access of COURSER's hotel room by co-conspirator Joseph Gamrat and Krell include the following:

i) MSP Report dated 8-18-15 acknowledges Radisson Staff providing info to extortion texts coming from Livengood's phone

ii) Radisson check in times and reservations being provided and then being used in the extortion texts

iii) Extortion Text – "*I pay them better for info. #Radisson*"

iv) Extortion Text 5-28-15 notes photographic and video evidence from the Radisson is going to be released if COURSER does not resign from office

v) Surveillance updates being shared that ended up in the extortion texts from Livengood's phone.

vi) Surveillance at Radisson "*yea someone was in both beds*" (from inside COURSER's hotel rooms).

vii) Surveillance at Radisson "*His clothes are still there*" (from inside COURSER's hotel rooms)

viii) Surveillance at Radisson "*I just think it's strange that both beds are used. I typically sleep in one and put my suitcase or bag on the other. You? Heat was high too which is just the way Cindy likes it*".(from inside COURSER's hotel rooms)

ix) MSP Report dated 10-13-15 texting about conditions and surveillance of room – this information was contained in the extortion texts from Livengood's phone. (from inside COURSER's hotel rooms)

x) MSP interview detailing audio surveillance from inside COURSER's hotel room

xi) Krell texts "*have you checked if ass is staying?*"

xii) Krell texts "*he checked in at 7:51*"

xiii) Krell texts "*he hasn't checked out yet*"

xiv) Krell texts "*he is scheduled to check out*"

xv) Krell texts "*what the F@$& her room?*""*his*"

52

xvi)    Acknowledgment of accessing hotel account and representing as COURSER

xvii)    Acknowledging placing fictitious name on COURSER's hotel account – this information was used in the extortion texts to remove COURSER from office.

xviii)    Gamrat texting to an unknown party "*I am on my way….now. Was looking for potential evidence like trash or a wrapper. Nothing – which doesn't say a whole lot though*". This information was used in the extortion to remove COURSER from office.

xix)    Sharing pictures from surveillance

xx)    Stating room is in COURSER's name

xxi)    Krell asking if rooms are next to each other

xxii)    Surveillance "*he turned off is his light at 6:20 and Cindy went to her office at ???*"

b.    These texts demonstrate violations of MCL 750.539j Invasion upon Seclusion / Invasion of Privacy by participating in illegally accessing COURSER's hotel room. Also this shows Defendant Stalking MCL 600.2954 prohibited by 750.411h / MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

c.    The information that is contained in these texts show the illegal accesses used by Defendants in their efforts to remove COURSER from office.

d.    These actions by Defendants could not have been done but for their access thru their state employment.

176.    The Defendants sent and received additional text messages that demonstrate a criminal conspiracy between themselves and other co-conspirators.

a.    On 6-23-15 ALLARD sent a text message to GRAHAM (both State Employees) and CLINE: "*Why the fuck did I do this?*" GRAHAM: "*Who the hell knows. Needed to stop for some road head.*" Defendants listening to sexual intercourse of COURSER thru wiretapping, eavesdropping, and listening devices. See Ex 2, p. 21.

b.    On 6-23-15, ALLARD to GRAHAM State Employees and CLINE, "*they just banged.*" Defendants listening to sexual intercourse of COURSER thru wiretapping / listening device. See Ex 2, p. 21

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

c.    On 6-25-15, ALLARD to GRAHAM State Employees and CLINE, "*Poundtown!!!*" Defendants listening to sexual intercourse of COURSER thru wiretapping / listening device. See Ex 2, p. 25

d.    On 6-30-15, during the day as State employees, GRAHAM to ALLARD and CLINE, "*Tell him to shut the fuck up!!!! Gonna blow my cover even more then it's already blown.*" GRAHAM texts this to ALLARD while GRAHAM is conducting surveillance of COURSER 100 miles from the State offices where GRAHAM is stationed and while ALLARD is on the phone with Joseph Gamrat to whom he has just sent pictures provided by GRAHAM. See Ex 1, p. 169.

e.    On 6-29-15, during the day as State employees, CLINE to GRAHAM and ALLARD, "*Leave it to the gay cousin to blow my cover…*" See Ex 2, p. 32.

f.    On 6-30-15, during the day as State employees, GRAHAM with ALLARD, GRAHAM: "*I say we follow them after they leave our meeting to see what happens. ☺*" ALLARD: "*I'm down. My friend suggested we do that as well.*" GRAHAM: "*Okay deal. We'll 'leave for lunch' at the same time they do.*" Defendants ALLARD and GRAHAM were coordinating these actions with some unknown person. See Ex 2, p. 24.

g.    On 6-30-15, Joseph Gamrat texted to ALLARD phone text, "*I need a picture of the cars or something if he can do it. Thanks.*" See Ex 48.

h.    On 6-30-15, GRAHAM to ALLARD, "*Aren't the best pics ever but here they are. ☺*" "*Here's where I'm at now.*" See Ex 2, p. 3.

i.    On 6-30-15, ALLARD to Joseph Gamrat, "*Not great pic but you can see the cars.*" Exhibit 66.

j.    On 6-30-15, GRAHAM with ALLARD and CLINE, GRAHAM: "*Cindy is leaving now. Had to run to my car lol.*""*Sweating my ass off lol.*""*She told everyone in the office that she was 'having lunch with a friend' so she probably wouldn't be back, Lol.*" ALLARD (to GRAHAM and CLINE): "*what's going on now?*" GRAHAM: "*Nothing just waiting.*""*Cindy rolled up her window 10 min ago.*" ALLARD (to GRAHAM and CLINE): "*Can you get a better pic without that screen on it?*""*I guess.*" CLINE: "*Are they still in the cars?*" GRAHAM: "*Still in Todds car as far as I can tell.*" CLINE: "*This is like a modern day afternoon soap opera. Only text and not TV.*" ALLARD (to GRAHAM and CLINE): "*Lol it is great.*" GRAHAM: "*Cindy left Todd is driving towards Lapeer on 69.*""*He just walked into Tim Hortons.*""*I think I just saw Cindy leaving.*" "*Todds going to his car now.*" ALLARD: "*Who are you going to tail?*""*I'm on phone with Joe.*" GRAHAM: "*Todd…he's easier to know if he's just going home or somewhere else with her.*""*Both heading south.*" ALLARD: "*Towards*

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

*Lapeer?*" GRAHAM: "*No away from lapeer. Towards lake orion / Detroit.*" ALLARD: "*Both of them are??*" GRAHAM: "*Yes together.*" ALLARD: "*Separate cars??*" GRAHAM: "*Yes.*""*Now heading west through suburbs of Lake orion.*" ALLARD: "*Where is that towards? Are they on highway?*" GRAHAM: "*South now toward Clarkston or auburn hills.*""*No highway. Main road by not the biggest in the area.*""*Lost them at a red!!!!!!!*""*Fuck #!!!!!!*" ALLARD: "*You can get it back.*" GRAHAM: "*Maybe???? Its really busy.*""*Lots of traffic. Coming up to highway soon so who knows where they'll go.*""*Fuck me. They drove into some of the worst traffic in Oakland county. Probably lost them.*" See Ex 2, pp. 34-38

k.   On 7-3-15, as State employees, ALLARD with GRAHAM: "*they're freaking out man. I guess they brainstormed about being at the HOB at 9am Monday and stopping us from going in.*" GRAHAM: "*How do you know that?*" ALLARD: "*Bug.*" This is a clear acknowledgement by Defendants they are actively engaged in wiretapping, eavesdropping, and illegal listening devices. Ex. 1, p. 163.

l.   On 7-3-15, as State employees, ALLARD with GRAHAM: "*I'm waiting for more info from Joe.*" GRAHAM: "*We need to hear that recording so we can prepare.*" See Ex 1, p. 162.

m.   On 7-7-15, ALLARD texted Joseph Gamrat, "I want to scare the living shit out of them," to which Joseph Gamrat responded, "Nice. I have no idea how to do that but that's all right." See Ex 50.

n.   On 6-8-15 ALLARD to GRAHAM, "*Fuck them. I'm turning up the heat. Probably calling Brandon.*" Defendants were using Brandon Hall (Hall) a political blogger to release information illegally obtained thru Defendant's status as State employees. See Ex 15, p. 32.

177.   The above texts show clear coordination between Defendants, Joseph Gamrat, and other co-conspirators to receive illegally obtained information from wiretapping, eavesdropping, and illegally planted listening devices.

178.   The above texts prove that Defendants were coordinating these actions with Joseph Gamrat and other co-conspirators who were engaged in an extortion plot to remove COURSER from office and deny him due process and equal protection under the laws. In fact, COURSER has been intentionally treated differently from others who were similarly situated. For example, Milo Dakin, Monte Geralds, and David Jaye.

55

179.    The above texts prove that Defendants were taking pictures of COURSER and sending them to other co-conspirators.

180.    The above texts prove that Defendants were conducting a criminal conspiracy against COURSER.

181.    The above texts show that Defendants were receiving illegal information from Joseph Gamrat thru wiretapping and eavesdropping. This was illegally obtained information was then used to extort COURSER. This information was obtained by Defendants and co-conspirators while Defendants acted as State employee acting under color of law.

182.    Defendants listened to COURSER thru a listening device in violation of wiretapping or eavesdropping in violation of 18 U.S.C. § 1030, MCL 752.795, 18 U.S.C. § 2511 and Michigan Eavesdropping statute MCL 750.539b, MCL 750.539c and MCL 750.539d. This was also violated MCL 750.539j Invasion upon Seclusion / Invasion of Privacy/ Stalking MCL 600.2954 prohibited by 750.411h / MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

183.    Defendants as State employees under color of law violated MCL 750.157criminal conspiracy / RICO violations 18 U.S.C. § 1961 / MCL 750.159i against COURSER.

184.    The information that is contained in these texts show the illegal accesses used by Defendants in their efforts to remove COURSER from office.

185.    These actions by Defendants could not have been done but for their access thru their state employment.

56

## HOUSE INVESTIGATES COURSER

186.   Within hours of the publication of the The Detroit News article, Cotter, having seemingly already been prepared, requested and directed Bowlin to "investigate" and prepare a report on alleged misconduct by COURSER and Bauer.

187.   Within hours of the article breaking, Cotter, having seemingly already been prepared, requested and directed Bowlin to "investigate" and prepare a report on alleged misconduct by COURSER and Bauer.

188.   Under Cotter's direction, Bowlin did an investigation into the alleged misuse of taxpayer resources.

189.   As an example of how insufficient and suspect the investigation really was, Bowlin later stated during an interview with the MSP that he asked other members during the investigation just how low they wanted the bar to be set for the expulsion of COURSER and Bauer and that "they set it the way they wanted to set it."

190.   Hassan Beydoun[5] ("Beydoun") would later state in his interview with the MSP that ALLARD was "the most manipulative, deceitful person involved in all of this" and described him as "the mastermind."

191.   Cotter only gave Bowlin two weeks to investigate, in spite of the fact that Bowlin requested more time for the investigation.

192.   Upon information and belief, as part of the investigation, Bowlin conducted a series of interviews with several key players but never recorded the interviews, instead simply asking two staff members to take notes.

---

[5] Now counsel for the House of Representatives.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

193.    On August 31, 2015, Cotter, Bowlin, Swartzle, Saari, and Beydoun published a report called the "*Report on the Investigation of Alleged Misconduct by Representative Todd Courser and Representative Cindy Gamrat*" (the "HBO Report").

194.    The HBO Report was based almost entirely on the unsworn testimony of ALLARD and GRAHAM.

195.    The HBO Report was rebroadcast and published many times by several different news outlets from August 2015 through December 2015.

196.    The HBO Report included false statements made as fact that were taken directly from the unsworn allegations of ALLARD and GRAHAM.

197.    On September 1, 2015, The House Select Committee, formed by H.R. 129 to examine the qualifications of COURSER and Bauer, met to adopt the rules of the committee.

198.    All committee members were handpicked or approved by Cotter, who also determined that the committee would be made up of four Republicans but only two Democrats, ensuring his control of the majority of votes and, subsequently, the outcome.[6]

199.    Upon information and belief, the rules adopted by the committee did not allow for COURSER to call, question, or cross examine witnesses.

200.    Although the Select Committee was carried out to give the appearance of a fair hearing, the Republican committee members had all previously signed the Caucus Pledge to stand with Cotter.

201.    By the time the committee hearings began on Tuesday, September 8, 2015, COURSER had only been allowed a quick review of the hundreds of pages of documents and

---

[6] Rep. Ed. McBroom as the chairperson of the committee. The members of the committee were as follows: McBroom, Verheulen, Heise, Lafontaine, and Democrats Chirkin and Liberati.

58

audio, and had been denied the opportunity to have a copy of any of the evidence in the HBO Report; evidence that was the foundational evidence of the special committee hearings.

202.    When the Democrat Representatives requested to question ALLARD and GRAHAM during the Committee, they were told by Rep. Ed. McBroom ("McBroom") that ALLARD and GRAHAM refused to testify. This was not true.

203.    Democrats Chirkin and Liberati put forward House Resolution 137 ("H.R. 137") to subpoena ALLARD and GRAHAM to allow the veracity of their allegations to be questioned under oath. McBroom and the Republican members all voted against this resolution.

204.    The credibility of ALLARD and GRAHAM, as accusers, was not allowed to be questioned or countered by COURSER, Bauer or any of the committee members. This was in spite of the fact that McBroom would later admit that ALLARD and GRAHAM had "precious little" credibility.

205.    The HBO Report was based primarily upon the accusations alone of ALLARD and GRAHAM. These statements were not taken under oath. However, they were accepted as sworn evidence in the HBO Report and also in the Committee hearings.

206.    During the committee hearings, evidence and testimony from Anne Hill and Karen Couture that corroborated COURSER and Bauer's testimony and discredited ALLARD and GRAHAM was not presented by the Committee.

207.    Many Democrat Representatives, including Chirkin, Liberati, and Singh, questioned the process, lack of witnesses, lack of subpoenas, lack of due process, and lack of any substantial evidence on the record.

208.    The Minutes of the House Select Committee to Examine the Qualifications of Representatives Cindy Bauer and Todd COURSER contain admitted omissions.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (fax)

***DEFENDANTS SIGNED A CONFIDENTIALITY AGREEMENT WITH THE HOUSE IN ANTICIPATION OF NEGOTIATIONS OF SETTLEMENT / ACTING IN CONCERT WITH SPEAKER OF HOUSE / HOUSE LEADERSHIP AND SO CALLED "HOUSE INVESTIGATORS" TO DENY COURSER PRECEDURAL DUE PROCESS AS WELL AS FAIR AND JUST TREATMENT.***

209.    Defendants acting with co-conspirators denied COURSER Due Process and Equal Protection under the law, Fair and Just treatment, the ability to confront one's own accusers, the ability to have fair hearing, the ability to have access to evidence, the ability to present evidence, the ability to be represented by counsel, the ability to present witnesses, and the ability to cross examine witnesses.

210.    In September 2015, Defendants were in negotiations to settle with the House of Representatives and part of that negotiation was a confidentiality agreement. See Ex 5, p. 180. On 9-8-15 Defendants via text, "I would also do it now before you sign any confidentiality agreement."

211.    On 9-10-15 Defendants signed a confidentiality agreement, "Confidentiality goes out and they have no reason to settle." See Ex 5, p. 227.

212.    The Select Committee denied COURSER standing in the hearing to remove him from office.

213.    The Select Committee adopted rules to deny any objections to their proceedings.

214.    The Select Committee denied COURSER right to representation in the hearing by forcing COURSER's lawyers to sit as spectators in the gallery.

215.    COURSER was also forced to sit as a spectator in the gallery denying him any procedural due process in the hearing.

216.    The Select Committee played the recording of COURSER made by Defendants and never authenticated it.

217.     Based on the fabricated recording made by Defendants COURSER was forced to defend himself against the fabricated recording of May 19, 2015.

218.     The Select Committee refused to allow COURSER to test the recording.

219.     The Select Committee refused to call Defendants to authenticate the recording.

220.     The Select Committee refused to subpoena Defendants to testify as to the recording and the events surrounding the recording.

221.     The Select Committee refused to allow COURSER to cross-examine witnesses.

222.     The Select Committee refused to allow COURSER to present evidence.

223.     The Select Committee allowed COURSER 3 hours of access to the evidence against him when the tapes themselves amounted to almost 4 hours and they had literally 800 plus pages of documentation.

224.     The Select Committee allowed COURSER no ability to take the evidence to have it reviewed by outside sources.

225.     The Select Committee denied COURSER any ability to defend himself in a hearing that denied him any fair and just treatment under the Michigan Constitution.

226.     The Select Committee denied COURSER any ability to defend himself in a hearing that afforded him no due process under the Michigan and U.S. Constitutions.

227.     The Select Committee never disclosed that the Defendants were under a confidentiality agreement with the House of Representatives that was signed at the same time as the hearings against COURSER.

228.     After COURSER was removed from the House Defendants filed suit against the House of Representatives in Federal District Court in Grand Rapids and settled their case with the House and were paid 500k in settlement money. Exhibit 67.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

229.    Defendants ALLARD and GRAHAM were granted lifetime legal services paid by the state in any action between themselves and COURSER.

230.    On September 11, 2015, COURSER was forcibly removed and constructively expelled from the House.

### FAIR AND JUST TREATMENT AND DUE PROCESS VIOLATIONS OF DEFENDANTS IN CONCERT WITH HOUSE LEADERSHIP

231.    Cotter stated after Courser COURSER and Bauer were removed from office, "To me, it didn't make a difference how we got the result of both of these members no longer being a member of the body." Cotter as Speaker had handpicked the committee; placed the republican legislators under an agreement that required them to vote as he required; had placed the Allard and Graham under contract of confidentiality; refused to allow the subpoena power to the committee. All of this was a departure from the policy/custom established in the prior 3 expulsion in Michigan history. Exhibit 68. Cotter's actions along with Defendants actions and others, as noted throughout this complaint, denied Courser fair and just treatment in a legislative hearing.

232.    The allegation of criminal conduct used to remove Courser was misuse of taxpayer resources; this was never shown by any evidence. But this was a criminal allegation by the Defendants and used in concert with others to bring the accusation of felony conduct to remove Courser from office.

233.    Defendants along with House leadership created a policy and custom through the prior 3 expulsions that preserved fair and just treatment as well as due process for the accursed legislator.

234.    Defendants, along with others acted in concert to actively and maliciously depart from the police and custom and their actions denied COURSER his right to fair and just

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

treatment and due process by placing each Republican committee member under agreement to vote as the Speaker of the House Required; by placing Defendants ALLARD and GRAHAM under a confidentiality agreement at the point of the need for them to authenticate the recording and be questioned; by refusing allow COURSER any rights to a fair hearing as noted below; and by creating a process whereby COURSER would be prosecuted based on edited, modified, fabricated, and destroyed evidence.

235.    COURSER's treatment was a complete departure from the prior House actions to expel legislators.

236.    The Defendants along with the House created a policy to completely deny all due process and fair hearing to COURSER.

237.    The standard was created in the 1880's when Milo Dawkins was expelled from the House and every effort was made to grant him fair and just treatment and every avenue for procedural due process. None of this was afforded to COURSER.

238.    This practice deprived COURSER of a substantive constitutional right and was executed pursuant to an official custom or policy. This policy or custom was the moving force behind the constitutional violation in order; and thus, establishes liability against Defendants.

239.    Art. I § 17 of the Michigan Constitution states, "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law. *The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.*"

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

240.    Michigan's legislature expelled its first legislator, Milo Dakin in 1887. During this expulsion the House of Representatives took many steps to ensure procedural safeguards to ensure due process, and fair and just treatment.

241.    They included the basic elements of due process, fairness, and justice which would be expected in a hearing of such magnitude as removing the representation of the people.

242.    In 1963, the people of Michigan themselves codified the importance of such standards by adding to Michigan's Constitution the fair and just clause which states, "*The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.*"

243.    However, COURSER was not afforded the basic elements of due process, fairness, or justice in his the legislative hearing which was conducted in the process to remove her from office and remove the representation of approximately 90,000 people in his district.

244.    Historical documents show that legislators expelled prior to COURSER were afforded opportunities such as having an impartial tribunal, the ability to confront their accusers, provide a defense, call witnesses, cross examine witnesses, submit evidence for exhibits, make objections, approve rules, authenticate evidence, and allow for in person public comment.

245.    Cotter's implementation of the custom or policy departed from Michigan's historical precedent without allowing those opportunities, and in stark contrast removed those elements from COURSER's hearing. Thus, the execution of the official custom or policy deprived COURSER of a substantive constitutional right. This denied Courser fair and just treatment.

246.    While the other legislators were given the opportunity to participate as active agents in the hearings, COURSER was forced to sit in the audience as an observer while

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (fax)

accusations were leveled against him, with no ability to defend himself against them. In fact, new rules were established for his hearing that threatened that if he did, he could be punished for contempt of the legislature. This denied Courser fair and just treatment.

247.    By implementing the custom or policy in this way, Cotter attempted to create a situation to deny COURSER legislative governmental immunity. This denied Courser fair and just treatment.

248.    Denial of COURSER to have standing in the hearing to remove COURSER from office was done to deny him legislative immunity, by creating the fallacy that Courser acted as a witness in giving testimony not as a legislator. This denied COURSER fair and just treatment.

249.    This allowed COURSER's words to then be simply matched against new allegations made by the Defendants to then charge COURSER with perjury. This denied COURSER fair and just treatment.

250.    This is not just an injustice to COURSER, but it cannot be overlooked the injustice this is to the people he represented. As he served as their representative, when due process and fair and just treatment was denied to him, it was indirectly denied to his constituents as well, and this is not only egregious, it is offensive to the people of Michigan.

251.    Cotter's implementation of the custom or policy deprived COURSER of the due process and fair and just standards used previously by Michigan's legislature because the recording being used as evidence against COURSER was edited, modified, and fabricated. In addition, evidence was destroyed while in possession of the House, MSP, and Attorney General.

252.    Cotter was also hiding his unclean hands. For instance, Cotter had the creators of the recording of COURSER under a "confidentiality agreement". This denied COURSER the right to question these men and the recordings authenticity. This was not disclosed to the public

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

and denied COURSER a fair hearing in violation of both the Due Process Clause and the Fair and Just Treatment Clause.

253.    Cotter had each member of the Republican slanted Select Committee under a caucus agreement that demanded that they vote as the Speaker required. This was not disclosed to the public and this denied COURSER a fair hearing under the Due Process Clause and the Fair and Just Treatment clause.

254.    The evidence wherein explains why. Simply put, what the evidence shows, is that Cotter could not allow the hearings to be conducted as they had been before, because if he had, the unclean hands of himself and his staff Swartlze, Bowlin, Saari, Beydoun, ALLARD, GRAHAM, and CLINE would have been revealed. And with the immense public attention this case had, that was much too great a risk for him to take. So COURSER was denied any procedural due process in the hearing.

255.    The attempt to expel COURSER was internally and politically motivated by Cotter from the beginning. "Kevin Cotter from day one tried to put a lasso around Courser and Gamrat and get them to be functional members of the caucus." See Ex 10, p. 25.

## COUNT 1
## VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS UNDER 42 U.S.C. § 1983

256.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

257.    Based on the facts set forth herein and in the proceeding paragraphs, Defendants are liable to COURSER for violation of his civil rights under 42 U.S.C. § 1983. In fact, Defendants were part of the process to set up COURSER to be removed from office and deprive him of his due process rights under the Fourteenth Amendment, Equal Protection rights under the Fourteenth Amendment, and Fourth Amendment rights. Defendants, as state actors under

66

color of law, conducted illegal surveillance, wiretapping, and eavesdropping and illegally accessed COURSER's computer; all in an effort to extort COURSER. These actions, along with editing, modifying, and fabricating certain voice recordings allowed the House to create a certain select committee which then deprived him of his due process rights under the Fourteenth Amendment, Equal Protection rights under the Fourteenth Amendment, and Fourth Amendment rights. Defendants were entirely part of the process to removed COURSER from office and create criminal charges against him using fabricated and deleted evidence.

258.    These Defendants were all state actors acting under the color of law acting in their capacity as employees of the House and reporting to other House members. In that capacity, they conducted illegal surveillance, wiretapping, eavesdropping, and then edited certain recordings to paint COURSER in a false light.

259.    The conduct of these Defendants, under the color of law, offends the community's sense of fair play and decency.

260.    These Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

261.    Defendants illegally recorded, edited, and then transmitted what they alleged to be a genuine recording of a conversation. The House then used that recording to constructively expel or force the resignation of COURSER on September 11, 2015.

262.    The actions of Defendants deprived COURSER of his rights, privileges, and immunities secured by the Constitution and laws. In fact, Defendants, when acting under color of State law, must respect fundamental human rights and personal immunities.

263.    These guarantees were violated when Defendants' conduct deprived COURSER of liberty and failed to respect decencies of civilized conduct to the extent that it "shocks the

67

conscience." This occurred, in part, when Defendants conducted surveillance, illegally recorded conversations, edited those conversations, and then transmitted those conversations with the obvious intent or reckless disregard of negligence that the edited recordings would be used to removed COURSER from his elected position.

264.    These Defendants violated COURSER's substantive rights under the Due Process Clause of the Fourteenth Amendment not to be deprived of liberty and property without due process of law.

265.    These Defendants also violated COURSER's substantive rights under the Equal Protection Clause of the Fourteenth Amendment not to be deprived of equal protection of the laws.

266.    Article I § 17 states that, "The right of all individuals, firms, corporations, and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed."

267.    These Defendants also violated COURSER's rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure when they illegally and unlawfully recorded conversations without COURSER's knowledge or consent.

268.    COURSER was forced from office without due process or equal protection (and other Constitutional violations) and was forced to endure loss of salary, income, and future prospects, including loss of his seat for the remainder of the term.

269.    Defendants' actions against COURSER, in concert with other co-conspirators, acted in a vindictive manner toward COURSER. Defendants, in concert with other co-conspirators, withheld benefits to COURSER and enforced certain laws, including policies and customs of the House, and then criminal laws, out of spite or illegitimate animus.

68

270.     These actions by Defendants demonstrate a "selective prosecution" against COURSER. The individual mistreatment of COURSER by state actors and government officials can be challenged under the federal constitution regardless of the motivation behind the conduct. Defendants, as state actors, along with other co-conspirators, including the House and individual House employees and representatives, acted arbitrarily or irrationally, and treated COURSER less favorably than those similarly situated. For example, Milo Dakin, Monte Geralds, and David Jaye.

271.     The selective enforcement against COURSER is a violation of his rights to Equal Protection of his constitutional rights by invidious discrimination. In fact, the Defendants, as state actors, along with other co-conspirators, including the House and individual House employees and representatives, have "singled out" COURSER for punishment because of his exercise of constitutionally protected rights.

272.     Here, Defendants were upset with COURSER's refusal to sign the Caucus Pledge and vote the will of his constituents. This was COURSER's constitutionally protected right, which he was entitled to exercise. Defendants had a "stake" in the exercise of that right, .i.e, their desire to bring COURSER in line with the Republican Caucus. The conduct of Defendants was unreasonable and was initiated with the intent to punish COURSER for exercising his protected right.

273.     COURSER was also subjected to purposeful discrimination intended to accomplish some forbidden aim. The Defendants intended to deprive COURSER of his right to represent his constituents. Defendants' actions, as state actors, were deliberately based upon an unjustifiable standard.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

274.     COURSER is now in jeopardy of losing his law license, his law practice, and his commercial building. His accounting practice/law practice has been completely destroyed by the actions of these Defendants. His practice is now in jeopardy due to the ongoing stain and stigma and the further actions by these Defendants. He has suffered irreparable harm economically, mentally, emotionally, personally, and professionally.

275.     Defendants are jointly, severally, and/or alternatively liable to COURSER for all of his injuries and damages.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 2
## VIOLATION OF 42 U.S.C. § 1985

276.     COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

277.     Based on the facts set forth herein and in the proceeding paragraphs, all of the Defendants are liable to COURSER for conspiracy to violate his constitutional rights under 42 U.S.C. § 1985.

278.     Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

279.     The actions by Defendants demonstrate a well-organized plan to dig up "evidence" they used to help expel COURSER from office.

70

280. Defendants and/or an agent thereof engaged in a concerted action or conspiracy involving two or more persons for the purpose of depriving, directly or indirectly, COURSER the equal protection of the laws.

281. The action was designed to accomplish either a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means; all in furtherance of the conspiracy.

282. Defendants and/or an agent thereof illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of conducting surveillance and disseminating information regarding COURSER.

283. Defendants and/or an agent thereof illegally, in combination, conspired to improperly obtain information, publicly humiliate, harass, embarrass, and otherwise cause COURSER to lose his employment as a Representative.

284. This conspiracy resulted in the illegal, unlawful, or tortious activity of illegally surveying, improperly disseminating private information, and improper removal of COURSER from The House.

285. As a result of the conspiracy and Defendants and/or an agent thereof illegal, wrongful, or tortious acts, COURSER sustained damages and was deprived of a right or privilege of a United States citizen.

286. In doing so, Defendants prevented COURSER from performing his duties as a State Legislator. See 42 U.S.C. § 1985(1). Defendants conspired to prevent, by force, intimidation, or threat, COURSER from holding office, or from discharging any duties thereof. Defendants also induced COURSER to leave his position, where his duties as a Representative were required to be performed. Defendants also caused injure to COURSER on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or

71

to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

287.    Defendants also deprived COURSER of rights and privileges. See 42 U.S.C. § 1985(3). Defendants conspired to deprive COURSER of equal protection under the laws. Defendants also conspired to cause injury to COURSER and to deprive him from having and exercising his rights and privileges of a citizen of the United States.

288.    Defendants are jointly, severally, and/or alternatively liable to COURSER for all of his injuries and damages.

289.    COURSER is entitled to bring a claim under 42 U.S.C. § 1985 because Defendants, as state actors, in concert with other co-conspirators, treated him adversely compared to others similarly situated, due solely to an illegitimate animus and selective prosecution based on COURSER's exercise of an independent constitutional right.

290.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

**COUNT 3**
**VIOLATION OF THE FAIR AND JUST TREATMENT CLAUSE OF ARTICLE I, § 17**
**of the MICHIGAN CONSTITUTION**

291.   COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

292.   Article I, § 17 of the Michigan Constitution states that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to **fair and just treatment in the course of legislative and executive investigations and hearings** shall not be infringed." (Emphasis added.)

293.   The right to fair and just treatment is distinct and separate from the right to substantive and procedural due process.

294.   The Due Process Clause of the Michigan Constitution provides, in pertinent part, that "[n]o person shall ... be deprived of life, liberty or property, without due process of law." Const. 1963, art. 1, § 17. The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart. The doctrine of substantive due process protects unenumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment. Further, the substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference.

295.   In a long line of cases, the Federal and Michigan Courts have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right to bodily integrity. "[T]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment

guarantee of due process."[7] Federal and Michigan Courts have since recognized a liberty interest in bodily integrity in circumstances involving such things as abortions.[8]

296.   COURSER was employed by the House as a duly elected State Representative and, at all relevant times, met the constitutional requirements to hold the position as an elected representative. He was a citizen of the United States, at least 21 years of age, an elector of the district he represented, had not been convicted of subversion, and had not been convicted of a felony involving a breach of public trust in the preceding 20 years. Mich. Const. art. IV, § 7.

297.   At all times, COURSER was an "individual" for purposes of the Fair and Just Treatment Clause.

298.   COURSER was subject to a legislative investigation into his alleged wrongdoings, as well as several legislative hearings that ultimately led to his constructive expulsion.

299.   As described at length above, the House's investigation into COURSER's alleged wrongdoing was neither fair nor just.

300.   Also, the hearings that were conducted by the House, which ultimately culminated in COURSER's constructive expulsion, were neither fair nor just.

---

[7] *Mays v Snyder*, 323 Mich App 1, 59; 916 NW2d 227 (2018) (citing *Alton v. Texas A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999))

[8] *Roe v. Wade* , 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), end-of-life decisions, *Cruzan v. Dir., Missouri Dep't of Health* , 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), birth control decisions, *Griswold v. Connecticut* , 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), corporal punishment, *Ingraham v. Wright* , 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), and instances in which individuals are subject to dangerous or invasive procedures that restrain their personal liberty, see, e.g., *Rochin v. California* , 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (determining that a detainee's bodily integrity was violated when police ordered doctors to pump his stomach to obtain evidence of drugs); *Screws v. United States* , 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (holding that an individual's bodily integrity was violated when a citizen was beaten to death while in police custody).

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

301.   To further demonstrate the unfair and unjust nature of the investigation and hearings, COURSER was not afforded the same procedure afforded to past legislators facing censure or expulsion.

302.   In fact, several other past members of the State Congress have committed felonies and other misconduct and never faced censure or expulsion.

303.   The Defendants and their co-conspirators (including the House) deprived COURSER of his substantive constitutionally protected right to fair and just treatment in the course of the legislative investigation and hearings that led to his expulsion from the House.

304.   The Defendants and their co-conspirators (including the House) state actions were executed pursuant to an official custom or policy. This custom or policy was the moving force behind the constitutional violation.

305.   Had COURSER been allowed to call, question, and cross examine witnesses, the public and the other Representatives would have found out that Courser was not guilty of the accusations charged against him, likely preventing his expulsion and subsequent charges. Courser was charged after two expulsion votes and entering the third expulsion based on the accusations in the HBO Report. Where the witnesses were never allowed to be cross examined and no witnesses were allowed from COURSER. COURSER was also refused any ability to cross examine the evidence or present evidence.

306.   "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Thus, the required elements of due process are those that "minimize substantively unfair or mistaken deprivations" by enabling persons to contest the basis upon which a state proposes to deprive them of protected interests. The core of these requirements is notice and a **hearing before an**

**impartial tribunal**. Due process may also require an opportunity for **confrontation and cross-examination**, and for **discovery**; that a **decision be made based on the record**, and that a **party be allowed to be represented by counsel**. See *Carey v. Piphus*, 435 U.S. 247, 259 (1978). "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases." *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976).

307.  An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and **afford them an opportunity to present their objections.**" This may include an obligation, upon learning that an attempt at notice has failed, to take "reasonable followup measures" that may be available. In addition, notice must be sufficient to enable the recipient to determine what is being proposed and **what he must do to prevent the deprivation of his interest.** Ordinarily, service of the notice must be reasonably structured to assure that the person to whom it is directed receives it. Such notice, however, need not describe the legal procedures necessary to protect one's interest if such procedures are otherwise set out in published, generally available public sources.

308.  The table below highlights the core requirements mentioned above to provide due process to individuals as well as to what extent COURSER was provided these elements during the HBO investigation and Select Committee Hearings to expel him.

| Due Process Procedures[A] | Courser Select Committe & Investigation |
|---|---|
| Hearing before an impartial tribunal | No<br><br>Hearing was before a partial tribunal |
| Opportunity for confrontation | No Opportunity |
| Opportunity for cross-examination | No Opportunity |
| Opportunity for Discovery | No Opportunity |

76

| Due Process Procedures<sup>x</sup> | Courser Select Committe & Investigation |
|---|---|
| Decision based on the record | No - Record was incomplete |
| Party be allowed represented by counsel | Counsel and party were forced to sit in audience during hearing - not participants |
| Afford an opportunity to present objections | No Opportunity |
| Sufficient notice of what is being proposed and what party must do to prevent deprivation of his interest | No |

309.    To give fuller context we will look at each procedure individually.

310.    **Impartial Tribunal.** "Just as in criminal and quasi-criminal cases,[9] an impartial decision maker is an essential right in civil proceedings as well.[10] "The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. . . . At the same time, it preserves both the appearance and reality of fairness . . . by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him."[11]

311.    Evidence shows that the Arbiters of the HBO investigation and select committee were predisposed to find against COURSER. For one example, after the expulsion Bowlin admitted to the Michigan State Police, *"And in my mind [00:12:00] on that issue the bar was pretty questionable as to what had to be the level for expulsion. And I said to the people that I talked to, the members that I talked to, as to how low do you want that bar to be for members behavior to be set. It wasn't in the constitution as to the felonious behavior but where do you want that bar to be? And they set it the way they wanted to set it. But that wasn't my decision nor should [00:12:30] have been of staff. Um, and so then I started getting into actually doing*

---

[9] *Tumey v. Ohio*, 273 U.S. 510 (1927)
[10] *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970).
[11] *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980)

77

*interviews. Um trying to figure out from day to day exactly what that report, report should look like.* (Bowlin MSP interview p.6-7)

312.    In addition, COURSER was not allowed to have his case heard by an impartial tribunal. The Select Committee was established by Republican Speaker of the House Cotter to include 4 Republicans and 2 Democrats, the Chair of the committee being Republican Representative McBroom. This intentional partisanship was a severe flaw and allowed the Republicans to vote as a block, outnumbering the Democrats, and fully control the hearing, which happened over and over during the committee and prevented COURSER from having a fair hearing.

313.    The Committee was not impartial for another reason, the Republican committee members had signed an agreement with Cotter prior to the Select Committee. They signed an agreement to stand together on all important votes, which in this case would certainly qualify. They were not serving as free agent Representatives but had already committed to voting together as a block, which they did continuously throughout the hearing, creating a barrier to any fairness or justness during the committee hearing.

314.    Representative Roberts stated on the House floor, *"Why was the committee not equally Republican and Democrat, why was it stacked? Why couldn't it have been a bipartisan body that looked into this?"* (House Journal)

315.    And Representative Liberati, one of the Democrats who served on the Select Committee stated on the House floor after the hearings concluded, *"I also have a very deep-seated respect for this institution in this House of Representatives and it is actually why I asked to be on this committee. I thought we were going to work in a bi-partisan manner to one of the…the most power we have invested in us is to expel another member. I put that at the highest*

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

*bar, the highest, the highest bar....I think that was maybe one of my moments I shouldn't have did that, because all I have seen since this select committee started is a one sided it was not bipartisan....there was 4 Republicans and 2 Democrats, there was a striking of what I believed was very relevant testimony. It would have been more relevant, but I got cut off on my questions."*

316.   **Confrontation, Questioning of Witnesses.** The National Conference of State Legislators outlines Basic Elements of a Fair Disciplinary Process including, *"Any hearing should be conducted to ...uphold the right of the accused to question witnesses and to call witnesses."*[12]

317.   COURSER was not given any opportunity to call witness, to question, or to confront his accusers in any way during the hearing or in any other area of the investigation. Instead COURSER was forced to sit in the audience while the hearing was conducted, having no recourse to defend himself as allegations and untruths were uttered and repeated by the witnesses and the committee members.

318.   Even further, the four Republicans on the committee repeatedly voted as a block to shut down the requests made by the two Democrat committee members to call key witnesses, such as the staff whose allegations the charges were founded upon, and to ask pertinent questions of the few witnesses who were called.

---

[12] "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Where the "evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealously," the individual's right to show that it is untrue depends on the rights of confrontation and cross-examination. "This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, . . . but also in all types of cases where administrative . . . actions were under scrutiny." *Greene v. McElroy*, 360 U.S. 474, 496–97 (1959)

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

319.    Representative Liberati, a Democrat who served on the committee explained, *"So there are numerous things, we were ruled, questions ruled out of order not relevant numerous times, with numerous witnesses. The biggest one to me is the subpoena. Ben Graham and Keith Allard started this whole thing and I wouldn't be sitting at this podium talking to my colleagues if it wasn't for Ben Graham taping that recording. I know this 800-page booklet, folder of information was put together for us by the House Business Office and by the counsel, the leadership counsel. I am not going to take that book as gospel truth; I am trying to get to the bottom of what's in this report and every time, not every time, but multiple times my questions were ruled out of order, I objected. Police our own members, but if we don't police our own members, there needs to be just a little bit of legitimacy; letting counsel testify on the time line when things happened. So I cannot support the resolutions."*

320.    Representative's Dianda, Smiley, and Chirkun explained their nay votes to be recorded in the journal, all recording.[13]

321.    Representative Chirkun, a Democrat who served on the committee also voiced his opposition.[14]

---

[13] "Today I voted against House Resolutions 139 and 141 expelling Representative Todd Courser from the 82nd House District and Cindy Gamrat from the 80th House District within the Michigan House of Representatives. I'm gravely concerned this process is severely flawed. The House Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser has not done its due diligence. They have struck key testimony from Speaker Cotter's office concerning the allegations from the official record and refused to call on key witnesses to testify in front of the body as to what they experienced while in Rep. Courser and Gamrat's office. Quite simply, there is not sufficient information until that body finishes its work. I take each and every vote very seriously and this one is no different especially considering we will be removing members from this body. My hope is the Select Committee will continue its work and determine what specific parties knew and when they were involved. I request my remarks be printed in the journal."(House Journal).

[14] "I rise in opposition today to the House Resolutions that seek to expel State Representatives Cindy Gamrat and Todd Courser today. Being the minority vice chair of the Select Committee to Examine the Qualifications of Representative Cindy Gamrat and Todd Courser, I saw the available evidence presented to the members of the committee. During the three days of committee hearings, my colleague Frank Liberati and I asked numerous questions of those that testified, only to be ruled out of order as it was not relevant to the task of the committee. Each one of our questions specifically had evidence

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

322.     Rep Sam Singh also voiced his opposition on the House Floor.[15]

323.     **Discovery.** COURSER was not given opportunity for a full discovery and barriers to obtaining discovery were put in place by the House.

324.     Bowlin and Cotter released the HBO Report to the media, before letting COURSER have a copy, which was not what he had been told by Tim Bowlin how it would go earlier in the investigation. In fact, Bowlin stated, "If we meet I will not be able to go over the report with you. You will get a copy of the report though when it's released."

325.     When COURSER finally received the HBO Report he found it was just a summary of "Findings" which were false, and did not include the evidence.

---

stemming from the actual report and yet we were unable to get our questions answered. I still have many questions that have yet to be answered. When former Chief of Staff Norm Saari testified in committee, the body did an unprecedented thing by completely striking his testimony despite our questions pertaining directly from the report provided to us and directly relevant to the firing of staff. Based on the evidence provided, I felt there was enough to significantly censure both Representatives Gamrat and Courser but without hearing directly from two key witnesses and getting all of the possible evidence and information, I was not ready to proceed with a resolution to expel both members at this point in time. When I sought subpoena power in committee to bring additional witnesses forward and to get answers to these questions, I was denied. The staffers that were to be subpoenaed are central to the allegations specifically challenging the qualifications of Representatives Courser and Gamrat to continue their legislative service. In addition, at the beginning of the hearings, House Republican legal counsel advocated for the expulsion of Representative Courser and the censure with strict conditions for Representative Gamrat. Yet, with little explanation or discussion, we are moving today to expel both, all while the majority of my legislative colleagues have not had enough opportunity to review the information presented to the committee and to receive the necessary answers to make their determination on how to proceed."

[15] "Also, there were people who were on the list of witnesses that we wanted to have come forward. Now, we've been told time and time again, 'Well everything is in the 800 pages.' We have two whistleblowers who had the opportunity obviously to speak with the legal counsel, as well as with our House Business Office Director, and put things into a record. They were not under oath, they did not have any members that I'm aware of that were part of that process....Now, I keep hearing it's in the report, but these individuals, if you had subpoenaed them, would have been under oath. That to me is the most important piece. That is one of the pieces that is missing here today. That the two whistleblowers were not under oath, did not have an opportunity to testify....But until I have the two people that started this whole thing under oath, then I don't think we've done our due diligence."

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

326.    COURSER was allowed very limited access to review the over 800 pages of evidence and hours of audio recordings which were kept in Bowlin's office just days before the Select Committee hearing.

327.    COURSER was not allowed to make copies of the evidence nor was he even allowed a copy of the summary of his statement made during the HBO investigation.

328.    COURSER was not given access to any of the evidence from his office computers which were seized by the House.

329.    COURSER was not given copies of the audio recordings or provided originals to review for authenticity.

330.    COURSER was not allowed to make discovery requests of his own of the House or of his accusers.

331.    **Decision to be Made Based on the Record.** COURSER was denied a decision based on the record as COURSER was afforded no ability to participate in the committee to contribute importance evidence for the record, leaving the record itself incomplete. COURSER was not allowed to submit exhibits for committee discussion, to object to questioning, to call witnesses, or to cross examine witnesses.

332.    In addition, actions taken by the non-impartial tribunal prevented key witnesses and evidence from being entered into the record.

333.    **Party be allowed to be represented by counsel**. Although COURSER was not denied to obtain his own counsel, COURSER and his counsel were not allowed to actively participate in the hearing proceedings; instead they were forced to sit with the audience. Rule 11 of the Committee precluded COURSER or his counsel from objecting or in any way interfering in the committee or face punishment for contempt of the Legislature. In essence, removing

82

COURSER's opportunity for representation during the hearing. The only time COURSER was allowed in front of the committee was on the second and final day when he was called forward to read a statement requesting censure and answer questions from the committee. He was not allowed any further involvement during the hearing.

334.    **Afford an Opportunity to Provide Objections.** COURSER was not afforded any opportunity during the investigation or Select Committee to provide objections.

335.    **What he must do to prevent the deprivation of his interest.** "Ordinarily, service of the notice must be reasonably structured to assure that the person to whom it is directed receives it.[16] Such notice, however, need not describe the legal procedures necessary to protect one's interest *if such procedures are otherwise set out in published, generally available public sources.*"[17]

336.    There had only been three expulsions in Michigan's history, there were not published procedures available to COURSER. In fact, with each expulsion, rules and procedures were changed, including with COURSER's. Despite this, COURSER was not given any notice which described the process or procedures of the Select Committee Hearings and expulsion proceedings. At times, COURSER was given the rules, dates, times, and locations, however not all the time. There were times when COURSER's attorney was forced to find out about important details from the media who received information before COURSER.

337.    In addition, many times COURSER was intentionally not informed of important information and/or the events were changed along the way without notifying COURSER. For example, COURSER was instructed by Bowlin that he would gather information in his investigation and then sit down with him to review it before meeting with Cotter, and after all

---

[16] *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965)
[17] *City of West Covina v. Perkins*, 525 U.S. 234 (1999)

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

parties discussed the findings, Bowlin would give a recommendation of how things should proceed.

338.   However, without notice, while Bowlin was still conducting his investigation and before any findings had been made, Cotter formed the Select Committee to Examine the Qualifications of COURSER as a Representative.

339.   Not only was COURSER not afforded due process, the investigation and committee hearing were blatantly unfair and unjust.

340.   The investigation, expulsion, and Committee process were politically motivated and handled in a way that is in stark contrast compared to the previous three expulsions which have occurred in Michigan, of Representative Milo Dakin in 1887, Representative Monte Geralds in 1978, and Senator David Jaye in 2001.

341.   Dakin was charged by the House for misfeasance, malfeassance, or venal and corrupt conduct in office, for soliciting and procuring monies to influence votes for "the purpose of corruptly and unlawfully appropriating all or a part of such money for his own personal use and benefit."

342.   Records show that great care was provided during Dakin's hearing to hold as close to possible a hearing which would replicate that which would be found in a court room, especially given that he had not been convicted criminally. During the hearing the importance of fairness and justice was referenced and on multiple occasions, Rule 6, which read, "All the rules legal and usual governing cases at law in courts of record in this State, not inconsistent herewith, shall be observed in the conduct of this examination." (P. 1572 Journal of the House 1887)

84

343.    Dakin's hearing lasted about 20 hours and took place in the presence of the entire House. He was afforded all elements of due process and fair and just treatment. The House even agreed to cover the costs of Dakin's attorney for his defense.

344.    Geralds was disbarred by the Attorney Grievance Commission and convicted criminally for charges of embezzlement. Following his conviction he was provided 30 hours of Committee Hearings by the House for his defense.

345.    Jaye had been convicted of 3 DUIs, had multiple charges of assault, and was arrested again and facing additional potential charges. Jaye was also provided 30 hours of Committee Hearings for his defense and also afforded the elements of due process and fair and just treatment such as calling witnesses, authentication of evidence, confronting his accusers, providing a defense, and representation throughout the full hearing.

346.    Representative COURSER had no criminal charges, convictions, or even criminal findings in the House investigation. COURSER was provided about 4 hours of the total 7 hour Committee Hearing; nothing more.

347.    COURSER was not allowed to confront his accusers, provide a defense, to call or cross examine witnesses, question authentication of evidence, object in any way, nor afforded any due process or fair and just treatment at the hearing. In fact, COURSER was forced to sit in the audience as an observer during her Hearing and rules of the committee threatened that if he or his attorney interrupted the Committee, for example trying to object or speak at all he could be punished for contempt of the Legislature (Rule 11).

348.    Representative Singh voice his opposition on the House Floor.[18]

---

[18] "I'll tell you, I'm a little surprised how quickly we ended up here, but I knew we would end up here at some point in time. I really, if you talk to my wife, know how much I have thought about this, calling former legislators including my mentor who served in this body for 22 years, who actually served in the Monte Geralds' expulsion from this chamber and asked them: What did they look at? What did they

349.    The following table outlines the procedure and elements of involved in each of the expulsions in Michigan, and it is clear to see the start contrast between the treatment COURSER received compared to the other three hearings and expulsions.

350.    Although Geralds was only the second legislator expelled in Michigan with a drastic process change of holding his hearing in a committee rather than the full House like Dakin, the committee notes related to Geralds' expulsion are not available in the Library of Michigan Archives. In addition, committee notes are available online through 1977 however for 1978, during the time of Geralds' expulsion, they are deemed protected under copy-write law.

| | Representative Milo Dakin Expelled 4/28/1887 | Representative Monte Geralds Expelled 5/10/78 | Senator David Jaye Expelled 5/24/01 | Representative COURSER Constructively Expelled |
|---|---|---|---|---|
| Criminal Convictions Related to Expulsion | None | Convicted of embezzlement 1978 | Convicted of DUI, 3rd in 2000 followed by charges of assault and missed parole, 2001 arrested | None |
| Legislative Committee Makeup | Entire House of Representatives | Standing Committee on House Policy | Select Committee 3 Republicans 3 Democrats | Select Committee 4 Republicans 2 Democrats |
| Opportunity for Accused to Have Input in Setting Procedural Rules | Afforded | Committee Notes Unavailable | Afforded | Not Afforded |

see? And again, as we've talked about, whether it's the two expulsions that have happened since 1963 or the different select committees that were created but resulted in people actually resigning before the expulsion vote, what you saw in every single instance, was that there were already criminal charges. In most cases, the criminal charges had actually worked their way through the court process. Monte Geralds' case, the one that we dealt with here in the House, had actually gone through conviction and that is why it rose to the conversation and was a felony, mind you, and rose to that occasion. Across the building when we expelled David Jaye, many of us were staffers and working with organizations, that individual had three drunk drivings, had pending charges of domestic violence, and a whole series of other things added to them. What I really struggled with is that today we're going to have a vote on expulsion and we haven't even started a criminal investigation.: ( House Journal)

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

| | Representative Milo Dakin Expelled 4/28/1887 | Representative Monte Geralds Expelled 5/10/78 | Senator David Jaye Expelled 5/24/01 | Repesentative COURSER Constructively Expelled |
|---|---|---|---|---|
| **Opportunity for accused to Participate in Full Legislative Hearing** | Afforded | Committee Notes Unavailable | Afforded | Not Afforded |
| **Hours of Hearings** | 20 Hours of Full House Hearing | 30 Hours of Committee Hearing\n\nAttorney Grievance Commission\n\nCriminal Proceedings | 30 Hours of Committee Hearing\n\nCriminal Proceedings | About 2 Hours of Committee Hearing\n\n(There were a total of 7 hours of Select Committee however the majority of those hours were spent related to Representative Courser) |
| **Opportunity for Accused to Submit Subpoena and Witness List** | Afforded | Afforded in Criminal Court | Afforded | Not Afforded |
| **Number of Witnesses Called by Committee (Not counting the accused)** | 6 | Committee Notes Unavailable | 24 | 2 |
| **Number of Witnesses Called by Accused** | 8 | Committee Notes Unavailable | 7 | 0\n\n(Not Afforded) |
| **Opportunity for accused to Call Witness** | Afforded | Afforded in Criminal Court | Afforded | Not Afforded |
| **Opportunity for accused to Cross Examine Witnesses** | Afforded | Afforded in Criminal Court | Afforded | Not Afforded |
| **Opportunity for accused to Object to Questioning** | Afforded | Afforded in Criminal Court | Afforded | Not Afforded |

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

| | Representative Milo Dakin Expelled 4/28/1887 | Representative Monte Geralds Expelled 5/10/78 | Senator David Jaye Expelled 5/24/01 | Repesentative COURSER Constructively Expelled |
|---|---|---|---|---|
| Opportunity for accused to Submit Exhibits To Be Discussed in Committee | Afforded | Afforded in Criminal Court | Afforded | Not Afforded |
| Opportunity for accused to Object to Evidence | Afforded | Afforded in Criminal Court | Afforded | Not Afforded |
| Allowed for Authentication of Evidence by Committee | Yes | Yes - in Criminal Court | Yes | No |
| Audio / Video Exhibits - Chain of Custody / Authenticity Tested | Not Applicable No Audio or Video submitted | Committee Notes Unavailable | Yes | No |
| Opportunity for Public Comment | Yes | Committee Notes Unavailable | Yes | No |
| Opportunity for Accused to present Closing Arguments | Afforded | Afforded in Criminal Court | Afforded | Not Afforded |
| Allowed the Full House to Vote on Censure in lieu of Expulsion | 4 Separate Articles / Charges were submitted to House for a Vote | Yes | No | No |
| Number of Votes Taken by Legislature to reach Expulsion | 1 | 1 | 1 | 3 |

351.    Both Geralds and Jaye had been through proceedings in a court of law prior to their expulsions, providing opportunities of due process and results which could be relied upon by the House Members.

88

352.     **Legislative Committee Makeup** (Table Row 3). Milo Dakin's expulsion process was carried out in front of the entire house and each side was given the opportunity to select 3 representatives. Geralds' hearing was conducted in the standing Committee on House Policy. For Jaye, the Senate created a special Select Committee of 3 Republicans and 3 Democrats. For COURSER, a special Select committee was created as well however Cotter created it with 4 Republicans and 2 Democrats which allowed the Republicans to vote as a block and prevent the Democrats and Representative COURSER from having a legitimate voice in the process.

353.     **Opportunity for Accused to Have Input in Setting Procedural Rules** (Table Row 4)**.** During previous expulsions, Dakin and to a lesser extent Jaye were afforded the opportunity to have input in deciding procedural rules. COURSER was not given opportunity for input.(Geralds' notes are unavailable).

354.     **Opportunity for accused to Participate in Full Legislative Hearing** (Table Row 5). During previous expulsions, legislators were afforded the opportunity to fully participate and engage in the full legislative hearing, COURSER was not.

355.     Dakin was called with his representation to occupy the seats at the committee and engaged fully in the entire committee procedure. Jaye also was afforded the opportunity to engage in his full hearing. (Geralds' notes are unavailable.)

356.     COURSER was forced to sit with her counsel in the audience at her legislative hearings, removing her ability to participate fully and thwarting his opportunity to have counsel fairly represent him. In fact, rule11 of the committee threatened that if COURSER or her counsel were to try and object or mount a defense from the audience where they were placed, they could be found in contempt of the Legislature for interfering with the Committee.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

357.    Rule 11: Any witness or attorney representing a witness, may be punished for contempt by the Legislature, as provided by law (see MCL 4.82 and 4.101) under either of the following circumstances:

    a.    Pursuant to a properly issued subpoena, he or she refuses to be sworn or testify, or fails on demand to produce paper, book, or documents in regard to the matter under investigation, or otherwise neglects or refuses to obey the committee subpoena.

    b.    He or she is guilty of deliberately interfering with the duties and powers of the Committee while in attendance at a meeting of the Committee.

358.    COURSER was only given one instances on the second and final day where he was called by the committee to read a statement requesting censure and answer questions. While at the same time, House majority counsel, Brock Swartzle and House Business Office Director Tim Bowlin, occupied the seats at the front with the committee during the entire proceedings.

359.    **Hours of Committee Hearing** (Table row 6). Dakin's was afforded 20 hours of hearings, Geralds and Jaye were afforded 30 hours, yet COURSER was only afforded 5. (Although there were 7 total hours of the Select Committee 5 focused on Representative COURSER.)

360.    **Opportunity for Accused to Submit Subpoena and Witness List** (Table Row 7). During the previous expulsions, Dakin and Jaye were afforded the opportunity to submit subpoena and witness lists, COURSER was not.

361.    **Number of Witnesses Called by Committee** (Table Row 8). During the previous expulsions, the House committees called numerous witnesses except in COURSER's case. For example, in regards to Dakin, the committee called 6 witnesses and for Jaye they called 24 witnesses, including multiple legislative aides. In COURSER's only 2 witnesses were called beyond Representatives COURSER and Bauer, House Business Office Director Tim Bowlin and Chief of Staff Norm Saari, whose testimony was stricken from the record by the chair. Although

90

the 2 Democrats on the committee requested and motioned to call the persons who made the allegations as witnesses, they were denied by Chair McBroom and the Republicans.

362.    **Number of Witnesses Called by Accused** (Table Row 9). Dakins was afforded to call 8 witnesses and Jaye called 7 witnesses in his legislative hearings. (Geralds' committee notes are unavailable). COURSER was not afforded the opportunity to call any witnesses at all. For example, COURSER was not afforded the opportunity to call the former staff, Allard, Graham, and Cline who had made the allegations against him.

363.    COURSER was also not allowed to call legislative assistants, Anne Hill and Karen Couture, who were witness to Representative COURSER's conduct in the office which was being questioned by the committee, as well as to the conduct of Allard, Graham, and Cline.

364.    Anne Hill and Karen Couture had provided written and verbal testimony during the HBO investigation which contested the allegations against COURSER and substantiated Bauer's testimony. These witnesses were not called nor were their testimonies presented or discussed by the committee during the hearing.

365.    **Opportunity for accused to Cross Examine Witnesses** (Table Row 10). Both Dakin and Jaye were given opportunities to cross examine witnesses in their legislative hearings (Geralds' Committee notes are unavailable). COURSER was not afforded any opportunity to cross examine witnesses.

366.    **Opportunity for accused to Object to Questioning** (Table Row 11). During the previous expulsions Dakin and Jaye given the opportunity to object to questioning, COURSER was not.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

367.    **Opportunity for accused to Submit Exhibits** (Table Row 12)**.** During the previous expulsions Dakin and Jaye were given the opportunity to submit exhibits to be discussed during the hearing, COURSER was not.

368.    **Opportunity for accused to Object to Evidence** (Table Row 13)**.** During the previous expulsions Dakin and Jaye were given the opportunity to object to evidence, COURSER was not.

369.    **Opportunity for accused to Object to Evidence** (Table Row 14). During previous expulsions, authentication was verified of documents and pictures submitted as exhibits, except in COURSER's hearing.

370.    During Jaye's hearing for instance, multiple witnesses were called to authenticate pictures taken from Jaye's office computer which were exhibits of the committee. However in COURSER's hearing, the information from his office computers which had been seized by Bowlin and Swartzle in the investigation was not provided or presented but was destroyed by the House. (Forensic Expert Neil Broom)

371.    **Audio and Video Exhibits - Chain of Command / Authenticity Tested** (Table Row 15)**.** During Jaye's expulsion, authenticity and chain of custody of pictures, audios, and video evidence was verified through witnesses and transcripts. However, in COURSER's hearing the committee did not allow for even the basic steps of authenticating the evidence.

372.    A recording was played by the Select Committee in COURSER's hearing which was later found by an expert forensic specialist to have been altered and edited, as well as later confirmed altered during deposition by Josh Cline. The Select Committee did not take steps to verify the authentication of the recording or present the original for review. In fact, in an even further act of complete egregious offense to fairness and justness, the committee chair denied the

request of the 2 Democrat committee members to call the person who made the recording, Ben Graham, as a witness to be questioned. In essence, the chair intentional denied the committee's ability to authenticate the recording they played.

373.   **Opportunity for Public Comment** (Table Row 16). During the previous expulsion hearings of Dakin and Jaye, opportunity was provided for in person public comment; however it was no afforded in COURSER's hearing. (Geralds' committee hearing minutes are unavailable under copyright).

374.   **Opportunity for Accused to present Closing Arguments** (Table Row 18). During the expulsions of Dakin and Jaye, opportunity was provided in the hearings for the them through their counsel to present closing arguments. (Geralds' committee hearing minutes are unavailable). COURSER was not afforded this opportunity in his hearing.

375.   **Number of Votes Taken by Legislature to reach Expulsion** (Table Row 20). During the previous explosions of Dakin, Jaye and Geralds, only 1 vote was taken by the House to expel. In COURSER's case, 3 votes were taken or attempted which lasted 14 hours to arrive at enough votes for the House's efforts at expulsion of COURSER.

376.   In order to arrive to Speaker Cotters desired outcome to expel both Representatives Bauer and COURSER, the vote to expel was left on the board for hours, when normal practice is to close the voting board within minutes of the call to vote. During this time, Representatives were not allowed to leave the floor, even to use the restroom, until they voted. During this time, pressure was increased until Speaker Cotter received the votes that he needed to expel. During this time, numerous Democrat Representatives made public statements to the lack of fairness and due process provided, including the Democrat representatives who served on the Select Committee.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

377.    The Defendants and their co-conspirators (including the House) acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law in arbitrarily expelling COURSER, even though he had not even yet been charged with a crime at the time of his constructive expulsion.

378.    The acts of Defendants and their co-conspirators created a plan to used false, edited, modified, and fabricated evidence to removed COURSER from office and then prosecute him criminally based on the surveillance, wiretapping, and fabricated recordings.

379.    These facts support the conclusion that COURSER's constitutional claim of injury to bodily integrity arose from actions taken by state actors pursuant to governmental policy. These facts and allegations implicate the state, state employees state officers, and authorized decision-makers (all of which include Defendants) in the adoption of particular courses of action that ultimately resulted in violations of COURSER's substantial rights.

380.    This coordinated effort involving various state employees and officials (all of which include Defendants), to mislead the public in an attempt to cover up the harm caused by the illegal acts of Defendants.

381.    These allegations also support the conclusion that governmental actors (including the Defendants), acting in their official roles, considered a range of options and made a deliberate choice to orchestrate an effort to conceal the unlawful acts of Defendants. The

382.    These allegations establish a violation of constitutional rights arising from the implementation of official policy.

383.    As a direct and proximate result of Defendants' actions, COURSER has suffered, and will continue to suffer, substantial damages.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

### COUNT 4
### VIOLATION OF FEDERAL WIRETAPPING ACT AND MICHIGAN'S EAVESDROPPING STATUTE

384.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

385.    Throughout the aforementioned time frame, Defendants and other non-named parties, acting as co-conspirators, had been spying on COURSER.

386.    Upon information and belief, Defendants were working with Joe Gamrat, Horr, Krell, and other unidentified persons to conduct surveillance activities, record conversations, and send extortive text messages to COURSER.

387.    Among other things, Defendants and/or their agents at their direction, unlawfully placed listening devices, tracking devices, and engaged in other inappropriate and illegal surveillance activities. These actions occurred by Defendant in their capacity as government employees.

388.    After obtaining private information from surveillance and listening devices, Defendants used that information to blackmail, extort, and threaten COURSER.

389.    Upon information and belief, Defendants spoke regularly with Joe Gamrat and other employees of the House before, during, and after the surveillance and blackmail was occurring.

95

390. Upon information and belief, Defendants also spoke directly with Livengood, in whose name the extortion phone was registered and whom the extortionist repeatedly mentioned as the recipient of the illegally obtained information and whom Defendants ultimately took their story.

391. Defendants violated MCL 750.540 when they, in conjunction with others (including other Defendants) and in order to aid the conspiracy described herein, willfully and maliciously tapped or otherwise made an unauthorized connection to an electronic medium of communication of COURSER.

392. Defendants violated MCL 750.539c when they, in conjunction with others (including other Defendants) and in order to aid the conspiracy described herein, willfully used a device to eavesdrop upon the conversations of COURSER without the consent of all parties to the conversation.

393. Defendants at one time or another, knowingly aided, requested, or employed others (including other Defendants) to eavesdrop on the conversations of COURSER without the consent of all parties to the conversation.

394. Defendants violated 18 U.S.C. § 2511 when they intentionally intercepted, endeavored to intercept, or procured other people (including other Defendants) to intercept or endeavor to intercept, wire, oral, and electronic communication of COURSER.

395. Defendant further violated 18 U.S.C. § 2511, when they intentionally used, endeavored to use, or procured other people (including other Defendants) to use or endeavor to use an electronic, mechanical, or other device to intercept oral communications of COURSER and did so when they placed recording devices (or authorized the placement of recording

devices) in COURSER's offices and other private places and then transmitted those communications through a wire, cable, or other connection.

396.    Defendants violated 18 U.S.C. § 2511, because they knew or had reason to know that the recording devices (or any component) had been sent through the mail or transported in interstate or foreign commerce.

397.    Defendants also violated 18 U.S.C. § 2511, because (a) their actions to record and/or transmit conversations of COURSER took place on the premises of a business or commercial establishment the operation of which affects interstate or foreign commerce or (b) their actions to record and/or transmit conversations of COURSER where obtained for the purposes of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce.

398.    Defendants violated MCL 750.539d when they installed listening devices in a private place without the consent of COURSER (and others) who were entitled to privacy in order to observe, record, transmit, or eavesdrop upon the sounds events in that place.

399.    Defendants violated MCL 750.539d when they distributed and disseminated or transmitted for access a recording they knew to be obtained in violation of such section. For instance, this occurred when GRAHAM played the alleged recording from COURSER's office to ALLARD and GRAHAM. Another violation occurred when ALLARD and GRAHAM transmitted the recordings to The Detroit News. Other violations occurred when Joe Gamrat, CLINE, Horr, and Krell sent and received transmissions of certain recordings.

400.    Defendants violated MCL 750.539d when they distributed and disseminated or transmitted for access the same recordings they knew to be obtained in violation of such section.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

For instance, this occurred when Defendants used The Detroit News to transmit the recordings to the world.

401.    Defendants violated MCL 750.539e when they used or divulged information they knew or reasonably should have known was obtained in violation of MCL 750.539b, 539c, or 539d. Defendants further violated 18 U.S.C. § 2511, when they intentionally disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

402.    Defendants further violated 18 U.S.C. § 2511, when they intentionally used or endeavored to use the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

403.    Defendants further violated 18 U.S.C. § 2511, when they intentionally disclosed or endeavored to disclose the contents of the wire, oral, or electronic communications intercepted by authorized means but knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, having obtained or received the information in connection with a criminal investigation, and with intent to improperly obstruct, impede, or interfere with a criminal investigation.

404.    At all relevant times, the Defendants listed herein acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

405.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and

98

permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

406.    Pursuant 18 U.S.C. § 2520, civil damages are authorized by statute for violation of 18 U.S.C. § 2511

407.    Pursuant to MCL 750.539h, civil damages are authorized by statute for violation of Act 328 of 1931, which necessarily includes 750.539a, 539b, 539c, 539d, *et seq*.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 5
## VIOLATION OF 18 U.S.C. 1030 and MCL § 752.791

408.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

409.    18 U.S.C. § 1030 is the Computer Fraud and Abuse Act ("CFAA"). The CFAA explicitly authorizes "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

410.    The CFAA prohibits seven types of conduct with respect to unauthorized access of computers. See 18 U.S.C. § 1030(a)(1)-(7).

411.    Here, Defendants violated the CFAA in the following ways:

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

a.      Defendants intentionally accessed COURSER's computers without authorization or exceeding authorized access and obtained information from COURSER's protected computers. 18 U.S.C. § 1030(a)(2)(C).

b.      Defendants knowingly and with the intent to defraud, accessed a protected computer of COURSER without authorization, or exceeding authorized access, and by means of such conduct committed fraud or furthered their intended fraud. 18 U.S.C. § 1030(a)(4).

c.      Defendants knowingly caused the transmission of information and as a result of such conduct, intentionally caused damage without authorization to a protected computer. 18 U.S.C. § 1030(a)(5)(A).

d.      Defendants intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly caused damage. 18 U.S.C. § 1030(a)(5)(B).

e.      Defendants intentionally accessed a protected computer without authorization, and as a result of such conduct, cased damage or loss. 18 U.S.C. § 1030(a)(5)(C).

f.      Defendants knowingly and with the intent to defraud trafficked in COURER's passwords or similar information through which a computer may be accessed without authorization, when such trafficking affects interstate commerce. 18 U.S.C. § 1030(a)(6)(A).

g.      Defendants with the intent to extort from COURSER a thing of value, transmitted in interstate commerce communications containing a threat to cause damage to a protected computer. 18 U.S.C. § 1030(a)(7)(A).

h.      Defendants with the intent to extort from COURSER a thing of value, transmitted in interstate commerce communications containing a threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality obtained from the protected computers without authorization or by exceeding authorized access. 18 U.S.C. § 1030(a)(7)(B).

i.      Defendants with the intent to extort from COURSER a thing of value, transmitted in interstate commerce communications containing a demand for a thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion. 18 U.S.C. § 1030(a)(7)(C).

412.    Defendants engaged in this conduct when they accessed COURSER's computers without authorization or in excess of authorization and obtained COURSER's passwords, emails,

100

text messages, and voice messages, which were then distributed to others without COURSER's consent and also used to extort COURSER to resign from office.

413.    Defendants' misappropriation of COURSER's passwords, emails, text messages, and voice messages violated 18 U.S.C. § 1030.

414.    As a result of Defendants conduct, COURSER suffered damages and loss.

415.    Defendants conduct involved a loss to COURSER during any 1-year period aggregating at least $5,000 in value. COURSER also suffered a loss through Defendants' attempt to commit an offense punishable under 18 U.S.C. § 1030.

416.    Defendants also violated MCL 752.791 *et seq*, commonly known as "Fraudulent Access to Computers, Computer Systems, and Computer Networks."

417.    Defendants intentionally accessed COURSER's computers in order to devise or execute a scheme or artifice with the intent to defraud and extort COURSER.

418.    Defendants also intentionally and without authorization or by exceeding valid authorization accessed COURSER's computers in order to alter, damage, delete, or destroy property or otherwise used the computers.

419.    Defendants also intentionally and without authorization or by exceeding valid authorization accessed COURSER's computers and inserted or attached or created the opportunity for an unknowing and unwanted insertion or attachment with the intent to acquire, alter, damage, delete, disrupt, or destroy property or otherwise use the computer.

420.    As a result of Defendants conduct, COURSER suffered damages and loss.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this

Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 6
### LIBEL, SLANDER, and DEFAMATION (INCLUDING DEFAMATION *PER SE*)

421.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

422.    COURSER is an attorney in private practice in Lapeer, Michigan.

423.    During his career as an attorney, COURSER has enjoyed a successful law practice until the Defendants targeted COURSER and published and disseminated malicious, reckless, and outrageous falsehoods about him, including, but not limited to, falsely asserting that COURSER committed misconduct in office, misuse of taxpayer resources, forced forgery, forcing staffers to lie, retribution against staffers, and extortion.

424.    Defendants transmitted and published these excerpts of their wiretapping and surveillance (including illegal or unauthorized recordings) with the knowledge that the recording was not authentic and had been fabricated, or in the alternative, Defendants acted with extreme reckless and negligent conduct.

425.    This led to COURSER to suffer extreme emotional and mental torment and destruction of his life including being afraid to work out of his office out of fear of being recorded.

426.    Defendants' statements are false because they are taken out of context through an edited and fabricated recording. The fabrication of the recordings demonstrates actual malice. The entire nature of the recording is defamatory when Defendants have edited, modified, and fabricated recordings; which they pass off to the general public as authentic.

102

427.     Defendants' edited, modified, and fabricated recordings were distributed and published to Livengood and The Detroit News, with knowledge that The Detroit News would then release the false recordings to the world. These recordings were published to The Detroit News with reckless disregard for the truth.

428.     The Defendants' false statements and lies about COURSER concerning misconduct in office, misuse of taxpayer resources, and lies concerning forcing staff to cover up his relationship and forge signatures destroyed his reputation both personally and professionally, as well as destroyed his law practice, nearly costing him his law license, and has done irreparable harm to his family and his life; forcing him to endure two separate criminal actions in two separate counties, a grievance commission investigation, a Michigan Unemployment Audit, and actions by the Michigan Secretary of State.

429.     Defendants engaged in this conduct as co-conspirators of the extortion plot to remove COURSER from office.

430.     When ALLARD and GRAHAM sent the recordings to The Detroit News, they were sent in the form of 13 separate fragments. Indeed, when ALLARD and GRAHAM instructed that some of the fragments were "off the record" and that some should be withheld.

431.     Upon information and belief, when these fragments were sent to The Detroit News, all Defendants knew that the recordings were based on fabricated, never authenticated recordings; which has now been shown to not be authentic, edited, and a fabrication.

432.     Defendants acted with malice or extreme negligence.

433.     ALLARD and GRAHAM knew that the May 19, 2015 recording had been edited and altered and still sent them to The Detroit News.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

434.   Based on the fabricated and edited recordings, Defendants knew the article published by The Detroit News on August 7, 2015, contained false allegations of felonious conduct by COURSER, misconduct in office, misuse of taxpayer resources, forced forgery, forcing staffers to lie, retribution against staffers, and extortion.

435.   Defendants made statements to The Detroit News and others that were defamatory (libel/slander) and caused irreparable harm to the COURSER's reputation and future earnings prospects.

436.   It has now been determined that the recording was in fact a fabrication and was not authentic and complete, but in fact was edited and could not have been made on the evening of May 19, 2015 between 10:00 pm and 12:00 am. See Ex 3.

437.   Since the publication of Exhibit 3, Defendants have not corrected their stories and acknowledged that the recording was a fabrication, edited, and is not authentic.

438.   Defendants assisted in the plot to remove the COURSER from office by passing off the 13 clips as a complete and authentic tape; knowingly acting without authenticating the recording; and intentionally and knowingly (or at the very least negligently) using fragments of a recording that are not authentic.

439.   These actions by Defendants amount to defamatory statements.

440.   Defendants' defamatory statements about COURSER were gratuitously made and served the purpose to embarrass, humiliate, harm COURSER, and cause COURSER financial loss. These statements were made in order to promote Defendants.

441.   Following the August 7, 2015 article, ALLARD and GRAHAM have brazenly repeated their false allegations about COURSER and continuing to hide and conceal that the recordings are edited, fabricated, and not authentic.

104

442.    Defendants' statements accusing COURSER of unethical and illegal conduct and thus being a felon are false and defamatory, *per se*, and utter fabrications that Defendants negligently and/or maliciously published and dispersed with knowledge that they were false or with reckless disregard for their truth or falsity.

443.    COURSER did not engage in illegal conduct as stated by Defendants.

444.    Even after it has been revealed that the recording is not authentic, Defendants have refused to issue a public retraction of the false and defamatory statements.

445.    Defendants have refused to publish a retraction of the false and defamatory statements.

446.    Defendants' defamatory falsehoods have improperly caused COURSER damages. As Chief Justice Warren aptly expressed it over 50 years ago: "Freedom of the press under the First Amendment does not include an absolute license to destroy lives or careers." Defendants have intentionally defamed and damaged COURSER, presumably in order to create a name for themselves, generate widespread publicity for their newspaper, receive promotions, and for their own financial gain. This is unconscionable, and Defendants should be held accountable.

447.    COURSER brings this action for the purpose of at least partially preserving and restoring his reputation, as well as recovering the significant damages that he has suffered.

448.    Defendants have known that publishing comments to The Detroit News and to others would cause a "buzz", which would benefit Defendants and cause COURSER damages.

449.    The defamatory statements set forth in the articles are false.

450.    The publication and distribution of the articles was not privileged.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

451.     At the time Defendants published the statements to The Detroit News and others, they were aware that COURSER had not engaged in the false conduct alleged or implied. In fact, Defendants had no evidence to support their claims in the articles.

452.     The defamatory statements in the letter that was published and distributed are defamation *per se*.

453.     Defendants negligently and/or maliciously published and distributed the defamatory statements about COURSER with actual knowledge of the falsity of the statements or with reckless disregard for their truth or falsity.

454.     The defamatory statements hold COURSER up to hatred, scorn, contempt, and/or ridicule, and were made with malicious intent.

455.     The false and defamatory statements by Defendants are naturally and obviously damaging to COURSER's business and reputation and have damaged his business and reputation.

456.     In addition to impairing COURSER's reputation and causing COURSER lost standing in the community, the false and defamatory statements have caused COURSER to suffer personal humiliation, mortification, embarrassment, mental anguish, and emotional distress.

457.     Though utterly false, the false and defamatory statements have created suspicion that COURSER is a criminal, capable of felonious assault and other unethical conduct.

458.     Such statements will or could impact COURSER's name and the value of his name by creating the false impression that he is a criminal, capable of felonious assault and other unethical conduct.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

459.    Such statements have also resulted in potential economic loss and other damages that are still being determined.

460.    COURSER has incurred some incremental or increased injury to feelings attributable to his sense of indignation and outrage as a result of the Defendants' bad faith and ill will.

461.    The conduct of the Defendants was "despicable" and "outrageous" within the meaning of the laws of the State of Michigan and malicious with the meaning of those laws, thus entitling COURSER to exemplary and punitive damages from the Defendants.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 7
## CIVIL STALKING UNDER MCL 600.2954

462.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

463.    Defendants' actions as described above were prohibited by MCL 750.411h and constituted stalking as defined by Michigan law.

464.    Specifically, Defendants' actions were willful and directed toward COURSER.

465.    Defendants' course of conduct involved repeated and continuous harassment directed toward COURSER, including, among other things, coordinating surveillance, following

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (fax)

COURSER, reporting her whereabouts, and sending extortion texts-that caused her emotional distress and mental anguish.

466.  Defendants' repeated and continuous harassment of COURSER would cause a reasonable person to feel terrorized, threatened, frightened, intimidated, harassed, and molested.

467.  Defendants' conduct has actually made COURSER feel terrorized, threatened, frightened, intimidated, harassed, and molested. In fact, COURSER was the subject of relentless extortion texts that targeted him and his family. It would be unreasonable to argue that such extortion texts did not terrorize, threaten, frighten, intimidate, harass, ore molest COURSER.

468.  COURSER was the targeted victim of Defendants' continued harassment.

469.  COURSER did not consent to any of the actions described above.

470.  The conduct of Defendants was not constitutionally protected. The conduct of Defendants did not serve any legitimate purpose. In fact, Defendants created the situation that led to stalking when they violated multiple stated and federal laws in order to remove COURSER from his position for their own pecuniary interest.

471.  As a direct and proximate result of Defendants' stalking, COURSER has suffered mental anguish, physical and emotional distress, humiliation, embarrassment, and the loss of her employment.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

## COUNT 8
## INVASION OF PRIVACY and INTRUSION UPON SECLUSION

472.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

473.    COURSER has a privacy interest in his personal life and business relationships.

474.    Defendants' wiretapping and surveillance constituted an unwarranted intrusion upon COURSER's seclusion or solitude, or into his private affairs.

475.    The intrusions by Defendants were and are objectionable and offensive to a reasonable person, including COURSER. The disclosure of the information would be highly offensive to a reasonable person.

476.    "Michigan has long recognized the common-law tort of invasion of privacy." *Lewis v. LeGrow*, 258 Mich.App 175, 193; 670 NW2d 675 (2003).

477.    Defendants' subsequent publication of the misleading and defamatory information constituted a public disclosure of false allegations that are now embarrassing to COURSER.

478.    Defendants' subsequent publication of the misleading and defamatory information constituted publicity which place COURSER in a false light in the public eye.

479.    Defendants' publication of the misleading and defamatory articles constituted an invasion into COURSER's private matters.

480.    COURSER has a right to keep his relationships private.

481.    Defendants were not private citizens when they complained about COURSER. Rather, they were acting in their scope as House employees. They were not charged with ensuring ethical compliance in their offices.

482.    The Defendants have obtained private information through a method objectionable to a reasonable person; to wit, by violating Michigan's wiretapping and

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

eavesdropping statutes and engaging in a plot to send extortive texts to COURSER demanding that he resign his elected office.

483.    At all relevant times, Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 9
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

484.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

485.    Defendants were aware that they were publishing the misleading and defamatory articles.

486.    COURSER has valid business relationship or expectancy with his clients, business relationships, and others. COURSER's business relationship or expectancy was a "reasonable likelihood of probability" and actual relationships existed.

487.    Defendants knew that COURSER has contractual or business relationship with his clients. In fact, Defendants published information knowing it would reach COURSER's clients.

488.    Defendants knew that the misleading and defamatory information could cause COURSER's relationships to believe that COURSER was a criminal.

110

489.    Defendants' act of publishing the misleading and defamatory information was an intentional interference by Defendants inducing or causing a breach of termination of the relationship or expectancy.

490.    Defendants' act of publishing the misleading and defamatory information is a per se wrongful act or the doing of a lawful act with malice or unjustified in law for the purpose of invading the contractual rights or business relationship of COURSER.

491.    COURSER has suffered damages, which continue.

492.    The conduct of the Defendants was "despicable" and "outrageous" within the meaning of the laws of the State of Michigan and malicious with the meaning of those laws, thus entitling COURSER to exemplary and punitive damages from the Defendants.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of not less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

<u>**COUNT 10**</u>
<u>**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>

493.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

494.    The Defendants' conduct of wiretapping and surveillance and then publishing and distributing the information was widely regarded as extreme and outrageous conduct.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

495.    The Defendants' acts of wiretapping and surveillance and then publishing information was intentional and were done with reckless disregard to the harm that might be cause in COURSER.

496.    As the result of wiretapping and surveillance and then publishing information, COURSER has suffered severe emotional distress.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 11
## NEGLIGENCE and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

497.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

498.    The Defendants conducted wiretapping and surveillance and distributed misleading and false information in order to cause damage to COURSER. This violated 18 U.S.C. §§ 2511 and MCL 750.539b, MCL 750.539c, MCL 750.539d

499.    The Defendants violated MCL 750.479c when they concealed material facts related to a criminal investigation, made false or misleading statements, and provide false information.

500.    The Defendants violated MCL 750.422 when they committed perjury.

112

501.   The Defendants violated stalking statutes of 18 U.S.C. § 2261A; MCL 750.411h and 750.411i when they followed COURSER and placed him under surveillance with the intent to injure, harass, and intimidate COURSER.

502.   The Defendants violated 18 U.S.C. § 1875(d) when they transmitted communications to COURSER and his family with the intent to extort money or other things of value and when these communications contained a threat to injure COURSER's property, reputation, or reputation of another, or a threat to accuse COURSER of a crime.

503.   The Defendants violated 47 U.S.C. § 223 when they made harassing telephone calls in interstate communications and made threatening and extortive text messages that were obscene with the intent to abuse, threaten, or harass COURSER.

504.   Defendants violated 18 U.S.C. § 96 RICO and MCL 750.159i. (Michigan RICO) when they engaged in racketeering activities with a common criminal enterprise.

505.   Defendants violated MCL 750.157a when they conspired to commit an offense prohibited by law or to commit a legal act in an illegal manner.

506.   Defendants violated MCL 750.483a when they removed, altered, concealed, or destroyed, other otherwise tampered with evidence to be offered in a present or future official proceeding.

507.   Defendants violated MCL 752.795 when they fraudulently accessed COURSER's emails, texts, voicemails, passwords, and electronic accounts.

508.   Defendants violated MCL 750.540 when they illegally used COURSER's electronic communications and made unauthorized connections to COURSER's emails, texts, voicemails, passwords, and electronic accounts.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

509.    Defendants violated 18 U.S.C. 1030 and MCL § 752.791 when they made illegal and fraudulent connections to COURSER's computers.

510.    Defendants violated other statues as described in this Complaint.

511.    Defendants owed COURSER a duty to not engage in the above described illegal conduct.

512.    Such conduct involves an unreasonable risk of harm.

513.    Such conduct violates the general duty to conform to the legal standard of reasonable conduct in the light of the apparent risk.

514.    Such conduct would foreseeably result in emotional harm and injury to COURSER.

515.    Wiretapping and surveillance and distribution of misleading and false information has caused and continues to cause COURSER great emotional distress and embarrassment.

516.    Defendants had a duty to exercise reasonable and ordinary care and caution in and about their conduct.

517.    Defendants were negligent in their acts and/or omissions as described above, by, amongst other things, engaging in wiretapping and surveillance and distribution of misleading and false information based on false and unverified information, including a series of altered recording that were obtained in violation of the Michigan wiretapping and eavesdropping statutes.

518.    At all relevant times, Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

519.    As a direct and proximate cause of the conduct of Defendants as described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to,

114

severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 12
## VIOLATIONS OF RICO; 18 U.S.C. § 1962(a), (b), and (c) and MCL 750.159i

520.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

### CULPABLE RICO PERSONS

521.    All Defendants in this matter are RICO persons.

### RICO ENTERPRISE

522.    The RICO enterprise consists of all Defendants and other co-conspirators as described in this Complaint who, associated in fact, worked through the enterprise to commit a pattern of racketeering, which includes the specific predicate acts alleged herein.

### INTERSTATE OR FOREIGN COMMERCE

523.    Defendants' racketeering activity affected interstate commerce.

524.    Telephone conversations, correspondence, documentation, and other communication, as described herein, was used the U.S. Mail and interstate wires.

525.    Also, the pattern of racketeering crossed state lines when Defendants provided financing, payments, U.S. Mail, and interstate wires in an effort to remove COURSER from

115

office and to damage his livelihood, all with the intent to engage in illegal wiretapping and eavesdropping and to promote a sensational story for profit.

526.     Therefore, the activity of the enterprise and the predicate acts of racketeering affect interstate commerce.

### PATTERN OF RACKETEERING

527.     Defendants (and other co-conspirators as described in this Complaint) have engaged in a long-term pattern of racketeering activity, which has benefitted the criminal RICO enterprise and harmed COURSER.

528.     As described in this Complaint, some Defendants (and other co-conspirators as described in this Complaint) started the scheme to violate state laws and then spy on COURSER in order to "dig up dirt" on him. This scheme involved illegal wiretapping and eavesdropping. This included purchasing favors and information from the Radisson Hotel in Lansing. Information was also illegally harvested from COURSER's private email, text messages, and voice recordings. Information obtained was then used to extort COURSER. The illegally obtained information was then provided to Livengood and The Detroit News for broadcast around the world. Eventually, this scheme resulted in the MSP and Michigan Attorney General investigating and bringing charges against COURSER to cover up the conspiracy to defraud and extort. This was all done in order to deprive COURSER from his office, property, and livelihood. All Defendants (and other co-conspirators as described in this Complaint) joined and continued that fraudulent scheme in order to defraud COURSER.

529.     Defendants (and other co-conspirators as described in this Complaint) conspired to earn a profit through a process of fraud and misrepresentation of material facts, to advance their own careers, and to harm COURSER.

530.    Defendants (and other co-conspirators as described in this Complaint) conspired to provide misinformation to the general public in order to convert COURSER's House seat to their own in order to profit.

## RACKETEERING ACTIVITY

531.    Defendants (and other co-conspirators as described in this Complaint) engaged in a pattern of racketeering activity that harmed COURSER, including additionally incurred legal costs, the inability to earn money, the loss of property rights and profits, and a violation of his due process, equal protection, and other Constitutional rights.

## VIOLATIONS OF MCL § 750.539B, 539C, 539D, 539E AND 750.540

532.    Defendants violated MCL 750.540 when they conspired to and did (in order to aid the conspiracy) willfully and maliciously tape or otherwise make unauthorized connections to an electronic medium of communication of COURSER.

533.    Defendants violated MCL 750.539c when they trespassed for purpose of eavesdropping or surveillance.

534.    Defendants violated MCL 750.539c when they conspired to and did (in order to aid the conspiracy) willfully use a device to eavesdrop upon the conversations of COURSER without the consent of all parties to the conversation.

535.    Defendants violated MCL 750.539d when they conspired to and did (in order to aid the conspiracy) install listening devices in a private place without the consent of COURER (and others) who were entitled to privacy in order to observe, record, transmit, or eavesdrop upon the sounds and events in that place.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

536.     Defendants violated MCL 750.539d when they conspired to and did (in order to aid the conspiracy) distribute and disseminate or transmit for access a recording they knew to be obtained in violation of such section.

537.     Defendants violated MCL 750.539e when they conspired to and did (in order to aid the conspiracy) use or divulge information they knew or reasonably knew or should have known was obtained in violation of MCL 750.539b, 539c, or 539d.

### *VIOLATIONS OF 18 U.S.C. § 2511*

538.     Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) intentionally intercept, endeavor to intercept, or procure other people (including other Defendants) to intercept or endeavor to intercept, wire, oral, and electronic communications of COURSER.

539.     Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) intentionally use, endeavor to use, or procure other people (including other Defendants) to use or endeavor to use an electronic, mechanical or other device to intercept oral communications of COURSER.

540.     Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) know or have reason to know that the recording devices (or any component) had been sent through the mail or transported in interstate or foreign commerce.

541.     Defendants violated 18 U.S.C. 2511 because (a) their actions to record and/or transmit conversations of COURSER took place on the premises of a business or commercial establishment the operation of which affects interstate or foreign commerce or (b) their actions to record and/or transmit conversations of COURSER where obtained for the purposes of obtaining

118

information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce.

542.    Defendants violated 18 U.S.C. 2511 when they intentionally disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

543.    Defendants violated 18 U.S.C. 2511 when they intentionally used or endeavored to use the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

544.    Defendants violated 18 U.S.C. 2511 when they intentionally disclosed or endeavored to disclose the contents of the wire, oral, or electronic communications intercepted by authorized means but knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, having obtained or received the information in connection with a criminal investigation, and with intent to improperly obstruct, impede, or interfere with a criminal investigation.

### *VIOLATIONS OF MCL 750.479C*

545.    Defendants violated MCL 750.479c when they were informed by a "peace officer" that there was a criminal investigation and they concealed material facts related to the criminal investigation.

546.    Defendants violated MCL 750.479c when they were informed by a "peace officer" that there was a criminal investigation and they made statement that they knew were false or misleading.

119

547.    Defendants violated MCL 750.479c when they were informed by a "peace officer" that there was a criminal investigation and they provided writings, documents, and recording that they knew were false or misleading.

548.    Defendants violated MCL 750.479c when they destroyed, edited, and fabricated evidence.

### *VIOLATIONS OF MCL 750.422*

549.    Defendants violated MCL 750.422 when they committed perjury in order to promote and continue their conspiracy to defraud COURSER and start and continue a criminal investigation.

### *VIOLATIONS OF 18 U.S.C. § 2261A, MCL 750.411H, AND 750.411I*

550.    Defendants violated 18 U.S.C. § 2261A; MCL 750.411h and 750.411i when they placed COURSER under surveillance, followed him, took pictures and video, and then broadcast those picture and video through email and text messages.

551.    Defendants violated 18 U.S.C. § 2261A; MCL 750.411h and 750.411i when they placed COURSER under surveillance, followed him, took pictures and video, with the intent to injure, harass, and intimidate COURSER.

### *VIOLATIONS OF 18 U.S.C. § 1875(D)*

552.    Defendants violated 18 U.S.C. § 1875(d) when they made threats and extortion through interstate communications.

553.    Defendants violated 18 U.S.C. § 1875(d) when transmitted these threats and extortion to COURSER and his family with the intent to extort money or other things of value and when these communications contained a threat to injure COURSER's property, reputation, or reputation of another, or a threat to accuse COURSER of a crime.

### *VIOLATIONS OF 47 U.S.C. § 223*

554.   Defendants violated 47 U.S.C. § 223 when they made obscene or harassing telephone calls in interstate communications.

555.   Defendants violated 47 U.S.C. § 223 when they made threatening and extortive text messages that were obscene with the intent to abuse, threaten, or harass COURSER.

### *VIOLATIONS OF MCL 750.157A*

556.   Defendants violated MCL 750.157a when they conspired to commit an offense prohibited by law or to commit a legal act in an illegal manner.

### *VIOLATIONS OF MCL 750.483A*

557.   Defendants violated MCL 750.157a when they removed, altered, concealed, or destroyed, other otherwise tampered with evidence to be offered in a present or future official proceeding.

### *VIOLATIONS OF MCL 752.795*

558.   Defendants violated MCL 752.795 when they fraudulently accessed COURSER's computers.

559.   Defendants violated MCL 752.795 when they fraudulently accessed COURSER's emails, texts, voicemails, passwords, and electronic accounts.

### *VIOLATIONS OF TITLE VII OF THE FEDERAL CIVIL RIGHTS OF 1964 AND THE MICHIGAN CIVIL RIGHTS ACT*

560.   Defendants violated Title VII of the federal Civil Rights Act of 1964 and under the Michigan Civil Rights Act when they sent and distributed pornographic pictures to other employees at the House.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

## *MAIL AND WIRE FRAUD – 18 U.S.C. §§ 1341, 1343*

561.    Defendants committed mail fraud when they sent any correspondence, documents, recordings, or funds, throughout the commission of their fraudulent scheme, through the U.S Mail or through other wired communications, such as telephones, emails, and text messages.

562.    These actions and statements sent by U.S. Mail or by telephones, emails, and text messages were not only false, but misleading in such ways as to the Defendants' illegal benefit and to COURSER's detriment.

563.    Further, the Defendants' correspondence, to include recorded conversations, is fraudulent and part of a greater scheme to defraud COURSER because of the Defendants unethical desire for unilateral benefit.

564.    Thus, by sending correspondence, recordings, emails, and text message to through the U.S. Mail and wires, Defendants intended to mislead, defraud and extort COURSER and citizens of the world into believing the truth of their correspondence and documents in order to mislead, defraud, and extort COURSER.

565.    The aforementioned records, emails, and text messages were false, fraudulent, and misleading. They were sent in an attempt to conceal the on-going RICO enterprise and was part of a greater "scheme or artifice to defraud" COURSER out of his rights to his office, property, business, and livelihood.

566.    The recordings, emails, and text messages were transmitted over the wires electronically via electronic mail and facsimile.

567.    Defendants knowingly transmitted their lies through the U.S. Mail and electronically via electronic mail and facsimile.

568.     Defendants' correspondence and documents were and are false, fraudulent, and misleading.

569.     Defendants utilized the mail and wires to perpetuate their misdeeds.

570.     Upon information and belief, Defendants engaged in other acts in furtherance of the schemes that involved use of interstate wire and the U.S. Mail, as identified in this Complaint

### *VIOLATIONS OF 42 U.S.C. § 1983 AND*

571.     Defendants, through the conspiracy, engaged in actions that violated COURSER's civil rights under 42 U.S.C. § 1983 and 1985, as described in this Complaint.

### *VIOLATIONS OF MCL § 445.61, ET SEQ (INCLUDING MCL § 445.65, 445.67, 445.67A, 445.69, 445.71)*

572.     Defendants, through the conspiracy, engaged in actions in violation of Michigan's Identity Theft Protection Act as described in this Complaint.

### *VIOLATIONS OF MCL § 752.791, ET SEQ AND 18 U.S.C. § 1030*

573.     Defendants, through the conspiracy, engaged in actions in violation of Michigan's Fraudulent Access to Computers, Computer Systems, and Computer Networks Act as described in this Complaint.

574.     Defendants, through the conspiracy, engaged in actions in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

### *VIOLATIONS OF COMMON LAW INVASION OF PRIVACY*

575.     Defendants, through the conspiracy, engaged in actions in violation of Michigan's common-law tort of invasion of privacy as described in this Complaint.

### *VIOLATIONS OF MCL § 750.213; EXTORTION AND BLACKMAIL*

576.     Defendants, through the conspiracy, engaged in actions of extortion and blackmail, in violation MCL 750.213 as described in this Complaint.

123

### *VIOLATIONS OF MCL § 750.505; MISCONDUCT*

577.   Defendants, through the conspiracy, engaged in actions of misconduct, in violation MCL 750.505 as described in this Complaint.

### *VIOLATIONS OF MCL § 750.349B; UNLAWFUL IMPRISONMENT*

578.   Defendants, through the conspiracy, engaged in actions of unlawful imprisonment, in violation MCL 750.349b as described in this Complaint.

### *INJURY*

579.   COURSER is a person who sustaining injuries to his business, property, and livelihood by reasons of the Defendants' violation of RICO and Defendants' commission of the predicate acts.

580.   COURSER has been harmed because, as a result of Defendants' actions, he has, to this day been deprived of business, property, and livelihood.

581.   COURSER has been harmed because he has been forced to incur substantial attorneys' fees in order to enforce his rights in the face of Defendants' predicate actions.

582.   COURSER has been harmed because he was forcibly removed and constructively expelled from office as a result of Defendants' predicate actions, causing him hardship, embarrassment, and loss of income and livelihood.

583.   COURSER has been harmed because he has suffered mental and emotional distress and attorneys' fees caused by Defendants actions against them.

584.   As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 13
## CONSPIRACY TO VIOLATE RICO; 18 U.S.C. § 1962(d)

585.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

586.    Section 1962(d) makes it unlawful to conspire to violate subsections (a), (b) or (c) of Section 1962. 18 U.S.C. § 1962(d).

587.    Each Defendant was a co-conspirator that knowingly joined the conspiracy and involved him or her, directly or indirectly, in the commission of at least two predicate offenses, including but not limited to the predicates of extortion, mail fraud and wire fraud, as alleged herein.

588.    Defendants were each aware of their role as co-conspirators because they have been engaged in a quid-pro-quo relationship with the other Defendants.

589.    Defendants knowingly and willingly involved themselves in a greater scheme to defraud, and commit the predicate acts alleged above, when they conspired to create a mutually beneficial business relationship whereby they attempted to deprive COURSER of his businesses, property, profits, livelihood, and value.

590.    Defendants also knowingly and willingly committed the predicate acts of fraud, mail and wire fraud, illegal wiretapping and eavesdropping, extortion, blackmail, and other

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (fax)

crimes and violations as described in this Complaint. Defendants also engaged in monetary transactions derived from unlawful activity of their conspiracy.

591.    Defendants were each aware of their role as co-conspirators.

592.    Defendants knowingly participated in a greater scheme to defraud, and commit the predicate acts alleged herein.

593.    As a result of their conspiracy, the predicate acts and greater scheme to defraud, COURSER was harmed.

**COUNT 14**
**INTENTIONAL INTERFERENCE WITH OR DESTRUCTION OF EVIDENCE and SPOILATION OF EVIDENCE**

594.    COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

595.    Defendants have remained in possession of their cellular phones and computers, despite pending criminal actions against COURSER.

596.    Defendants have known about pending and probable civil claims since at least September 2015.

597.    Starting in about January 2015, Defendants were making audio and video recordings and taking pictures of COURSER during surveillance. Upon information and belief, Defendants made at least 799 recordings. Exhibit 69.

598.    Defendants have also transferred fragments of recordings to Livengood through email wires. See Ex. 51. Text communications detailed herein also detail numerous exchanges of video, pictures, and audio; and the existence of multiple audio recordings.

599.    One of these recordings was allegedly made on May 19, 2015. This recording has been edited and modified. See Exs. 7 and 8.

126

600.   The original recording made May 19, 2015 no longer exists. Upon information and belief, many other recordings, pictures, and video (as referenced in the many text messages no longer exist. These items and data were evidence in this case and in pending criminal cases.

601.   Upon information and belief, these recordings, videos, and pictures were intentionally or willfully destroyed in bad faith or through gross negligence. This intentional and willful destruction of evidence by Defendants was designed to disrupt COURSER's future civil cases and pending criminal cases.

602.   The destruction of this evidence has caused actual disruption of future civil cases (including this case) and pending criminal cases.

603.   As a proximate cause of Defendants' actions. COURSER has been damaged.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 15
## CONSPIRACY and CONCERT OF ACTIONS

604.   COURSER restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

605.   Defendants acted tortiously.

606.   Defendants acted pursuant to a common design.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

607. At all relevant times, Defendants, by a combination of two or more persons, engaged in concerted activities described in the preceding paragraphs by express or implied agreement.

608. This concerted action was intended to, among other things, defame COURSER, embarrass COURSER, cast COURSER in a false and misleading light, and cause COURSER harm and damages as described in this Complaint.

609. This concerted action was also intended to, among other things, violate criminal statutes in order to "set up" COURSER using a fabricated recording and to then have COURSER criminally charged.

610. Defendants' actions were designed to accomplish multiple illegal and unlawful purposes, as described in this Complaint; or Defendants' actions were for a lawful purpose by unlawful means.

611. COURSER is not able to identify all of the activities of Defendants due to the generic similarity of such activities engaged in and promoted by Defendants and/or an agent thereof; but has provided details herein of the many activities engaged in and promoted by Defendants.

612. As a direct and proximate result of Defendants' concerted activities, COURSER has sustained, and will continue to sustain, severe injuries and damages.

613. Due to the concert of action among Defendants and/or an agent thereof, each is liable to COURSER for these injuries and damages even if there was no directed relation to the aforementioned activities conducted by any one particular person, party, or agent thereof.

614. Defendants are jointly, severally, and/or alternatively liable to COURSER for all of their injuries and damages.

128

615.   COURSER is entitled to exemplary and punitive damages.

616.   As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, COURSER has suffered damages in an amount of no less than $25,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

/s/ Matthew S. DePerno
Dated: December 28, 2018       Attorney for Plaintiff Todd COURSER
951 W. Milham Avenue
PO Box 1596
Portage, MI 49081
(269) 321-5064

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

## <u>VERIFICATION</u>

I, TODD COURSER, being first duly sworn, deposes and says that I am the plaintiff in the above-entitled cause. I am familiar with the facts at issue in this case. I have read the foregoing Complaint and know its content, that to the best of my knowledge, information and belief, the contents thereof are true.

DATED: December 28, 2018        */s/ Todd COURSER*_____
                                         Todd COURSER

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, by and through his attorney DePERNO LAW OFFICE, PLLC, hereby demands a trial by jury in the above entitled matter as to all issues and claims for which a jury trial is allowed.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: December 28, 2018

/s/ *Matthew S. DePerno*
Attorney for Plaintiff Todd COURSER
951 W. Milham Avenue
PO Box 1596
Portage, MI 49081
(269) 321-5064

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)