# Exhibit 32

```
                                                        1
 1                  STATE OF MICHIGAN

 2    IN THE 71-A DISTRICT COURT FOR THE COUNTY OF LAPEER

 3   PEOPLE OF THE STATE OF MICHIGAN,

 4        Plaintiff,              HON. LAURA CHEGER BARNARD

 5   v                           District No. 16-1385-FY

 6   TODD ANTHONY COURSER,        Circuit No. 17-013022-FH

 7        Defendant,

 8   _____/   VOLUME 1 OF 2

 9              PRELIMINARY EXAMINATION HEARING

10      BEFORE HON. LAURA CHEGER BARNARD, DISTRICT JUDGE

11         Lapeer, Michigan - Monday, October 9, 2017

12   APPEARANCES:

13   For the People:    GREGORY TOWNSEND (P35857)

14                      DENISE M. HART (P45127)

15                      MICH. DEPT. OF ATTORNEY GENERAL

16                      3030 West Grand Boulevard

17                      Detroit, MI  48202-6030

18                      (313) 456-0285

19   For the Defendant:  MATTHEW S. DePERNO (P52622)

20                      951 W. Milham Ave, PO 1585

21                      Portage, MI  49024-1248

22                      (269) 321-5064

23                      *      *      *

24   RECORDED BY:       Shelley Lee, CEO 5171

25   TRANSCRIBED BY:    Candace C. Noblett, CSR 2238
```

2

1  WITNESSES:                                        PAGE:

2  BENJAMIN GRAHAM

3       Direct Examination by Mr. Townsend           6

4       Cross-Examination by Mr. DePerno             55

5                       *      *      *

6  OTHER MATERIAL IN TRANSCRIPT:

7                  ***   None Presented   ***

8                       *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

| | IDENTIFIED | RECEIVED |
|---|---|---|
| 1 EXHIBITS: | | |
| 2 Ppl Ex 1 Transcript of May 19, | | |
| 3        2015 Recording | 20 | 21 |
| 4 Ppl Ex 2 E-mail from Immanuel | | |
| 5        Eickhold | 48 | 48 |
| 6 | | |
| 7 Df Ex 3  E-mail "More trouble | | |
| 8        in Paradise" | 73 | 83 |
| 9 Df Ex 4  **Not identified | -- | 83 |
| 10 Df Ex 5  E-mail from Keith Allard | | |
| 11        with 13 attachments | 75 | 83 |
| 12 Df Ex 6  E-mail from Keith Allard | | |
| 13        dated 8-28-15 | 79 | -- |
| 14 Df Ex 7  Text Message from Keith | | |
| 15        Allard | 86 | -- |
| 16 Df Ex 8  Email of 4-12-15 between | | |
| 17        Todd Courser and | | |
| 18        his mother | 93 | 98 |
| 19 Df Ex 9  E-mail between Todd | | |
| 20        Courser and his brother | 99 | -- |
| 21             *     *     * | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

4

```
 1                    Lapeer, Michigan
 2                    Monday, October 9, 2017
 3                    10:10 A.M.
 4                 *    *    *
 5               THE COURT:  Preliminary
 6      Examination.  Are the People ready to proceed?
 7               MR. TOWNSEND:  People are, your
 8      Honor.
 9               THE COURT:  But the computer isn't.
10               COURT CLERK:  Okay.
11               THE COURT:  Is it ready?
12               COURT CLERK:  It's ready, yes.
13               THE COURT:  State your names for
14      the record.
15               MS. HART:  Thank you, your Honor.
16      Assistant Attorney General Denise Hart on behalf
17      of the People.
18               MR. TOWNSEND:  And good morning.
19      Greg Townsend, Assistant Attorney General on
20      behalf of the People of the State of Michigan.
21               MR. DePERNO:  Matthew DePerno on
22      behalf of the defendant Todd Courser.
23               THE COURT:  Okay.  You can call
24      your first witness.
25               MS. HART:  Your Honor, the People
```

5

1      call Benjamin Graham.

2                     THE COURT:  And just for the

3      record, there was one witness who was out of

4      state, and I've excused his appearance for today.

5                     MR. TOWNSEND:  Your Honor, I would

6      indicate to the Court there's an attorney here on

7      that motion.  I would ask the Court permission to

8      allow him to be excused if --

9                     THE COURT:  Absolutely.

10                     MR. TOWNSEND:  -- he wishes to be

11      excused.

12                     THE COURT:  You're all set.

13                     UNKNOWN SPEAKER:  Thank you, your

14      Honor.

15                     THE COURT:  We tried to get a hold

16      of you Friday to let you know, but

17      miscommunication.

18                     UNKNOWN SPEAKER:  Okay.  Thank you,

19      your Honor.

20                     MR. TOWNSEND:  Mr. Graham.

21                     THE COURT:  Raise your right hand.

22      Do you solemnly swear the testimony you're about

23      to give in the cause now pending is the truth, so

24      help you God?

25                     MR. GRAHAM:  I do.

6

1                B E N J A M I N   G R A H A M

2        (At 10:11 a.m., sworn as a witness, testified

3        as follows:)

4                      THE COURT:  Please watch your step,

5        be seated, and spell your last name for the court

6        reporter.

7                      THE WITNESS:  Last name is

8        Graham -- G-r-a-h-a-m.

9                      COURT CLERK:  First name?

10                     THE WITNESS:  Ben.

11                     COURT CLERK:  Ben?

12                     THE WITNESS:  Full name?

13                     COURT CLERK:  Yes.

14                     THE WITNESS:  Benjamin --

15       B-e-n-j-a-m-i-n.

16                     COURT CLERK:  Thank you.

17                     MR. TOWNSEND:  May I --

18                     THE COURT:  Go ahead.

19                     MR. TOWNSEND:  May I proceed?

20                     THE COURT:  Yep.

21                     DIRECT EXAMINATION

22   BY MR. TOWNSEND:

23   Q    Good morning, Mr. Graham.

24   A    Good morning.

25   Q    How are you?

```
                                              7
 1  A    I'm good.

 2  Q    Good.  I just -- well, I have several questions I

 3       want to ask you with regard to the situation.

 4            First of all, can I ask you how you were

 5       employed back in 2015?

 6  A    In 2015, I was hired on January 2nd by the State

 7       House of Representatives.

 8  Q    Okay.  And can you tell the Court, first of all,

 9       if you know an individual by the name of Todd

10       Courser?

11  A    I do.

12  Q    If you saw that person again, would you be able

13       to identify him?

14  A    Yes.

15  Q    Is he in the courtroom today?

16  A    Yes.

17  Q    Can you please point to him and tell the Court

18       what he's wearing?

19  A    He's right there, and he's wearing a brown blazer

20       and a blue shirt.

21            MR. TOWNSEND:  Your Honor, let the

22       record reflect the witness has pointed to and

23       identified the defendant Todd Courser?

24            THE COURT:  The record will so

25       indicate.
```

8

```
 1  Q    (Continuing by Mr. Townsend)  Sir, can I get some
 2       background?  How did you know Mr. Courser?
 3  A    I met Mr. Courser in -- when I was 17.  He was
 4       running for state rep here in Lapeer at that
 5       time, and I got to know him through that
 6       campaign, and assisted on that campaign.  And I
 7       assisted on quite a few of his campaigns, all the
 8       way up until 2014, when he won his election to
 9       the State House of Representatives.
10  Q    Did you work for him on the -- for the 2014
11       election?
12  A    I did.  My consulting firm, Bellwether --
13  Q    All right.
14  A    -- Strategies did.
15  Q    Okay.  Now, was he a repre -- well, give me his
16       job title he --
17  A    State --
18  Q    -- was elected to.
19  A    State Representative in the 82nd District.
20  Q    Okay.  And that's for the State of Michigan?
21  A    Correct.
22  Q    So he's an elected public official, am I correct?
23  A    Yes, sir.
24  Q    All right.  How -- did you get to work for him in
25       the legislature?
```

9

1  A    Yes.  I was employed by the State House -- the
2       State House of Representatives in the 82nd
3       District.  Representative Courser was my direct
4       supervisor.
5  Q    Okay.  And do you know -- did you know a Cindy
6       Gamrat?
7  A    Yes.
8  Q    How did you know her?
9  A    I got to know her during some political campaign
10      as well.  Representative Mr. Courser ran for
11      State -- state chair of the Michigan GOP, and Ms.
12      Gamrat was a -- was our co-chair candidate.  I
13      got to know her through that, and also worked on
14      her campaign through my consulting firm in 2014.
15 Q    All right.  Did you know whether or not Ms.
16      Gamrat at that time, if you knew whether she was
17      married or not?
18 A    She was married at that time.
19 Q    Did you know whether or not the defendant was
20      married or not at that time?
21 A    Yes, he was married.
22 Q    Did there come a point in time that you
23      discovered or come to find out that they were
24      having an extramarital affair with each other?
25 A    Yes.  We had suspicions during the majority of

10

1     our time while we worked in Lansing.  But a few

2     weeks before May 19th, it was confirmed to me by

3     Ms. Gamrat's husband, that he had confirmed that

4     they were indeed having an affair.

5  Q  And now we talked about May 19th.  Prior to May

6     19th of 2015, can you tell us about your

7     relationship with the defendant?

8  A  I --

9  Q  And how it progressed or decreased up to May

10    19th, if you could?

11  A  Yes.  During -- I had known Mr. Courser for

12    quite -- quite some time.  I thought of him as a

13    friend.  Once he hired me to work in his office

14    in Lansing, our relationship quickly

15    deteriorated.

16  Q  In what way and why?

17  A  Because of the affair, there was a lot of stress

18    in the office regarding just a lot of perceived

19    slights, and just it became a work environment

20    where the expectations were not in line with what

21    we were able to deliver.

22  Q  Okay.  During that period of time, prior to the

23    time that you confirmed the fact that they had an

24    extramarital affair, were there signs of things

25    going on between the defendant and Ms. Gamrat?

11

1  A    Yes, sir.

2  Q    Can you tell the Court about that?

3  A    There were times where Mr. Courser and Mrs.

4       Gamrat would spend extended periods of time in

5       their back office with the door closed and

6       locked.  There was long embraces.  He would give

7       her foot massages.  They would take long walks in

8       the afternoon.

9             They would go back to their hotel rooms

10      after session, which were in the same hotel, and

11      come back several hours later with changed

12      clothes, and various other things that just lead

13      us to believe that they were having an

14      inappropriate relationship.

15 Q    Did you see whether or not there was an

16      increasing stress level on the defendant during

17      this period of time?

18 A    Oh, yeah.  Yes, definitely.

19 Q    Could you explain to the Court?

20 A    Their -- previous to May 19th, as I said, Ms.

21      Gamrat's husband confirmed to me that they were

22      having an affair, and that he had discovered it,

23      and he had confronted them about it.  And after

24      that, there was quite a lot of stress in the

25      office.  Both Mr. Courser and Mrs. Gamrat would

                                                                        12

1          come in disheveled and in a mood that suggested

2          that they were very, very stressed.

3     Q    Were you concerned at all during this time of the

4          mental stability of the defendant?

5     A    I was, yeah.  And I thought that -- the events of

6          May 19th, is what lead me to believe that he was

7          mentally unstable.

8     Q    Okay.  There came a point in time -- and I want

9          to directly go to May 19th of 2015.  Did there

10         come a time on that day that you were contacted

11         by the defendant?

12    A    Yes, sir.

13    Q    Tell the -- could you go into detail, and explain

14         to the Court what that was?

15                   MR. DePERNO:  Objection, your

16         Honor.  My understanding is there is an audio

17         recording of the meeting on May 19th, and that

18         would be the best evidence of that meeting, as

19         opposed to Mr. Graham's testimony.

20                   THE COURT:  Response?

21                   MR. TOWNSEND:  Your Honor, I would

22         indicate that indeed there is a recording, and

23         indeed there is a transcript of what transpired

24         during the course of that meeting.  I do not

25         believe that there's anything with regard to

13

1     that, as to how it came about to go into the

2     meeting.  And I think it would be necessary to

3     explain that or lay the foundation for the

4     communications.

5              THE COURT:  I'll let you lay the

6     foundation, and then we'll go from there.

7              MR. TOWNSEND:  Thank you.

8  Q  (Continuing by Mr. Townsend)  Go ahead.

9  A  On May 19th, I was at home.  Around 9:30 I

10    received a call from Mr. Courser.  It was after

11    business hours.  And as I said, our relationship

12    had deteriorated to the point where I wasn't

13    accepting calls from him after business hours,

14    because it was a business relationship at that

15    point only.

16             So I let that go to voicemail.  He left

17    a message that said he needed me to call him

18    immediately.  He sounded stressed.

19 Q  First of all, when you heard the voice -- for

20    many years you've known the defendant; yes?

21 A  Yes, definitely.

22 Q  Are you familiar with the defendant's voice or,

23    you know, when you hear it, you know it was the

24    defendant?

25 A  Yes, sir.

14

1  Q    When you talked to him that night, was that the
2       defendant's voice that you heard?
3  A    Absolutely.
4  Q    Continue.
5  A    He left me a message, said he needed me to call
6       him immediately.  I called him back.  And he
7       would not speak at length, but said that he
8       needed me to come to his Lapeer law office
9       immediately.  And he said that he needed me to
10      come there because he needed me to destroyed him.
11 Q    He needed you to destroy him?
12 A    He needed me to destroy him.
13 Q    What did you think at that point?
14 A    I was very worried.  I -- I said, what -- what do
15      you mean you need me to destroy you?  And he
16      said, I can't speak anymore, you need to come to
17      my office.
18 Q    And after that, was that the extent of the
19      conversation --
20 A    Yeah.
21 Q    -- at that point?
22 A    Yes, sir.
23 Q    What did you do as a result of that conversation?
24 A    As I said, I was concerned.  It doesn't seem to
25      me that someone in a sound state of mind would

15

```
 1        say I need you to destroy me.

 2                    I called some co-workers that worked

 3        with me at the House at that time.

 4   Q    Who's that?

 5   A    Keith Allard and Joshua Cline.

 6   Q    Okay.  What did you do at that point?

 7   A    We spoke on the call regarding Mr. Courser's

 8        call, and his request that I come to his office.

 9   Q    And did you decide to go to his office?

10   A    I did.

11   Q    Why?

12   A    I felt at that point I really didn't have a

13        choice.

14   Q    Okay.

15   A    He was my supervisor, and I felt that my job

16        could be at risk if I didn't go, and I needed my

17        job.

18   Q    Were you concerned about going?

19   A    I was, yeah.  I was -- as I said, someone in a

20        sound state of mind doesn't say I need you to

21        destroy me.

22   Q    I believe I was reading in earlier transcripts

23        and stuff, something that you had -- somebody may

24        have been at a suicidal ideation?

25   A    I definitely thought that he could have been
```

16

1       suicidal at that point.  As I said, destroy me is

2       very strong language, and either sounds like, you

3       know, he could commit suicide or possibly harm me

4       as well.

5   Q   Okay.  And so this is -- when you went there as a

6       result of him being your boss and on account of

7       your business-related situation --

8   A   Um-hum (affirmatively).

9   Q   Is that a yes?

10  A   Yes, sir.

11  Q   Okay.  You can't go um-hum (affirmatively).

12  A   Yes.

13  Q   They're there, they're taking it down, they're --

14  A   Yes.

15  Q   -- recording it.  It's very difficult to record

16      um-hum (affirmatively).  So we need to make sure

17      you get the words out there correctly.

18  A   Yes, sir.

19  Q   All right.  Do you know whether or not the

20      defendant had any weapons?

21  A   Yes, yeah.  He kept -- I know he kept several

22      weapons at his office in Lapeer.  I know that he

23      kept a loaded handgun in his desk.

24  Q   Were you concerned about that?

25  A   I was.  I felt that he was unstable.  And to have

17

1       a loaded weapon that close when you're in an

2       emotionally and mentally unstable situation, is

3       definitely dangerous.

4  Q    Okay.  Now, you decided to take that interview --

5       or, that interview.  That meeting; is that

6       correct?

7  A    Yes, sir.

8  Q    Tell the Court why -- well, first of all, who you

9       talked about it with, and why you -- or, a

10      decision was made, and whose decision it was to

11      do that.

12 A    Yes, sir.

13 Q    Go into detail for me.

14 A    As I said, I -- I spoke with Keith Allard and

15      Josh Cline that evening, and we had a discussion

16      about if I should go, if I shouldn't go.  It was

17      decided by me that I needed to go, because of,

18      you know, I thought my job could be at risk if I

19      didn't.

20             Then we discussed his mental state and

21      how we thought the request that I destroy him was

22      very concerning.  And Mr. Allard suggested that I

23      tape the -- tape-record the conversation.  I

24      thought that was a very good idea, considering

25      the circumstances.

18

1 Q    Did he tell you to tape it?

2 A    No.

3 Q    Did he order you to tape it?

4 A    No.

5 Q    Whose decision was it to tape it?

6 A    Mine.

7 Q    Okay.  Go ahead.  For what reason?

8 A    I -- I felt that he was mentally unstable, and I

9      felt that I needed to have evidence of whatever

10     happened there.  I didn't want to be there with a

11     smoking gun and a dead body and not have any --

12     any way to explain it.

13 Q   All right.  So you went there.  And can you tell

14     the Court what time it was that you decided to go

15     there?

16 A   I believe I arrived at his Lapeer law office

17     around ten o'clock.

18 Q   And can you tell the Court exactly where that's

19     located?

20 A   It's on Main Street, on M-24, near KFC and across

21     from McDonald's.

22 Q   Okay.  Within the city limits of the City of

23     Lapeer?

24 A   Yes, sir.

25 Q   Okay.  So when did you start the tape?

19

1  A    I started the tape in my car, before I got out of

2       my car and walked into the office.

3  Q    Was the entire -- during that -- or, how long

4       were you there?

5  A    Approximately an hour and a half.

6  Q    Okay.  During that entire hour and a half, was

7       the tape running?

8  A    Yes, sir.

9  Q    So is -- everything that transpired in that

10      office that night, was taped?

11 A    Yes, sir.  I didn't turn it off until I got back

12      into my car.

13 Q    Okay.  And have you heard the recording?

14 A    Yes, sir.

15 Q    Okay.  And have you seen the transcript?

16 A    Yes, sir.

17              MR. TOWNSEND:  May I approach the

18      witness, your Honor?

19              THE COURT:  Go ahead.

20              MR. TOWNSEND:  I'll show you what's

21      been marked as People's Proposed Exhibit Number

22      1.

23          Mr. DePerno, I believe we show Mr.

24      DePerno first.

25              MR. DePERNO:  I object to the

20

1    transcript being entered. I don't think there's

2    any -- whoever took the transcript should have to

3    be here to --

4            MS. HART: Wait. Let me see it.

5            MR. DePERNO: -- testify to its

6    authenticity if they're testifying that that's

7    the transcript regarding the recording.

8            MR. TOWNSEND: Your Honor, I would

9    indicate that on the last page, Page 51, if the

10   Court wishes to review it, there is a

11   certification by Andrea Thor, indicating that

12   it's a certified transcript.

13          THE COURT: Okay. For purposes of

14   preliminary examination only, I'll admit the

15   transcript based upon the certification of the

16   transcriber.

17          MR. TOWNSEND: Okay.

18          (Whereupon People's Exhibit Number

19          1 was received into evidence.)

20 Q  (Continuing by Mr. Townsend) And you read this,

21   right?

22 A  Yes, sir.

23 Q  And when you read it, is it a fair and accurate

24   representation of what transpired within the --

25   in the office that day?

21

1  A     Yes, sir.

2                     MR. TOWNSEND:  Okay.  Now, your

3          Honor, at this point, Mr. DePerno had made an

4          objection.  I'd like to go into the details of

5          the meeting itself.  It is on the transcriber.  I

6          don't know if the Court wishes me to proceed

7          going -- answering in this order, or if the Court

8          just wants to review the transcript itself?

9                     THE COURT:  Let me review the

10         transcript, and you can proceed at this point in

11         time.  Just keep it short.

12                     MR. TOWNSEND:  I'll try.

13                     MR. DePERNO:  Your Honor, if I

14         could, I object on the grounds that the

15         prosecution hasn't turned over the actual

16         recording.

17                     THE COURT:  That didn't happen yet?

18                     MR. DePERNO:  No, it has not.

19                     MS. HART:  Oh, it certainly did.

20                     MR. DePERNO:  It has not.  And in

21         fact, their expert witness has now stated in a

22         letter that the prosecution or the police never

23         took a copy of the recording, so --

24                     THE COURT:  Okay.  This is all --

25                     MR. DePERNO:  -- I don't know what

22

1    to say.

2                    THE COURT:  This is all news to

3    everybody here.  What's going on?  Did you

4    believe that a copy of the recording was sent to

5    Mr. DePerno?

6                    MR. TOWNSEND:  I know a copy was

7    sent to Mr. DePerno.

8                    MS. HART:  It's in the House

9    report.

10                   MR. TOWNSEND:  It was in the House

11   report.

12                   THE COURT:  You didn't get it?

13                   MR. DePERNO:  We do not have a copy

14   of the transcript -- or, we don't have a copy of

15   the recording.

16                   THE COURT:  You don't have a copy

17   of the recording?

18                   MR. DePERNO:  Right.

19                   THE COURT:  You have a copy of the

20   transcript?

21                   MR. DePERNO:  We've seen the

22   transcript, but we can't verify the transcript --

23                   THE COURT:  Okay.

24                   MR. DePERNO:  -- as to the

25   recording.

                                                              23

1                    THE COURT:  Okay.  Then I want to
2           find out what happened to the recording.  You
3           believe that the recording was sent to Mr.
4           DePerno?
5                    MR. TOWNSEND:  I know it was.  I
6           know he has it.
7                    THE COURT:  Okay.
8                    MR. TOWNSEND:  It's not an if.
9           He's got it.  It's part -- it's part of the
10          House -- it was part of the House -- the initial
11          House information that was given.  He was given a
12          copy of every single transcript or tape that we
13          had.
14                   MS. HART:  Just one moment.
15                   MR. DePERNO:  Not true.  One of our
16          witnesses here today, Colleen Auer-Lemke will
17          have to testify that as she has written in her
18          police reports and has -- she's now indicated in
19          the -- a document, an e-mail that we've obtained,
20          that the police never took that recording.  They
21          claim they have observed it, but didn't copy it.
22                   THE COURT:  Observed it.  You mean
23          it's a -- is it a video, or is it just a --
24                   MR. TOWNSEND:  It's verbal.  It's a
25          verbal recording.

24

1                    MR. DePERNO:  It's a recording.

2                    THE COURT:  Verbal recording.

3          Okay.

4                    MR. TOWNSEND:  Can I just say

5          something, your Honor?

6                    THE COURT:  Sure, go ahead.

7                    MR. TOWNSEND:  We had a three-day

8          preliminary examination in Ingham County.

9                    THE COURT:  Okay.

10                    MR. TOWNSEND:  This is the first

11          time we have ever heard about this allegation.

12                    THE COURT:  Okay.  Well, this is a

13          preliminary examination.  As we discussed back in

14          chambers, it's not going to be finished today.

15          We're going to try to get through the witnesses

16          that are here, so they don't have to be coming

17          back to Lapeer County.  And there are

18          negotiations with respect to what is an end game

19          on this particular case.

20                    I want to make sure that a copy of the

21          recording goes to Mr. DePerno, even though it's

22          already been sent to him.  I want to make sure

23          that -- oop, there we go.  How's that?

24                    I'm going to allow him to proceed, but

25          I'm going to reserve any kind of

25

1 cross-examination after you've had a chance to

2 review the recording, too.  We'll keep this open

3 at this point.

4     MR. TOWNSEND:  I would indicate,

5 just so Mr. DePerno knows, this is a copy of all

6 the taped statements that were made; the one

7 there in Lapeer, the other ones that were in the

8 offices of the defendant, and Mrs. Gamrat.

9     THE COURT:  Okay.  So some of them

10 were in Ingham County, some of them were Lapeer

11 County?

12     MR. TOWNSEND:  Right.

13     THE COURT:  Okay.  So it's noted

14 for the record, they're received in court.  It

15 looks like a disk of some type that has the audio

16 recording of the Lapeer interview and of the

17 discussion in Ingham County.

18     MR. TOWNSEND:  Right.

19     THE COURT:  So both of them are on

20 there.

21     MR. TOWNSEND:  Can the defendant

22 acknowledge receipt of this?

23     MR. DePERNO:  I have a disk in my

24 hand, labeled MSP, 1st District HQ, Incident

25 Number 10-715-15, Courser/Gamrat/Graham audio

26

1        recordings.

2                        THE COURT:  Okay.  Thank you.

3                        MR. DePERNO:  Okay.

4                        THE COURT:  And we'll just make

5        sure that it's functioning, and leave that door

6        open if you have any type of recross or --

7                        MR. TOWNSEND:  Right.

8                        THE COURT:   -- clarification that

9        needs to be done as a result of your hearing and

10       comparing with the transcript that's been

11       admitted for purposes --

12                        MR. TOWNSEND:  Your Honor.

13                        THE COURT:   -- of preliminary

14       examination only.

15                        MR. TOWNSEND:  Could I ask --

16                        MR. DePERNO:  Thank you.

17                        MR. TOWNSEND:  Could I ask -- could

18       I ask permission of the Court to allow the

19       defendant and his counsel to listen to the tape

20       now?  Because we've got several witnesses, so he

21       can say that he's --

22                        THE COURT:  Is it going to be an

23       hour and a half, Counselor?

24                        MR. TOWNSEND:  Oh, probably.

25                        MR. DePERNO:  Probably.

27

1          THE COURT:  No, no.  We don't want

2     to do that.

3          How big is the transcript?  It looked

4     like you were holding up something that was about

5     ten pages.  That's it?

6               MR. TOWNSEND:  There's four pages.

7               MS. HART:  There's four pages per

8     page.

9               MR. DePERNO:  There's four pages

10    per page.

11               THE COURT:  Four pages.  Okay.

12               MR. TOWNSEND:  There is one I have.

13    Can I get it marked?  Could you look through

14    those to see if it's marked at all?  Is --

15               MR. DePERNO:  I got it.

16               MR. TOWNSEND:  May I approach the

17    witness, your Honor?

18               THE COURT:  Go right ahead.

19 Q   (Continuing by Mr. Townsend)  I'm going to go

20    through certain -- certain parts of the

21    transcript.  Now, you've read this transcript,

22    and it's accurate as to what had transpired; yes?

23 A   Yes, sir.

24 Q   All right.  Tell us how it began when you walked

25    in there.

28

```
 1  A    I walked in, and I -- I went to Mr. Courser's
 2       back office, and I asked him what's going on.
 3       And he proceeded to tell me that he'd received
 4       some -- some text messages that were threatening
 5       to reveal his affair with Representative Gamrat.
 6  Q    Did he go into detail at all about this?
 7  A    He did.  He showed me one of them.
 8  Q    And do you recall what it said?
 9  A    I couldn't say with certainty what the text said.
10       It was over two years ago.
11  Q    All right.  Go ahead.
12  A    He proceeded to tell me about these text messages
13       that he received.  And he believed that there was
14       a strong possibility that whoever had sent these
15       text messages would reveal his affair to the
16       general public.
17  Q    All right.  Continue.
18  A    He also proceeded to justify his affair by saying
19       his wife had had previous affairs, and that she
20       had some sort of mental disorder that he related
21       to Aspergers.
22  Q    Did he go into detail about what he wanted you to
23       do?
24  A    Yes.  He said that he had written an e-mail that
25       he wanted to have sent to a wide -- a wide swath
```

29

```
 1        of people.  We had an e-mail list numbering in
 2        the tens of thousands of e-mails from across the
 3        state.  And he wanted to have that e-mail sent to
 4        those people as a -- as a distraction from
 5        what -- from his affair coming out with
 6        Representative Gamrat.
 7   Q    Okay.  And if you go to Page 13 --
 8   A    Um-hum (affirmatively).
 9   Q     -- in the transcript, do you have that?  Go down
10        to Line --
11   A    Page 13?
12   Q    The line that --
13   A    I'm sorry, Page 13?
14   Q    Thirteen.
15                   MS. HART:  There's four pages.
16                   MR. TOWNSEND:  There's four pages
17        on each.
18                   THE WITNESS:  There's four pages.
19        Okay.  One -- okay.  So we're talking about the
20        fourth page of paper that I have?
21                   MR. TOWNSEND:  Well...
22                   THE WITNESS:  I'm sorry.
23   Q    (Continuing by Mr. Townsend)  That's all right.
24        Do you see where it says Page 13?
25   A    Yes, I got it.
```

30

1  Q    I want you to look at Line 20 -- or, actually 18,

2       and tell me -- before you read that section I'm

3       going to want you to read, is that what you were

4       talking about?

5  A    I'm sorry, can you repeat that question?

6  Q    Yes.  Just read that section.

7  A    Okay.

8  Q    Tell me what it's about.

9  A    Okay.  Line 19 and 20?

10 Q    Yeah.  He says, "Like tricky stuff.  Tricky

11      stuff.  The GPSing just gets really weird stuff."

12      (sic).

13 A    Um-hum (affirmatively).

14 Q    Okay.  What was that all about?

15 A    I don't -- it appears that he thinks people are

16      tracking him.

17 Q    Okay.  And then he later says -- well, read out

18      loud the next several paragraphs, would you?

19 A    Starting at 19?

20 Q    Sure, yeah.

21 A    "So GPSing just gets really weird stuff.

22             So I've come down to this and we can

23          sit here all night.  I've come down to

24          that the way to handle it is to do a

25          controlled burn of me." (sic)

31

1  Q    Okay.  Hold on.  When he said controlled burn to
2       you, does he go further on to explain what he
3       meant a controlled burn of himself?
4  A    Yes, I believe so.
5  Q    Okay.  What was -- what is it?
6  A    Yes.
7  Q    What's a controlled burn?
8  A    A controlled burn, what he was referring to was
9       sending out this e-mail that would muddy the
10      waters if his allegations of his affair were to
11      come out with Representative Gamrat.  Basically
12      that because this e-mail had been sent out, it
13      would be perceived as part of a larger smear
14      campaign that nobody would believe.
15 Q    Would I be correct in assessing that this e-mail
16      that he wanted you to send out was so outrageous
17      that --
18 A    Yes.
19 Q     -- nobody's going to buy anything else?
20 A    Yes.  It was -- it was lewd, and outrageous,
21      and --
22 Q    And we're going to get to that, okay?
23 A     -- people wouldn't believe it.
24              Yes.
25 Q    Okay.  Continue.

32

1  A     "So I've come down to the way to handle it is to

2        do a controlled burn of me.  It's so over-the-top

3        that people will see it, and it will be like"...

4  Q     Feel free to read it.

5  A     "Holy shit, what is that?  And anything that

6        comes after that will be mild by comparison.  In

7        a controlled burn, you do a little bit of truth

8        mixed with a lot of lies."

9  Q     Keep going.

10 A     I say, "Okay."

11              Mr. Courser says, "People are so

12       disturbed they won't print it.  But anything

13       after that is going to be suspect.  It will be

14       looking like a complete smear campaign."

15 Q     Continue.

16 A     And then I say, "What do you have in mind?"

17              He says, "An e-mail."

18              I say, "Okay."

19              There appears to be some inaudible

20       words --

21 Q     Does he say --

22 A     -- in there.

23 Q      -- Line 10, "As many e-mails as we can"?

24 A     Line 10?  Sorry.

25 Q     Page 4.

                                                                33

1  A    Oh, any e-mails -- oh, yeah.  I'm sorry, I missed

2        that.  "As many e-mails as we can."

3               I say, "Okay."

4               There's some inaudible.

5               "From a different e-mail.  Rolling out

6        of whatever, whatever the machinery would allow.

7        Normally with this sort of thing, I would have

8        Ike do it."

9               I say, "Um-hum (affirmatively)."

10              He says, "He's done it from gmail

11       accounts, a series of them."

12              I say, "Yes.  He told me how to do that,

13       though.  I can't remember."

14              Courser says, "The gmail account?"

15              I say, "Yes, he could do it, but

16       would..."

17              Courser says, "Took him a long time."

18              I say, "I think he -- yeah, he told me

19       he can only do 250 or 550 apiece." (sic)

20              Courser says, "A day or..."

21              I say, "For each of them a day, yeah."

22              Courser says, "That's what he did."

23              "So you'd have to create" -- I say, "So

24       you'd have to create like a crap ton of them, and

25       they're really hard to do, because they verify

34

1       everything with like phone numbers and stuff."

2               Courser says, "Right.  You have to pay

3       for phones and all kinds of bullshit, so..."

4               I say, "Ike did.  Ike had to pay for

5       phones or whatever?"

6               Courser says, "I think so."

7               I say, "Yeah, you probably have to have

8       some burner phones to -- what did the -- did they

9       say they wanted something?"

10              Courser says, "They didn't say anything.

11      They wanted a response.  I didn't respond.  I

12      don't respond to stuff like that."

13              I say, "Yeah, yeah.  That's messed up."

14              Courser says, "They don't want us here,

15      dude.  I mean, it's not, you know, the whole

16      thing with Tristan Cole up north and you just --

17      I mean they absolutely hate it.  The Speaker,

18      he's got a wound in his side, you know.  They're

19      not there.  They want something from us.  They

20      want us dead."

21  Q   Okay.  I'm going to refer you down to Page 16.

22      Down at -- or, Page 16, Line 17.

23  A   Yes, sir.

24  Q   If you could read that for me?

25  A   "You can't do this anymore.  What -- what do you

35

1    have in mind?  What's the e-mail?  Did you write

2    it yet?"

3              Courser says, "It's already written.  I

4    didn't print it."

5              There's some inaudible dialogue.

6              "I don't know what God will do, buddy.

7    I don't have an idea on that.  I thought I was

8    dead several times before already, so not going

9    to -- 'Todd Courser caught on tape behind Lansing

10   nightclub'."

11 Q  Is this the -- is he showing you at this point

12   what he had written?

13 A  He's reading it from his computer screen.

14 Q  Go ahead.

15 A  "Todd Courser caught on tape behind Lansing

16   nightclub."

17              MR. DePERNO:  Objection, your

18   Honor.  Is there a question --

19              MR. TOWNSEND:  Yes.

20              MR. DePERNO:  -- or are we just

21   reading from the transcript?

22              MR. TOWNSEND:  Right now...

23 Q  (Continuing by Mr. Townsend)  Did he -- let me

24   see if I could help out on this.  Did -- when you

25   were talking to him, did he have an opportunity

36

1      to read to you the letter that he had typed?

2  A   Yes, sir.

3  Q   And what you're going to read now, is what he had

4      typed, and he's reading it to you; is that

5      correct?

6  A   Correct.

7  Q   Proceed.

8  A   "Todd Courser caught on tape behind Lansing

9      nightclub.  In truth Courser secretly removed

10     from caucus -- caucus several weeks ago due to a

11     male paid on -- paid for sex."  Inaudible.

12     "Prominently in some nightclub.  He's a bisexual,

13     porn-addicted sexual deviant."

14             And then you just get end quote.

15             Courser says, "And then you just get

16     nasty about it."  Quote...

17 Q   Go ahead, read it.

18 A   "His cock is hanging out all over Lansing since

19     the election.  That's why he was thrown out of

20     caucus."

21 Q   When he read that to you, did you reply to him at

22     all?

23 A   Yes.  I said, are you serious?  What are you

24     talking about?  That's ridiculous.

25 Q   All right.  You read that.  Did there come a

37

1       point in time that you had been talking and

2       discussing with -- did there ever come a point in

3       time when you talked, I believe using the

4       terminology he wanted to inoculate the herd?

5  A   Yes, sir.

6  Q   Okay.  Without reading it, just tell me what --

7       what that was about when he talked to you about

8       it, and what did it mean?

9  A   He said that he wanted to inoculate the herd,

10      which I understood to be another word for a

11      controlled burn, in which he wanted to -- in an

12      inoculation that you give to a herd of animals to

13      keep them from getting a certain disease.

14      Basically he wanted to give his constituents and

15      the general public and republican delegates this

16      e-mail, which he would -- would be a shot, to

17      make sure that they would not succumb to the

18      allegations of his affair with Representative

19      Gamrat.

20  Q   Would it be fair to say he wanted to lie to them?

21  A   Yes.  He said so.

22  Q   Okay.  The other side, if you go to Page 19 of

23      the transcript, on this page read lines -- from

24      Line 8 to Line 11.

25  A   Courser:  "What does this do?  I need to, if

38

```
 1        possible, inoculate the herd against gutter
 2        politics that are coming.  Unless they have
 3        something really awful, which I do not know
 4        about, okay."
 5   Q    All right.  And also he had talked to you on the
 6        phone earlier about he wanted you to come over
 7        and destroy him; yes?
 8   A    Yes, sir.
 9   Q    Okay.  And now I want you to read from the Line
10        21 on Page 19, to Line 1 on Page 20.
11   A    Courser says, "We decided to destroy ourselves.
12        If this is the lead in, we go for the sham -- the
13        scam.  She's working through with her husband,
14        and they've been working through it.  I'm going
15        to go into all the details I can go into; what
16        happened, and how I'm going to do what I can."
17   Q    Okay.  Now, you were so -- you were still his
18        employee, an active state employee, correct?
19   A    Yes, sir.
20   Q    And the defendant was your supervisor; yes?
21   A    Yes, sir.
22   Q    You worked directly for him; yes?
23   A    Yes, sir.
24   Q    What do you -- when he's talking about this,
25        what's going through your mind?
```

39

1  A   I -- I was flabbergasted.  I was maybe angry or

2      saddened by the idea that we would seek to

3      deceive tens of thousands of people.  I was

4      shocked and surprised.

5  Q   Did there come a point in time that he's

6      attempting to get you to do something with all of

7      this?

8  A   Yes.  He wanted me to send this e-mail to a large

9      number of e-mail addresses.

10 Q   So he wanted to get you involved with this -- I

11     guess this lie?

12 A   Yes.  He wanted me to cover up his affair.

13 Q   Okay.  Now, I want to go to Page 30, Line 9.  And

14     read it to yourself quickly.  And does this deals

15     with everything we just talked about, about how

16     he wanted to get you involved with this?

17 A   Yes, sir.

18 Q   Okay.  Can you -- can you read that, please?

19 A   Starting at 9?

20 Q   Yeah, on Page 30, and Line 9.

21 A   Yes, sir.

22            "You want to do this tonight?"

23 Q   No.  I -- is that -- I just want to make sure we

24     know.  "You want to do this tonight", is that

25     sending the e-mail out?

                                                                40

1  A    Yes, sir.

2  Q    Okay.  Go ahead.

3  A    I say, "You want to do this tonight?"

4          Courser says, "I do.  You're not going

5      to work tomorrow."

6          I say, "All right."

7          Courser says, "You're going to be sick."

8          I say, "Okay."

9          Courser says, "Got it?"

10         I say --

11 Q    You're going to be sick?

12 A    Yes.

13 Q    Okay.  Go ahead.

14 A    I say, "Yeah.  I'm not going to work.  What am I

15     going to do tomorrow?"

16         Courser says, "Well, you're going to --

17     you're going to be home after this."

18         I say, "I don't know what you mean."

19         Courser says, "You're going to do this

20     and then go home."

21 Q    All right.  So you're going to do this.  You're

22     going to do this e-mail, or send out an e-mail

23     allegedly, and then you're going to go home and

24     be sick?

25                 MR. DePERNO:  Objection, your

41

1   Honor.  The witness didn't testify to that.

2       MR. TOWNSEND:  I'm asking him.

3       THE COURT:  He's testified as to

4   what he said.

5     Move on.

6 Q (Continuing by Mr. Townsend)  What'd you think

7   about that?  All of a sudden he's asking you to

8   take a day off after sending this stuff out.

9 A I don't know.  I thought it was -- I thought it

10  was inappropriate.  And I was still -- I was

11  still shocked that he was asking me to do it.

12  And I felt that --

13 Q Okay.  Page 31, Line 1 through Line 7, if you

14  could?

15 A Thirty-one?

16 Q Page 31, Line --

17 A I'm sorry, Line?

18 Q Line 1 through Line 7.

19 A I say, "I can't figure it.  I mean -- I mean, I

20  can't figure it out.  It's the easiest, quickest,

21  best way would be to just hit all the media,

22  don't worry about the other people."

23   Courser says, "I need the other people

24  though, because I want them to insulate.  You're

25  inoculating the whole herd."

42

```
 1              I say, "This is a crazy way to deal with
 2         the situation.  Normally people just front it
 3         off, head it off for themselves and say hey, this
 4         happened, or quietly resign and go away.  Like
 5         that's usually what happens when this situation.
 6         So this is kind of a crazy way to do it." (sic)
 7   Q    All right.  So after you're talking about this,
 8         did there come a point in time that you mailed
 9         them out, or you had a discussion where you're
10         concerned, or anything like that?
11   A    I did not send the e-mail, no.
12   Q    Okay.  What was your concern?  What'd you talk to
13         him about?
14   A    Well, I told him I didn't want to be part of
15         covering it up.
16   Q    Okay.  And that's all included in the transcript
17         too, whatever your discussions were?
18   A    There's some discussions there.  And then after I
19         left his office, I texted him to tell him that I
20         couldn't be a part of it, and I couldn't be a
21         part of covering it up.
22   Q    Okay.  Before you left his office, did you tell
23         him that you -- why you wanted to leave his
24         office without making an agreement?
25   A    I told him that I wanted to think about it.  I
```

43

1    felt -- I knew at that point I couldn't send it

2    out, but I -- I didn't feel that he would let me

3    leave unless I at least told him I would think

4    about it.

5            In fact, I asked -- I asked to leave I

6    think on two or three separate occasions, and he

7    kind of brushed that off and wouldn't let me --

8    let me leave.  So I felt that if I told him I'll

9    think about it, that he would -- that he would

10   let me go.

11 Q   All right.  So I -- did you leave his office?

12 A   Yes.

13 Q   And there came a point in time, I believe you

14   just indicated, you made re-contact with him;

15   yes?

16 A   Yes.  He texted me a little later in the evening,

17   and I responded to him and said that I

18   couldn't -- I couldn't send the e-mail, I

19   couldn't be a part of covering up.

20 Q   All right.  Do you know whether or not an e-mail

21   was sent out?

22 A   Yes.

23 Q   And to how many people, if you know?

24 A   I do not know.

25 Q   All right.  Do you know who sent that e-mail out?

44

1  A     I do.

2  Q     Who?

3  A     Immanuel Eickhold.

4  Q     Immanuel Eickhold?

5  A     Yes.

6  Q     All right.  And did you get a copy of that

7        e-mail?

8  A     Yes, sir.

9  Q     How did you get a copy of that e-mail?

10 A     A day -- the next day or the day after that, I

11       don't remember exactly, an intern in our office

12       in Lansing received the e-mail from an

13       investigative reporter from New York or something

14       like that who had received it.  I don't even know

15       how she received it.  But the interns forwarded

16       it on to us, because he was very concerned about

17       this type of information going around about our

18       boss.

19 Q     And in a --.

20                    MR. TOWNSEND:  May I approach the

21       witness, your Honor?

22                    THE COURT:  Go ahead.

23 Q     (Continuing by Mr. Townsend)  I'm going to hand

24       you this document that's been marked as People's

25       Proposed 2.  Please look at that, if you could.

                                                        45

1                    MR. DePERNO:  Is there a copy for

2       me?

3                    MR. TOWNSEND:  I thought you had a

4       copy.

5                    MR. DePERNO:  I don't.

6                    MR. TOWNSEND:  And that will be

7       sent to Mr. DePerno.  Did they give you this

8       copy?  I have a copy.

9                    MR. DePERNO:  Okay.  I object to

10      the same thing.  Okay.  I object to the cover

11      that's on there, and that's not part of the

12      e-mail.

13                   MR. TOWNSEND:  Hold on.

14  Q   (Continuing by Mr. Townsend)  Can you look at it,

15      please?

16  A   Yes, sir.

17                   MR. DePERNO:  Can I get some

18      clarification?  Is this an e-mail from Ben

19      Graham?

20                   MR. TOWNSEND:  Pardon?

21                   MR. DePERNO:  Is this an e-mail

22      from Ben Graham?

23                   MR. TOWNSEND:  No.  It's his

24      e-mail, the defendant's e-mail that was sent out

25      by Mr. Eickhold.

46

1           MR. DePERNO:  I object to it as

2      evidence then, without testimony as to Mr.

3      Eickhold that he sent this e-mail.  Ben Graham

4      didn't send the e-mail.

5           MR. TOWNSEND:  But he indicated

6      that he did receive a copy of it.  And I was

7      going to lay -- maybe lay an additional couple

8      questions for foundational purposes.

9           THE COURT:  Well, let's see if you

10     can lay the foundation.

11          MR. TOWNSEND:  Okay.

12          THE COURT:  I'll reserve a ruling

13     on the objection.

14  Q  (Continuing by Mr. Townsend)  The contents of

15     that e-mail, are you familiar with the contents

16     of that e-mail?

17  A  Yes, sir.

18  Q  And why are you familiar with the contents of

19     that e-mail?

20  A  I -- this -- a copy of this was shown to me by

21     Mr. Courser on his computer in his office that

22     evening.

23  Q  Okay.  Is it identical to what was shown on the

24     computer?

25  A  To the best of my knowledge, it is.

47

1  Q    And all of a sudden you got your name at the
2       bottom of that, don't they?
3  A    (No audible response).
4  Q    The second page.
5  A    Yes.
6  Q    Is there -- do you know why your name's at the
7       bottom of that page?
8  A    I believe this was forwarded -- I think this
9       e-mail was forwarded to me.
10 Q    The contents of that which was shown to you by
11      the defendant on his computer?
12 A    Yes, the main body of the e-mail.
13              MR. TOWNSEND:  At this time I would
14      move for its admission.
15              THE COURT:  For purposes of
16      preliminary examination, I will allow the
17      exhibit.
18              (Whereupon People's Exhibit Number
19              2 was received into evidence.)
20              MR. TOWNSEND:  May I get an exhibit
21      sticker?
22              COURT CLERK:  Sure.
23              THE COURT:  What number is that
24      going to be?
25              MR. TOWNSEND:  It's actually Number

48

1       1, Judge.

2                       THE COURT:  Thank you.

3                       MR. TOWNSEND:  The cover -- the

4       cover sheet had the original exhibit on it.

5                       MS. HART:  Two.

6                       MR. TOWNSEND:  I mean 2.

7                       THE COURT:  All right.

8   Q   (Continuing by Mr. Townsend)  Can you read that

9       into the record, please?

10  A   You'd like me to read the whole thing?

11  Q   Yes.

12  A   Okay.  Should I just skim to the main body of the

13      e-mail?  There's e-mail addresses and other

14      extraneous...

15  Q   Start with "Subject."

16  A   "Subject:  Breaking scandal, Todd Courser.  He's

17      a freak, he's a gun-toting, Bible-thumping,

18      cock-sucking freak.  His whole personalit is a

19      sham.  He's a tool, pawn of establishment." (sic)

20              "Forward:  Breaking scandal, Todd

21      Courser."  My name, Keith Allard, Steven Kara

22      (phonetic).  This e-mail was forwarded to us, and

23      this is a printout of it.

24              And then my e-mail address, Keith

25      Allard's e-mail address, Steven Kara's e-mail

49

1     address at the House.

2            It says, "Looks like the entire e-mail

3     didn't forward.  Sending again."

4            This is from George

5     Rathburn520@gmail.com.  Sent 5-20-2015, 11:36:36

6     a.m. Eastern daylight time.

7            "Subject.  Breaking scandal -- Todd

8     Courser, breaking scandal.  State Rep Courser

9     caught behind a Lansing nightclub.  Christian

10    conservative or Godless addicted monster?  Truth,

11    Courser secretly removed from caucus several

12    weeks ago due to male-on-male paid-for sex behind

13    a prominent Lansing nightclub.  Action soon

14    coming to remove Courser.  He is a bisexual,

15    porn-addicted sex deviant all over Lansing since

16    the election, and that is why he was thrown out

17    of caucus.  He is a freak.  He is a gun-toting,

18    Bible-thumping, cock-sucking freak.  His whole

19    personalit is a shame -- a sham.  He is a tool,

20    pawn of establishment.  In past election, he was

21    accused of child molestation, and he's done

22    things that should have him in jail.  He doesn't

23    work in Lansing.  He's just there feeding his

24    habit of alcohol, drugs, and illicity sex."

25            Illicit's spelled wrong.

50

1            "Most days he is high, stoned on drugs

2       and alcohol, while he's supposed to be voting at

3       the State House.

4            Rep Gamrat -- Gamrat, knew about it all

5       along and has helped cover his actions, has

6       played along and been complicit in his sordid

7       activities, and has covered for him over and

8       over.  And her involvement is the real reason she

9       was thrown out.  She shouldn't have entrusted a

10      state rep or national committee woman.  She is a

11      tramp, a lie, and a laugh for this bisexual

12      cock-sucking monster." (sic)

13           "This tea bagger takes his title

14      seriously, moaning, groaning, fucking and

15      screwing man-on-man, man-on-woman, and whoever he

16      can pay.  Pictures and video, youtube tell the

17      whole story."

18           Whole is misspelled.

19           "Of all of his exploits behind

20      nightclubs and hotels at some of the best and

21      worst places in Lansing, with all their grinding,

22      hot and sweaty sex and drug use.  It is too much

23      to hide anymore.  He is a scam."

24           And then there's some other extraneous

25      e-mail footers and things like that.

51

1                    THE COURT:  Could the three of you
2          approach real quickly?
3                    (Whereupon a discussion was had
4                    side bar.)
5                    THE COURT:  Is there a Lisa Ruce
6          Church (phonetic) here?  Okay, I just received
7          your notification.  You are from the news?
8                    MS. RUCE CHURCH:  Yes.
9                    THE COURT:  The Michigan
10         Information Research --
11                   MS. RUCE CHURCH:  Yes.
12                   THE COURT:  -- in Lansing?
13                   MS. RUCE CHURCH:  Yes.
14                   THE COURT:  Okay.  All right.  We
15         just -- I just saw this.  And we had the Lapeer
16         News approval, but we didn't -- I just saw this.
17         It wasn't on the normal format, so it slipped my
18         attention when I was going through the file.
19              So you are bound by any normal news
20         procedures --
21                   MS. RUCE CHURCH:  Yes, ma'am.
22                   THE COURT:  -- and I just wanted to
23         share that with counsel here.
24                   MS. RUCE CHURCH:  Yes, ma'am.
25                   THE COURT:  Thank you.

52

1       You may proceed.

2       It's almost 11 o'clock, gentlemen.  I
3    know I had some other matters scheduled.

4           MR. DePERNO:  Whatever the Court
5    wants to do, it's your call.

6           COURT CLERK:  I told them to come
7    back at 11:30.

8           THE COURT:  Okay.  We've got until
9    11:30 then.

10          MR. DePERNO:  Fine.

11          MR. TOWNSEND:  Thank you.

12  Q  (Continuing by Mr. Townsend)  Now, this was --
13     correct me if I'm wrong, this is the e-mail that
14     was written by the defendant; yes?

15  A  Yes, sir.

16  Q  That's the e-mail the defendant wanted sent to
17     his constituency?

18  A  Yes, sir.

19  Q  And other people maybe at the House or wherever?

20  A  Yes, yeah.  It was a --

21  Q  Where specifically did he want it sent, if you
22     recall?

23  A  He didn't say specifically.  I believe he said as
24     wide as possible.

25  Q  How many people do you have on your computer

53

1    services for e-mails and things of that nature?

2  A  I don't remember the specific number, but it's in

3    the tens of thousands.

4  Q  Okay.  Did you send this?

5  A  No.

6  Q  Did you send a text or anything like that?

7  A  I'm sorry.  What's that?

8  Q  Did you send -- you didn't send a text about

9    this?  You didn't send the e-mail or anything?

10  A  No, I did not send the e-mail.

11  Q  Just to clarify, I believe early on you had

12    indicated that the defendant was getting

13    threatening texts or something of that nature?

14  A  Yes, sir.

15  Q  What type of texts were those?  Were those texts

16    attributed from -- or, to speed this along, texts

17    about revealing the affair and things of that

18    nature?

19  A  Yes, sir.

20  Q  Did you send those texts?

21  A  No.

22  Q  Did you ever send him any texts threatening him

23    in any manner?

24  A  No.

25  Q  Do you know anybody that did?

54

1  A     I do know who -- I do know who sent those text

2        messages.

3  Q     Who sent those text messages?

4  A     I believe it was Ms. Gamrat's husband and a --

5        and a friend of his.

6  Q     And who's the friend of his?

7  A     I believe his name is David Horr.

8  Q     Okay.  Did you know whether or not Joshua Cline

9        sent any threats like that?

10 A     To my knowledge, I do not know.

11 Q     How about Mr. Allard?

12 A     As far as I know, he did not.

13 Q     Now, there was a discussion in the conversation

14       you had with the defendant in his office about

15       calling in sick or not going to work the next

16       day.

17 A     Yes, sir.

18 Q     Do you remember that?

19 A     Yes, sir.

20 Q     Did you go to work the next day?

21 A     I did not.

22 Q     Why?

23 A     I was at that point considering whether or not I

24       could remain employed at the House and remain

25       working for somebody who would conduct themselves

55

1      in that manner.

2                          MR. TOWNSEND:  Let me have one

3      moment, your Honor.

4                          THE COURT:  Certainly.

5                          MR. TOWNSEND:  I have no further

6      questions at this time, your Honor.

7                          THE COURT:  Mr. Deperno, any

8      questions?

9                          MR. DePERNO:  I do.

10                         CROSS-EXAMINATION

11  BY MR. DePERNO:

12  Q    You had said --

13                         MR. DePERNO:  Should I proceed now,

14     or you had made a comment about listening to the

15     recording?

16                         THE COURT:  I'm going to let you

17     proceed now.  And then if something comes up that

18     you want to recall the witness at a later date,

19     we'll do that.

20                         MR. DePERNO:  Okay.  Thank you.

21  Q    (Continuing by Mr. DePerno)  Mr. Graham, do you

22     recall the preliminary hearing we had in Ingham

23     County on May 26, 2016?

24  A    Yes, sir.

25  Q    Have you spoken with Denise Hart or Gregory

56

1       Townsend since then?

2   A   Yes, sir.

3   Q   What have you spoken about?

4                   MR. TOWNSEND:  Your Honor, I'm

5       going to object.  First of all, whatever we

6       talked about is work product, discussing

7       information with the witness.  And I'd be -- so

8       I --

9                   THE COURT:  I really don't want to

10      get into whatever happened down in Ingham County.

11      And so I'd ask you to tread very carefully there.

12      Let's just deal with what we've got going on up

13      here in Lapeer, please, and ask for your

14      consideration on that.

15  Q   (Continuing by Mr. DePerno)  You testified that

16      Todd Courser was your supervisor?

17  A   Yes, sir.

18  Q   Wasn't Keith Allard your supervisor?

19  A   No.  Keith Allard was another employee in the

20      office who had more seniority than me.  And he

21      was instructed to be the leader of the staff in

22      our office, but he was not my supervisor in any

23      official capacity.

24  Q   And if he had testified that he was your

25      supervisor, he'd be wrong; is that correct?

                                                              57

1   A    In any official capacity, he was not my

2        supervisor.

3   Q    What does that mean official capacity?

4   A    He didn't have any authority to hire, fire, or

5        penalize me for following or not following his

6        orders.

7   Q    But did he supervise you?

8   A    He was another staff member in the office with

9        more seniority, who was able to direct us in the

10       things that we were conducting in the office.

11  Q    So he directed you on how to do things in the

12       office?

13  A    Well, he knew more about the House than me.  He'd

14       been there for quite a while before, so he knew

15       more about the procedures and processes of the

16       House.

17  Q    And he did direct you then?  Yes or no question.

18  A    Yeah, he told me how to do certain things, yes.

19  Q    Was Tim Bowlin also your supervisor?

20  A    Tim Bowlin was the -- I'm not sure I would refer

21       to him as my supervisor.  He obviously had the

22       authority to hire and fire.  He was the head of

23       the House business office.

24  Q    And he would know how your job as a -- how your

25       job operates, correct?

58

1  A    Yes.

2  Q    So he could hire and fire you, so he was your

3       supervisor, correct?

4  A    Sure, yes.

5  Q    You stated that on the night of May 19th, 2015,

6       you spoke to Josh Cline, correct?

7  A    Yes, sir.

8  Q    You referred to him as one of your co-workers?

9  A    Yes, sir.

10 Q    Did you know that he was no longer employed by

11      the House at that time?

12 A    Yes, sir.

13 Q    So why -- how is he your co-worker?

14 A    He was a co-worker at one time.

15 Q    That's not what you testified to.  You said you

16      called and talked to a couple of your co-workers.

17 A    Yes.

18 Q    And that wasn't true, correct?

19 A    He was a co-worker at one time.

20 Q    But not on that night?

21 A    Correct.

22 Q    How many recordings of Todd Courser did you make?

23 A    I believe there was three recordings.

24 Q    That's it, just three recordings?

25 A    Yes.

59

1  Q    And is that just you personally who made three

2       recordings?

3  A    Yes.

4  Q    How did you make those recordings?

5  A    With my cell phone.

6  Q    Did anyone else make any recordings of Todd

7       Courser?

8  A    Not that I'm aware of.

9  Q    Did you make any recorders -- recordings on

10      computers?

11 A    No, sir.

12 Q    Do you have any knowledge if Todd's -- Todd

13      Courser's House of Representatives office was

14      bugged?

15 A    He told me it was.

16 Q    He told you it was?

17 A    Yes, sir.

18 Q    Didn't you tell -- didn't you have a meeting with

19      Anne Hill, where you told her the offices were

20      bugged?

21 A    Yes.  I told her that Todd had told me that the

22      offices were bugged.

23 Q    So it's going to come back around to Todd told

24      you that the offices were bugged?

25 A    Yes.  I didn't have any independent knowledge of

60

1       Todd -- the office being bugged.

2               MR. TOWNSEND:  Your Honor, may I

3       make an objection at this point as to the

4       relevancy of the line of questioning with regards

5       to the matter before the Court?

6               THE COURT:  Response?

7               MR. DePERNO:  I think it gets to

8       the idea that there were additional recordings

9       made by Ben Graham that lead up to that night on

10      May 19th, 2015.

11              THE COURT:  Response?

12              MR. TOWNSEND:  I guess my response

13      is the witness already testified to making the

14      three -- I mean, he can ask if he made any

15      recordings.  I believe it was already indicated

16      no.

17              THE COURT:  Let's clarify it.

18      Reask that particular question, and then we'll

19      move on.

20  Q   (Continuing by Mr. DePerno)  Did you place any

21      other -- did you place any recording -- recording

22      devices in Todd Courser's office?

23  A   Other than having my cell phone on me and having

24      it recording, no.

25  Q   And you did that in which office; Lapeer or in

61

1     the state offices?

2  A  Both.

3  Q  How many recordings did you make in the state

4     office?

5  A  Two.

6  Q  Why did you make recordings in the state office?

7              MR. TOWNSEND:  Again, I guess my

8     objection is to the relevancy as to the Lapeer

9     case.  That may have some interest for the Ingham

10    County case, but I don't know what it has to do

11    with this case.

12             THE COURT:  Ask that particular

13    question.  I'll have him answer it if it had

14    anything to do with the Lapeer case.

15 Q  (Continuing by Mr. DePerno)  Mr. Graham, you

16    testified that you recorded Todd Courser because

17    you were concerned for your safety, correct?

18 A  Yes, sir.

19 Q  So why did you record other meetings in the

20    Ingham Count -- in the Ingham County office?

21             You don't need to look at them.  You can

22    look at --

23             MR. TOWNSEND:  No, you don't have

24    to.  I'm objecting anyway.  Objection to the

25    relevancy of -- this is -- he's talking with

62

1     regard to the tapes being made in Ingham County,

2     having nothing to do with this case ending in

3     Lapeer.

4                THE COURT:  Response?

5                MR. DePERNO:  I think it has

6     everything to do with this case.  He has test --

7     I can ask him about his answers to questions,

8     when he's stated that he recorded Todd Courser

9     that night because he was afraid.  Was he afraid

10    also in Ingham County, in the state office

11    buildings?

12              THE COURT:  Well, you know what,

13    I'm going to sustain the objection, because I

14    don't care if he was afraid in Ingham County.

15    That's not what I'm dealing with here.  So let's

16    move it on, gentlemen.

17 Q   (Continuing by Mr. DePerno)  When you were

18    working as a staff person for the House of

19    Representatives, you also had your own

20    independent political company, correct?

21 A   I had -- yes.  I had a separate LLC from -- that

22    I started in 20 -- early 2014, I believe.

23 Q   And what was the name of that company?

24 A   Bellwether Strategies, LLC.

25              MR. TOWNSEND:  May I see that,

63

1      Counsel?

2  Q   (Continuing by Mr. DePerno)  What was the date

3      that the company was formed?

4  A   I believe it's 11-13-2013.

5                  MR. TOWNSEND:  Your Honor, again I

6      hate to keep doing this, but if I could make an

7      objection as to the relevancy with regard to the

8      LLC he may have.  And I assume the records of

9      course -- you know, if he says it's relevant, I

10     have no objection to the records.  But I don't

11     know how that has anything to do with Lapeer.

12                  THE COURT:  Response?

13                  MR. DePERNO:  Well, it has

14     everything to do with the charge in Lapeer,

15     because the charge claims that Ben Graham was at

16     Mr. Courser's office that evening as a state

17     employee.  It's our position that he was not

18     there as a state employee, but that he was there

19     as a political consultant to his own company.

20                  MR. TOWNSEND:  Well, then I guess

21     my position is just ask him.

22                  MR. DePERNO:  Well, I can ask him,

23     but I can also introduce the exhibit.

24                  THE COURT:  Okay.  Go ahead and ask

25     him, and we'll go from there.

64

1  Q    (Continuing by Mr. DePerno)  What was the purpose
2       of this company that you formed?
3                     MR. TOWNSEND:  Your Honor, I
4       object.  The defense counsel is not doing what
5       the Court directed.  I believe you said ask if he
6       was there or not.
7                     THE COURT:  He's got a point there,
8       Counselor.
9                     MR. DePERNO:  Can I not lay the
10      foundation as to lead up to that question first?
11                    THE COURT:  I think we all know
12      where we're leading up to.  Just ask the
13      question.  It's now five after 11.  We've got 25
14      minutes.
15 Q    (Continuing by Mr. DePerno)  Mr. Graham, were you
16      at Todd Courser's office on May 19th as a state
17      employee or as a member of your own political
18      consulting company?
19 A    I believe at that time I was working for the
20      State House, and I was there as a state -- as an
21      employee of the State House.
22 Q    Why do you think that?
23 A    Well, I was currently working for the State
24      House, and I was not working as part of that
25      political consulting company.  I was not paid as

65

```
1        part of that political consulting company for
2        that meeting.
3   Q    Well, you had been paid for a lot of other
4        meetings with Todd Courser?
5   A    In the year 2014, yes.
6   Q    And you were even paying --
7   A    In 2015, no.
8   Q    You were even paying bills for that -- you were
9        even receiving income from that company in 2015,
10       correct?
11  A    I don't believe that I received much if any
12       income in 2015 from that company.
13  Q    When Todd Courser called you that evening, and
14       you stated he needed you to come to his office,
15       did he tell you to come to his office as a state
16       employee?
17  A    He did not use those words specifically, no.
18  Q    Well, what words did he use specifically?
19  A    He said, I need you to come to my office.
20  Q    Okay.  You say -- you said you didn't have a
21       choice, but why didn't you have a choice to go to
22       his office?
23  A    Well, I felt that if I hadn't gone, I -- my job
24       in Lansing could be at risk.
25  Q    What made you think that?  Did he tell you your
```

66

1       job was at risk?

2   A   No.

3   Q   So what made you think that your job was going to

4       be at risk?

5   A   Well, I mean, if you defy a direct order from

6       your boss, your job could be at risk.  That's --

7   Q   And you --

8   A    -- usually how it works.

9   Q   You're telling us that you thought that if Todd

10      Courser asked you to come to his office at ten

11      o'clock at night, and you said I'm too tired,

12      that your -- that he would fire you the next day?

13  A   I thought that was a possibility, yes.

14  Q   All right.  You claim that he had weapons and a

15      loaded gun.  Have you ever seen this loaded gun?

16  A   Yes, sir.

17  Q   How did you see it?

18  A   I worked in his office for years.  It was common

19      knowledge.

20  Q   How did you work in his office --

21  A   I mean, he'd show me -- he'd shown me his weapons

22      many times.

23  Q   How long did you work in his office many times?

24  A   I had been working in his office as a -- as a

25      political consultant for the past few previous

67

```
1        years before 2015.
2   Q    And you had an -- you had an actual office in
3        Todd Courser's office for your company Bellwether
4        Strategies, correct?
5   A    I had a desk there up until January of 2015,
6        yeah.
7   Q    What do you mean you had a desk there?  In the
8        hallway?  Where was it?
9   A    Well, it was in his upstairs.  I mean, it's a
10       communal office.  There's --
11  Q    It was in an office, right?
12  A    Sure.
13  Q    So you had an office?
14  A    Yes.
15  Q    Okay.  Thank you.  And through that office, you
16       operated Bellwether Strategies?
17  A    In 2014, yes.  2015, no.
18  Q    Do you think there's any way that Todd Courser
19       could have asked you to come to his office
20       through your political consulting company?
21  A    Well, he didn't say come here as my political
22       consultant and I'll pay you the -- as a political
23       consultant.
24  Q    You said you decided to tape the interview
25       because you were afraid, right?
```

68

```
 1  A    Yes, sir.
 2  Q    Why didn't you call the police if you were
 3       afraid?
 4  A    Call the police and tell them that I'm afraid
 5       that my boss is going to kill me?
 6  Q    Yes.  You could say my boss has summoned me into
 7       his office at ten a -- ten p.m. at night, he has
 8       a loaded gun, I think he's suicidal, I don't want
 9       to go.  Why didn't you do that?
10  A    The thought didn't occur to me.
11  Q    The first thought you had was to record the
12       conversation?  That's what was going to protect
13       you from those bullets flying at you?
14  A    Well, as I said, I -- it was suggested to me by
15       Keith Allard.
16  Q    Right.  He suggested that you record the
17       conversation, and you did so at his suggestion,
18       correct?
19  A    Yes.  He suggested it, and I decided to do it.
20  Q    And did at any point any of you say I don't think
21       you should go to that office tonight, tell him
22       no, show up tomorrow at work and just don't go?
23  A    No.  The discussion was I needed to go, because I
24       could be fired because I didn't.
25  Q    And Keith Allard told you on the telephone, are
```

69

1    you saying, that you could be fired if you didn't

2    go?

3  A   I don't remember if that -- he specifically said

4    that.

5  Q   No.  You just said that.  You just said the

6    discussion was that you could be fired if you

7    didn't go.

8  A   Well, that was the connotation by saying you have

9    to go.

10 Q   Who made the connotation?

11 A   I believe Keith Allard did.

12 Q   He told you you had to go?

13 A   No.  He said that I had to go, because Courser

14    asked me to go.

15 Q   Why do you care what he said you had to do?

16    Because you already testified, you said he wasn't

17    your direct supervisor.

18 A   Well, he's a friend, and I felt that his advice

19    on the matter was important.

20 Q   So you listened to your friend as to whether you

21    should go put yourself in a deadly position?

22 A   Yes.

23 Q   Yes.  Okay.  Were you setting Todd Courser up

24    that night?

25 A   No.

70

1  Q    You knew you were recording the conversation,

2       correct?

3  A    Yes.

4  Q    Did you lead him on in any way during that

5       conversation?

6  A    Can you clarify the question?

7  Q    Did you lead him on in any way during that

8       conversation?

9  A    I don't know what you mean.

10 Q    Did you suggest to him during that conversation

11      that he should take certain actions, because you

12      knew you were recording him, and he didn't know

13      it?

14 A    I did not say any -- do any of those things

15      nefariously to lead him to do something.

16 Q    And you -- you said Todd Courser was your boss,

17      right?

18 A    Yes, sir.

19 Q    Did you treat that employee/boss relationship in

20      a way where you wouldn't betray his trust?

21                  MR. TOWNSEND:  Your Honor, may I

22      ask counsel --

23                  THE WITNESS:  Can you clarify?

24                  MR. TOWNSEND:  -- to repeat the

25      question?

71

1            THE WITNESS:  Can you repeat the
2       question?
3    Q   (Continuing by Mr. DePerno)  In a norm -- well,
4       let me say that in a normal boss/employee
5       relationship, you would want to have trust and he
6       would want to have trust, correct?
7    A   Yes.
8    Q   Did you act as an employee with Todd Courser, as
9       though you -- you wanted him to trust you, and
10      you wanted him to trust -- you wanted to trust
11      him, and you wanted him to trust you, right?
12   A   I guess I'm not understanding the question.
13   Q   Did -- let me just cut to the chase then.  Did
14      you ever -- did you know Todd Courser's password
15      to his e-mail?
16   A   Yes.
17   Q   Did you ever --
18   A   A lot of people did.
19   Q   Did you ever give that e-mail to anyone else?
20   A   Did I ever give his e-mail address to anyone
21      else?
22   Q   Did you ever give the -- did you ever turn over
23      his password to his e-mail to anyone else?
24   A   I don't recall specifically.  There is a
25      possibility that someone was given access to his

72

```
 1        e-mail.  The -- all his passwords to his e-mail
 2        addresses, his bank accounts, his business
 3        information, were all kept in a spreadsheet that
 4        was available to anyone in his law office.
 5   Q    But that's not the question I asked.  In the --
 6        at the Ingham County preliminary examination, you
 7        testified that you never turned over his password
 8        to anybody else.  Do you remember that?
 9   A    I do remember that.
10   Q    I'll give you Exhibit 3.
11                    MR. TOWNSEND:  May I see -- may I
12        see that, Counsel?
13                    MR. DePERNO:  Yes.
14                    THE COURT:  Counsel wanted to take
15        a look at that before you gave it to him.
16                    MR. DePERNO:  Too late then.
17   Q    (Continuing by Mr. DePerno)  Do you see at the
18        bottom where -- where there's the highlighted
19        section?
20   A    Yes, sir.
21   Q    What is it -- can you read that to us?
22   A    The -- my e-mail address?
23   Q    Can you read to me the text of the e-mail?
24   A    The start -- the body of the e-mail?
25   Q    It starts as, "More trouble in paradise", right?
```

73

1  A     Yes.

2  Q     Read that to us.

3  A     It says, "Log in ToddCourser@house.mi.gov,

4        password Courser25."

5  Q     And who'd you send that to?

6  A     I sent that to Keith Allard and Josh Cline.

7  Q     And Josh Cline wasn't working at the House at

8        that time, was he?

9  A     This is not the password to Todd Courser's e-mail

10       address.

11 Q     Whose e-mail address is that?

12 A     That's the password to the County Press online

13       access.

14 Q     This says, "Log in

15       ToddCourser@house.Michigan.gov" (sic).  Is that

16       his e-mail address?

17 A     ToddCourser@house.mi.gov is his pass -- his

18       e-mail address.  The password "Courser25" and

19       that e-mail address are the log-in for the County

20       Press online access.

21 Q     Why were you turning over log-in information and

22       passwords of Todd Courser to other people?

23 A     So they could read the article that I'm

24       forwarding them above.

25 Q     But I don't understand.  This is Todd Courser's

74

1      account, correct?

2   A  It's technically the account for the office, so

3      we can all read the local newspaper.  The State

4      of Michigan pays for this account, so people in

5      the office can maintain their knowledge about the

6      local area.  The County Press is one of the --

7      one of the publications that they subscribe to.

8      And this account was meant to be for everyone in

9      the office.

10            ToddCourser@house.mi.gov is his public

11     e-mail address that is used for the office

12     correspondence.

13  Q  And you weren't an employee at that time anymore,

14     were you?

15  A  Let's see here.  July 29th.  No, I was not.

16  Q  What did you mean by, "More trouble in paradise,

17     LOL"?

18  A  I believe I was referring to the contents of that

19     particular article.  I don't know exactly what

20     the article said, so I couldn't say.

21  Q  Sure, sure.  I'm going to hand you Exhibit 4.

22  A  Would you like this back?

23  Q  You can set it there.

24  A  Yeah.

25  Q  Did you turn over Cindy Gamrat's password to her

75

1    e-mail as well to Joe Gamrat?

2                    MR. TOWNSEND:  Your Honor, may I

3    make an objection, first of all as to relevancy

4    of anything dealing with Cindy Gamrat, and how

5    that relates back to this case against the

6    defendant in this matter?

7                    THE COURT:  I'm going to sustain

8    the objection.  I want to stick with Lapeer and

9    the incident.  That's where we're going to go at

10   this point.  You have other issues to deal with

11   in Ingham County.

12 Q  (Continuing by Mr. DePerno)  I'm going to show

13   you Exhibit 5.  This is an e-mail that you

14   received from Keith Allard, correct?

15 A  Yes, it appears to be, yes.

16 Q  This appears to be 13 recordings, correct?

17 A  I couldn't really say.  I don't know.

18 Q  You don't know what this was?

19 A  There's 13 attachments.

20 Q  Well, they have indications next to them on the

21   left that they are recordings, correct?  They're

22   titled MA4 files, which are --

23                    MR. TOWNSEND:  Your Honor, I'm

24   going to make an objection first of all to the

25   basis of foundation of the fact, unless this

76

1       witness has any knowledge of what this document

2       is.

3                    THE COURT:  Response?

4                    MR. DePERNO:  We believe, your

5       Honor, that these are additional recordings that

6       Keith Allard and Ben Graham made, and recordings

7       of the night on May 19th as well.

8                    MR. TOWNSEND:  Your Honor, he can

9       believe anything he wants.  Unless he can lay a

10      foundation for this document, we'll --

11                   THE COURT:  Let's try to lay the

12      foundation, Counselor.

13   Q  (Continuing by Mr. DePerno)  Mr. Graham, do you

14      recall receiving this e-mail?

15   A  No.

16   Q  You don't recall what the --

17   A  It was two years ago.

18   Q  You don't know what these recordings were at all?

19   A  No, I don't.  I mean, it was two years ago.

20   Q  But you were involved in this -- what you

21      referred to as this very strenuous situation with

22      Todd Courser, very stressful to you.  You didn't

23      even know if you should go to work the next day,

24      but you can't -- you're going to tell me that you

25      don't know what was in those recordings that were

77

1       shared with you?  Because at the bottom, if you

2       look at the bottom, you're --

3                       MR. TOWNSEND:  Your Honor, could

4       we --

5                       MR. DePERNO:  -- making comments

6       about them.

7                       MR. TOWNSEND:  Objection.  Can you

8       let the witness answer the question?

9                       THE COURT:  Yeah, it's kind of

10      compound at this point in time.  Let's do one

11      thing at a time.

12  Q   (Continuing by Mr. DePerno)  At the bottom of

13      that e-mail on July 19th, 2015, you made comments

14      about each recording, correct?

15  A   I don't know --

16                      MR. TOWNSEND:  Well, first of

17      all --

18                      THE WITNESS:  -- what these are.

19                      MR. TOWNSEND:  First of all, he

20      hasn't laid a foundation as to the authenticity

21      of this document, or even if the witness knows

22      about this document.  There's been no foundation

23      laid.

24                      THE COURT:  I think we're rushing

25      the fences, Counsel.  Let's take one step at a

78

```
 1       time.
 2  Q    (Continuing by Mr. DePerno)  At the bottom of
 3       that e-mail, you made comments regarding each
 4       attachment, correct?
 5  A    It appears so.  But like I said, it was two years
 6       ago.  I don't know.
 7  Q    Do you have any idea what OTR1 refers to?
 8  A    No, I really don't.
 9  Q    Even though you made comments regarding these
10       particular attachments and files, you're --
11  A    I mean, I made --
12  Q     -- telling me that --
13  A     -- comments about them two years --
14  Q    -- you don't recall --
15  A    -- ago.  I mean...
16  Q    Well, let me finish the question.
17  A    Okay.
18  Q    You're saying you don't recall what these files
19       were?
20  A    No.  They're just -- I mean, they're just generic
21       names.  How am I supposed to know what they are?
22       It's two years ago.
23  Q    Well, they would be -- didn't you save a copy of
24       this e-mail?
25                    MR. TOWNSEND:  Your Honor, I'm
```

79

1       going to make an objection to now being

2       argumentative with the witness, who has answered

3       this question several times.  Mr. Deperno just

4       doesn't like the answer.

5                   THE COURT:  I'm going to sustain

6       the objection, ask that you move on.  We have

7       eight minutes.

8  Q    (Continuing by Mr. DePerno)  I'm going to show

9       you another e-mail.  This is another e-mail

10      that's sent to you on August 28, 2015, correct,

11      that you received from Keith Allard?

12 A    Yes.

13 Q    Regarding -- it's with a file called Voice

14      004.M4A, right?

15                  MR. TOWNSEND:  Your Honor --

16                  THE WITNESS:  Yes.

17                  MR. TOWNSEND:  -- at this point in

18      time I'm going to make another objection to the

19      relevancy, unless he ties it to this case in

20      Lapeer County.  I just don't understand the

21      relevancy of this whole thing.

22                  THE COURT:  Response?

23                  MR. DePERNO:  Well, these are --

24      they're recordings, I believe, of the May 19th

25      meeting, that were being e-mailed back and forth.

80

1       And I'd like to ask the witness about them.

2                    MR. TOWNSEND:  Okay.  If you ask

3       him about that, I have no objection.

4                    THE COURT:  All right.  Then

5       it's --

6                    MR. TOWNSEND:  If we can ask about

7       those specific --

8                    THE COURT:  Then ask about that,

9       Mr. DePerno.

10  Q   (Continuing by Mr. DePerno)  And you received

11      this e-mail, correct, from Keith Allard?

12  A   Yes.

13  Q   And there is two attachments.  One is called

14      Voice 004, and one is Voice 005, correct?

15  A   Correct.

16  Q   Were these the recordings from May 19, 2015?

17  A   I couldn't say with certainty.  I don't believe

18      so.

19  Q   You don't think they were.  Do you know what the

20      file was called from May 19, 2015?

21  A   I believe it was Voice 003.

22  Q   Voice 003.  So what was 00 --

23  A   Or Voice -- or Voice 002.  One or the other.

24  Q   What was Voice 004?

25                   MR. TOWNSEND:  And if that's the

81

1      case, then it's not relevant to this proceeding.

2                  THE COURT:  I'm going to sustain

3      the objection, and ask that you move on.  We've

4      got the recording from May 19th.  That's all this

5      Court is concerned -- which this Court is

6      concerned with.  And let's move on.

7                  MR. DePERNO:  Well, I should --

8                  THE COURT:  And, you know, it's now

9      11:25, gentlemen.  Maybe we should pick -- and

10     ladies, we should pick a new date to continue the

11     exam, and allow continued negotiations.

12                 MR. TOWNSEND:  Okay.  I don't know

13     how much longer Mr. DePerno has with this

14     witness, because I have no redirect at this

15     point.

16                 THE COURT:  You think -- do you

17     think you could wrap it up in --

18                 MR. DePERNO:  Probably not in

19     nine -- not in five minutes, I cannot.

20                 MR. TOWNSEND:  Well --

21                 THE COURT:  Are you being

22     difficult, Counselor?

23                 MR. DePERNO:  No, no, I'm not.

24                 THE COURT:  Okay.  Just checking.

25                 MR. DePERNO:  No, not at all.

82

1                    MR. TOWNSEND:  Your Honor, may I --

2                    MS. HOWARD:  Your Honor, my name is

3      Sarah Howard.  I'm an attorney here on behalf of

4      the witness.

5                    THE COURT:  Okay.

6                    MS. HOWARD:  And we'd object to

7      adjourning it, an adjournment of the hearing.

8      He's been here now, this is the second time he's

9      had to come back to court.  If we could finish

10     today, we would appreciate that, your Honor,

11     because he's not able to take two days off of

12     work.  He's self-employed.  Every time he has to

13     do that and come back, he has to take a whole day

14     off.  And so we would ask that then he be

15     finished today, so he can be excused.

16                    THE COURT:  I'm here all day long.

17     The problem is, I have other things on the

18     docket.  And these folks came in at ten o'clock

19     and 10:30 when they were scheduled -- or, 10:30

20     when they were scheduled, and my clerk asked them

21     to come back at 11:30 so I could handle those

22     matters also.  I want to get everybody as

23     complete as possible.

24                    I'm going to give you a couple of extra

25     minutes, Mr. DePerno.  Let's see if we can wrap

83

1      this up.  I'm asking you really nice.

2                  MS. HOWARD:  Thank you, your Honor.

3                  MR. DePERNO:  I'll move for

4      admission -- I should have moved for admission of

5      my other exhibits -- Exhibits 1 through 5.

6                  THE COURT:  Any objection for

7      purposes of exam?

8                  MR. TOWNSEND:  Yes, 'cause they're

9      not relevant.

10                 THE COURT:  I'm going to admit --

11                 MR. TOWNSEND:  For purposes of --

12                 THE COURT:  -- them for purposes

13     of --

14                 MR. TOWNSEND:  -- exam, I have --

15                 THE COURT:  -- of exam, Counselor.

16                 MR. TOWNSEND:  I have no objection

17     for purposes of exam.

18                 THE COURT:  Sit down.

19                 (Whereupon Defendant's Exhibit

20                 Numbers 1 through 5, respectively,

21                 were received into evidence.)

22  Q   (Continuing by Mr. DePerno)  So you thought the

23     recording from May 19th was the Voice 002, or

24     Voice 003?

25  A   One of those, yes.

84

1 Q    And you have no recollection of what these were?

2 A    I don't know specifically what they were, no.

3 Q    Did you ever send any recordings to Chad

4      Livengood at the Detroit News?

5 A    I don't -- I don't recall specifically if I sent

6      recordings to Chad Livengood at the Detroit News.

7 Q    Do you know if anyone sent any recordings to Chad

8      Livengood at the Detroit News of that recording

9      that you made at Todd Courser's office?

10 A    Yes.  I believe Chad -- I'm sorry.  I believe

11      Keith Allard sent recordings to Chad at the

12      Detroit News.

13 Q    So you gave the recording to Keith Allard; is

14      that correct?

15 A    Yes.

16 Q    And then you believe that Keith Allard sent that

17      recording to Chad Livengood?

18 A    Yes.

19 Q    Did Chad Livengood edit those recordings at all?

20 A    I -- I mean, I think you'd have to ask him that.

21      I know that the recordings that were published

22      were small snippets of the full hour and a half

23      recording.

24 Q    So there could have been some editing done to

25      those recordings?

                                                                85

1                    MR. TOWNSEND:  Objection,

2          speculation.

3                    THE COURT:  I'll sustain.

4   Q    (Continuing by Mr. DePerno)  Did you ever listen

5          to the recordings that Chad Livengood placed on

6          the Detroit News website?

7   A    Yes.

8   Q    Was that the full recording of your meeting with

9          Todd Courser?

10  A    It was excerpts of the full recording.

11  Q    So there was some editing done, correct?

12                   MR. TOWNSEND:  Objection,

13         relevancy.

14                   THE COURT:  I'll sustain the

15         objection.  Move on.

16  Q    (Continuing by Mr. DePerno)  Do you recall

17         sending a text message to Keith Allard, stating

18         that you were working to have Todd Courser

19         impeached?

20  A    I do not recall that, no.  Again, I'm not saying

21         it didn't happen, I just don't -- I don't

22         remember that happening.

23  Q    I'm showing you Exhibit 7.

24                   MR. TOWNSEND:  Your Honor, this is,

25         I guess, an objection as to the relevancy of this

                                                                86

1        as to, again, the Lapeer case.

2                     THE COURT:  Response?

3                     MR. DePERNO:  I think the -- the

4        text messages show Mr. Allard's motivation for

5        his meeting on May 19th, 2014.

6                     MR. TOWNSEND:  Well, Mr. --

7                     THE COURT:  I don't care about

8        motivation, Counselor.  I'm just looking at

9        probable cause on the charges.

10               And from the -- I do see that several of

11       my 10:30 people have come back in.  Are any of

12       those cases ready?  Because I'll take a belief

13       break so we can go forward.

14               You can step down for a few minutes.

15       We'll just take a brief recess on this file.

16                     (Whereupon a pause was had in the

17                      proceedings from 11:30 a.m. to

18                      11:42 a.m.)

19                     THE COURT:  People versus Courser,

20       Number 1385.

21               You may proceed.

22  Q    (Continuing by Mr. DePerno)  We were looking at

23       that text message, Mr. Graham?

24  A    Yes, sir.

25  Q    You did receive that text from Keith Allard,

1    correct?

2  A   I do not know if I received this text from Keith

3    Allard.

4  Q   Were you trying to get Todd Courser impeached?

5             MR. TOWNSEND:  Your Honor,

6    objection, relevancy.

7             THE COURT:  Response?

8             MR. DePERNO:  It goes to the night

9    of May 19th, again.

10            THE COURT:  Well, the testimony is

11    already on the record that the relationship had

12    broken down at that point in time.  And based

13    upon this witness's testimony, I think that there

14    already has been shown that there were not good

15    feelings between the two.  So let's move on with

16    that.

17  Q   (Continuing by Mr. DePerno)  Mr. Graham, did you

18    tell Brandon Hall that that night of May 19th,

19    2015, that you were just feeding Mr. Courser

20    information that he wanted to hear?

21  A   I did tell him that regarding a specific

22    allegation that I made about -- or, a specific

23    comment that I made about Mr. Hall.  I made a

24    negative comment about his mental capacity, and I

25    felt bad about that, so I told him that I was

88

1    feeding into what Mr. Courser thought about Mr.

2    Hall.

3  Q  Okay.  And do you recall at the preliminary

4    examination in Ingham County when I asked you

5    that, you flat out said no, that you never made

6    that statement to Brandon Hall?

7  A  I don't remember what your question was

8    specifically, so I can't -- I can't really answer

9    that.

10 Q  Did you lie at the preliminary examination in

11   Ingham County?

12 A  No, sir.

13 Q  So if your testimony is different today than it

14   was then, there's an explanation; is that

15   correct?

16 A  Yes, I would say so.

17 Q  Thank you.  But you don't know what that

18   explanation is?

19 A  Well, I don't remember specifically what your

20   question was in Ingham County.

21 Q  Did you ever hack into Todd Courser's e-mail and

22   harvest e-mails from his e-mail account?

23             MR. TOWNSEND:  Again, just

24   objection to relevancy, your Honor.  This -- I

25   don't understand the relevancy of the line of

89

1    questioning that has to do with this specific

2    charge in Lapeer.

3                    THE COURT:  Response?

4                    MR. DePERNO:  It's a line of

5    questioning that the prosecution brought up when

6    they asked Mr. Graham if he was involved in the

7    extortion of Todd Courser.  So I can --

8                    THE WITNESS:  Okay, I don't recall

9    that.

10                   THE COURT:  I don't recall that

11   either, Counselor.  That word would ring a bell

12   with me.  I don't remember that.

13                   MR. DePERNO:  Well, I don't think

14   they said extortion.

15                   MR. TOWNSEND:  Yeah.

16                   MR. DePERNO:  But they talked about

17   the text messages that Todd Courser was being

18   sent.  And the prosecution asked Mr. Graham if

19   Ben Graham had been involved in that.  He said, I

20   didn't send any text messages, didn't send any

21   e-mails.  Joe Gamrat was the one who sent text

22   messages and e-mails with David Horr.

23                   THE COURT:  Okay.  That's your

24   answer.  Let's move on.

25                   MR. DePERNO:  Move on with my

90

1    questions?  I don't --

2                    THE COURT:  Move on with the

3    examination.

4                    MR. DePERNO:  Okay.

5                    THE COURT:  You've got your answer

6    with respect to who was sending text messages.

7    You asked -- your question was did he go into Mr.

8    Courser's e-mail account and harvest them, I

9    believe --

10                   MR. DePERNO:  Correct.

11                   THE COURT:  -- was the word that

12   you used.

13                   MR. DePERNO:  That's the question

14   that I asked.

15                   THE COURT:  I'll let him answer

16   that one question.

17                   THE WITNESS:  Can you restate the

18   question?

19 Q   (Continuing by Mr. DePerno)  Did you go into Mr.

20   Courser's private e-mail account and harvest

21   e-mails?

22 A   Can you be more specific about what you mean by

23   harvest e-mails?

24 Q   Copy, forward to yourself, take control of.

25 A   I mean, there was -- I had access to all of Mr.

91

1      Courser's e-mail addresses, passwords for

2      basically everything in his whole life.  So,

3      yeah, there's a possibility that I read some of

4      his e-mails.

5 Q   Did you --

6 A   But I was tasked with reading most of his

7      e-mails.  He didn't respond to any e-mails

8      basically.

9 Q   In his private e-mails?

10 A   I had access to them.  They -- his -- his e-mail

11      address password, as I said, was on a spreadsheet

12      that was accessible to anyone in his law office.

13 Q   So if there was an e-mail between Todd Courser

14      and his mother, do you think it would be

15      appropriate for you to take that e-mail and

16      send --

17            MR. TOWNSEND:  Object.

18            MR. DePERNO:  -- it to other

19      people?

20            MR. TOWNSEND:  Objection, relevancy

21      as to the issues before the Court.

22            MR. DePERNO:  I think it --

23            THE COURT:  I'm going to allow him

24      to answer that question.

25            THE WITNESS:  Sorry.  The question

92

1      again, please?

2  Q    (Continuing by Mr. DePerno)  If there was an

3      e-mail between Todd Courser and his mother, a

4      private e-mail --

5  A    Um-hum (affirmatively).

6  Q     -- would it be appropriate for you to take that

7      e-mail and send it to other people?

8  A    I'm not -- I'm not sure I can answer as to

9      whether or not it is appropriate.

10 Q    Well, if it had nothing to --

11 A    I mean, it's kind of a judgment call that each

12     individual person would make about a specific

13     situation.

14 Q    Did you forward an e-mail from Todd Courser and

15     his mother to other people?

16 A    Can you be more specific about an e-mail?

17 Q    Did you ever forward an e-mail from Todd Courser

18     to Keith Allard and Joshua Cline, that was a

19     private e-mail between Todd Courser and his

20     mother?

21                 MR. TOWNSEND:  Your Honor, can I

22     ask what is the e-mail?  Maybe it would help as

23     far as triggering a thought.

24                 THE WITNESS:  Thank you.

25 Q    (Continuing by Mr. DePerno)  Do you recall

93

1      harvesting this e-mail from Todd Courser's

2      private e-mail account, and sending it to Keith

3      Allard and Joshua Cline?

4   A  Can I look at the e-mail?

5                  THE COURT:  Certainly.  What date

6      is the e-mail?

7                  THE WITNESS:  I believe it says

8      April 12th, 2015.

9              This would be before the event --

10                 THE COURT:  Yes.

11                 THE WITNESS:  -- of May 19th.

12             All right.  Can you restate the

13     question?

14  Q  (Continuing by Mr. DePerno)  Did you forward this

15     e-mail, that was a private e-mail between Todd

16     and his mother, did you forward this to other

17     people?

18  A  I did send this e-mail.  There's no indication of

19     where it came from.

20  Q  Are you testifying that you didn't get this from

21     Todd Courser's private e-mail?

22  A  No.  I just said there's no indication here of

23     where it came from.

24  Q  So where did you get this e-mail?

25  A  From Todd Courser's e-mail address.

94

1  Q    Okay.  Why did you take this e-mail from his

2       private e-mail and send it to Keith Allard and

3       Joshua Cline?

4  A    At the time I felt it was important information

5       for them to know regarding Todd Courser's mental

6       state.

7  Q    But why?  What's in here about his -- that would

8       be disruptive to his mental state?

9  A    This is regarding some -- I'm sorry, I didn't

10      read the e-mail entirely.

11                 MR. TOWNSEND:  Again, objection,

12      relevancy, Judge.

13                 THE COURT:  I'll give him time to

14      read it.

15                 THE WITNESS:  I'm ready to answer

16      that question.  Can you restate the question, or

17      re --?

18 Q    (Continuing by Mr. DePerno)  What about this was

19      problematic about his mental state?

20 A    This e-mail was regarding -- it's talking about a

21      trip that Mr. Courser took with his -- his

22      brother-in-law, his brother, and Mrs. Gamrat to

23      Washington DC, in which his brother confronted

24      him about the way in which he conducted himself

25      with Ms. Gamrat.

1 Q   So why did you send this to Keith Allard -- why
2     did you send this to Keith Allard?

3 A   As I said, I felt it was important for him to
4     understand regarding the affair and Mr. Courser's
5     mental state.

6 Q   Why did you send it to Joshua Cline?

7 A   Same answer.

8 Q   Joshua Cline was no longer working for the House
9     at the time, was he?

10 A  No, I do not believe so.

11 Q  Then why did you send it to somebody who wasn't
12    even working for the House?  Why would -- why
13    would it matter to Joshua Cline about Todd
14    Courser's mental state?

15            MR. TOWNSEND:  Again objection,
16    relevancy, Judge.

17            THE COURT:  I'm going to sustain
18    the objection.  And I want to see the three of
19    you back in chambers very briefly.  And like I
20    said, I would like to try to wrap up with this
21    witness today.

22            THE WITNESS:  Should -- should I
23    stay here?

24            (Whereupon a brief pause was
25            had in the proceedings from 11:52

96

1                      a.m. to 12:01 p.m.)

2                      THE COURT:  Recalling People versus

3          Courser.

4                  The record should indicate we had a

5          brief discussion in chambers, and I believe there

6          are a couple of subpoenaed witnesses from the

7          defense; is that correct?

8                      MS. HART:  They're out in the

9          hallway, Judge.

10                      THE COURT:  Out in the hallway.

11          There was some discussion that we might want to

12          do a hearing on if they even need to be brought

13          in.  And so is that -- am I stating correctly,

14          Mr. DePalmer, (sic) what was going on?

15                      MR. DePERNO:  DePerno.

16                      THE COURT:  DePerno.  Oh, I'm

17          sorry.  I'm thinking of the actor.

18                      MR. DePERNO:  Thank you.

19                      THE COURT:  Are we -- are we where

20          we're supposed to be on that?  That's

21          basically --

22                      MR. DePERNO:  I think that's --

23                      THE COURT:  That's what's going on?

24                      MR. DePERNO:  That's what we

25          discussed.

97

1                THE COURT:  I would like to --
2        since the three of them are from the state
3        police, I would like for them to be able to go
4        back to their duties.  And if we need to bring
5        them in after doing the argument on if they
6        should even be here, then I'll let you bring them
7        back in.
8                MR. DePERNO:  Thank you.
9                THE COURT:  I don't want them to be
10       under concern about missing a subpoena.  So we'll
11       let them go at this point.
12                And, Mr. Graham, you're still under
13       oath.  You may come back up here.
14                And we also discussed the fact that --
15                MR. TOWNSEND:  Were we continuing
16       this, your Honor, or --
17                THE COURT:  Well, we're -- I'm just
18       putting on the record that Mr. DePerno has not
19       yet had a chance to hear the tape of the May
20       19th, and that there is a possibility he may want
21       to recall this witness upon -- upon review of
22       that.
23                Anything further at this point in time
24       with this witness, Mr. DePerno?
25                MR. DePERNO:  Well, I do have more

98

1       questions that may not be related specifically to

2       that tape.  I thought what we discussed, is that

3       we would --

4                       THE COURT:  Try to wrap him up

5       quickly.

6                       MR. DePERNO:  Okay.

7                       THE COURT:  'Cause now it's noon.

8       And I don't want to bring anybody back unless

9       there's a reason to bring them back, based upon

10      your review of the audio tape.

11  Q   (Continuing by Mr. DePerno)  We were

12      discussing -- what exhibit number was that that

13      you're looking at there, that e-mail?

14  A   I believe it says 8.

15                      MR. DePERNO:  Exhibit 8.  I'd move

16      for admission of Exhibit 8.

17                      THE COURT:  For purposes of

18      preliminary examination --

19                      MR. TOWNSEND:  For purposes --

20                      THE COURT:  -- we'll admit Exhibit

21      8.

22                      MR. TOWNSEND:  Thank you.

23                      (Whereupon Defendant's Exhibit

24                      Number 8 was received into

25                      evidence.)

99

1  Q    (Continuing by Mr. DePerno)  I was asking you, I

2       think at the time we stopped -- well, let's --

3       let me move on to a different correspondence.

4            Did you also take an e-mail that was

5       between Todd Courser and his brother, and

6       distribute that e-mail as well, also?

7  A    Could you be specific about what e-mail?

8  Q    This one.

9  A    Thank you.

10 Q    And that is -- what is that, Exhibit 9?

11 A    Yes.

12 Q    Did you take that e-mail and send it to Keith

13      Allard and Joshua Cline also?

14            MR. TOWNSEND:  Again, I'll renew my

15      continuing objection with regard to the relevancy

16      of these e-mails as to the issue before this

17      Court.

18            THE COURT:  Response?

19            MR. DePERNO:  It's relevant because

20      the prosecution asked the questions.

21            MR. TOWNSEND:  The prosecution

22      asked whether or not he sent -- if he sent any

23      direct texts.

24            THE COURT:  I think this goes

25      beyond the scope, and will sustain the objection

100

1       at this point.

2   Q   (Continuing by Mr. DePerno)  Did you assist Joe

3       Gamrat in setting up a key log or surveillance

4       software?

5   A   No.

6   Q   Did you harvest any other e-mails besides these

7       two, from Todd Courser's personal e-mail, and

8       send those to other people?

9                   MR. TOWNSEND:  Objection,

10      relevancy.

11                  THE COURT:  Response?

12                  MR. DePERNO:  I think it -- that's

13      our same line of questioning, that these relate

14      to his prior testimony that he had nothing to --

15      that he went to the office on May 19th just

16      because he was summoned as an employee.

17                  MR. TOWNSEND:  I don't understand.

18      Are you -- the question is so general.

19                  THE COURT:  All right.  I'm going

20      to sustain the objection.  I want to focus on the

21      19th.  There -- as I stated earlier, there is

22      ample evidence before this Court that there was

23      not a good relationship between this witness and

24      Mr. Courser.  And the Court is aware of that, so

25      let's move on.

1  Q     (Continuing by Mr. DePerno)  Did you know that

2        Exhibit 8 and 9 would be used by someone to

3        extort Todd Courser?

4                      MR. TOWNSEND:  Objection,

5        relevancy.

6                      THE COURT:  I'll let him answer the

7        question.  Overruled.

8                      THE WITNESS:  Can you restate the

9        question?

10 Q     (Continuing by Mr. DePerno)  Did you know that

11       Exhibit 8 and 9 would be used by someone to

12       extort Todd Courser?

13 A     No.  I didn't have any knowledge of what anyone

14       would do with any e-mail that I sent to people.

15 Q     What did you think people would do with those

16       e-mails?

17                     MR. TOWNSEND:  Well, objection as

18       to that, speculation.

19                     THE COURT:  I'll sustain that

20       objection.  It calls for speculation.

21 Q     (Continuing by Mr. DePerno)  Were you in any way

22       part of any efforts to extort Todd Courser to

23       remove him from office?

24 A     No.

25 Q     Did you ever meet with Speaker of the House Kevin

102

```
 1      Cotter regarding Todd Courser?
 2                   MR. TOWNSEND:  Objection,
 3      relevancy, unless it's, again, with regard to
 4      this case in Lapeer County, and not with regard
 5      to Ingham County and issues resolving there.
 6                   THE COURT:  I'll restrict the
 7      question to that.
 8                   THE WITNESS:  I'm sorry, can you
 9      restate that question?
10  Q   (Continuing by Mr. DePerno)  Did you have any
11      meetings with Kevin Cotter regarding Todd
12      Courser?
13                   MR. TOWNSEND:  Again, I just --
14                   THE COURT:  With respect to Lapeer
15      County, May the 19th.
16  Q   (Continuing by Mr. DePerno)  With respect to May
17      19th --
18  A   No.
19  Q   -- 2015?
20  A   No.
21  Q   Let me circle back to the -- your testimony that
22      you talked to Keith Allard and Joshua Cline
23      before you went to meet with Todd Courser on May
24      19th.  Do you recall that?
25  A   Yes.
```

1  Q    Do you recall that Josh Cline offered to go in

2       your place?

3  A    I do not remember that, no.

4  Q    No?  He never made that offer to you?

5  A    It was more than two years ago.  I couldn't say

6       with absolute certainty, but I do not recall

7       that.

8  Q    Do you have any idea how those e-mails, Exhibit 8

9       and 9, ended up in text messages that were used

10      to extort Todd Courser?

11 A    No.

12 Q    Did Joe Gamrat have anything to do with directing

13      you to record that meeting on May 19th, 2015?

14 A    No.

15 Q    Do you recall meeting with Tim Bowlin regarding

16      the events of May 19 --

17 A    Yes.

18 Q    -- 2015?

19 A    Yes.

20 Q    And did he ask you questions about that night?

21 A    Yes.

22 Q    Did there come a point where Tim Bowlin asked you

23      to change your story about what you had said to

24      him happened on May 19th?

25 A    Did he say change your story?

104

1  Q    Did he ever ask you to change your testimony or

2       story?

3  A    Not that I can recall.

4  Q    But it could have happened?

5  A    It was two years ago.  I mean, anything could

6       have happened.

7  Q    Did you learn about the affair of Todd Courser

8       and Cindy Graham (sic) --

9                   MR. TOWNSEND:  Cindy Gamrat.

10                  MR. DePERNO:  I'm sorry.

11                  THE WITNESS:  My last name's

12      Graham.

13                  MR. DePERNO:  Cindy Gamrat.  Thank

14      you.  Sorry.

15 Q    (Continuing by Mr. DePerno)  Did you learn about

16      the affair between Todd Courser and Cindy Gamrat

17      because of -- because you were reading Todd

18      Courser's private e-mail?

19 A    Did I learn specifically?  Like, I mean, there

20      was many different ways in which it was confirmed

21      to me.

22 Q    Well, how -- well, there wouldn't be many ways

23      it's confirmed to you.  There would be one way of

24      confirming it.

25 A    As I said earlier, Joe Gamrat confirmed to me

105

1          that he had confirmed it beyond the shadow of his

2          doubt, and he had confronted them about it, and

3          they had admitted it.

4  Q    Did you read e-mails about it in Todd Courser's

5          personal e-mail?

6  A    About that specific conversation?

7  Q    About the affair between Todd Courser and Cindy

8          Gamrat.

9  A    Well, I think we already discussed those e-mails

10          in which the allegations of the affair were

11          discussed, so yes.

12  Q    Why did you want to have Todd Courser impeached

13          from office?

14                    MR. TOWNSEND:  Objection,

15          speculation.

16                    THE COURT:  I'm going to sustain

17          the objection.

18  Q    (Continuing by Mr. DePerno)  You had stated in

19          your testimony that you didn't want to go to work

20          the next day, because you were deciding whether

21          you wanted to work for a person like Todd

22          Courser?

23  A    Yes.

24  Q    Did you have a moral issue?

25  A    I had a legal issue.  I felt that what he'd asked

106

1     me to do was illegal.

2 Q    What was illegal about it?

3 A    I don't --

4             MR. TOWNSEND:  Objection, Judge,

5     relevancy.

6             THE COURT:  I'm going to sustain

7     the objection.  It doesn't matter to me what he

8     thinks.

9 Q    (Continuing by Mr. DePerno)  Was it it was just a

10    legal issue?  It wasn't a moral issue?

11            MR. TOWNSEND:  Objection,

12    relevancy.

13            MR. DePERNO:  Well, he -- he

14    testified about why he didn't go to the office.

15            THE COURT:  I'll let him answer if

16    it was a legal or a moral issue to him.

17            THE WITNESS:  I felt what he had

18    asked me to do was quite possibly illegal, and I

19    didn't want to work for somebody who would

20    conduct themselves in that manner.

21 Q    (Continuing by Mr. DePerno)  So it had nothing to

22    do with your morality or his morality?

23            MR. TOWNSEND:  Objection as to

24    what --

25            THE COURT:  I'm going to sustain

107

1    the objection.  Let's move on.

2                    MR. DePERNO:  I don't have any

3    other questions then, other than subjecting him

4    to recall.

5                    THE COURT:  All right.

6                    MR. TOWNSEND:  I have no redirect.

7                    THE COURT:  All right.  I have no

8    questions.

9            Thank you, you may step down.

10                    THE WITNESS:  Thank you, your

11   Honor.

12                    (At 12:15 p.m., witness excused.)

13                    THE COURT:  Gentlemen, let's pick a

14   new date to continue this.  What kind of time are

15   we going to need; two weeks, three weeks?  You

16   tell me.

17                    MS. HART:  Your Honor, I'm going to

18   be out of town from the 20th until the 30th of

19   October.

20                    THE COURT:  So you'd like something

21   after that?

22                    MS. HART:  So I'd like it to be

23   some time after that date.  That would be

24   appreciated.

25                    THE COURT:  Any problem with

108

1      that --

2                      MR. DePERNO:  No, I have no

3      problem.

4                      THE COURT:  -- Mr. DePerno?

5                      MR. DePERNO:  No.

6                      THE COURT:  Okay.  Let's shoot --

7                      MR. DePERNO:  That'd be in

8      November, right?

9                      THE COURT:  November.

10                What dates do we have, Shell?  Let's

11     start at one o'clock.

12                     COURT CLERK:  November 2nd at one

13     o'clock.

14                     MR. DePERNO:  Thursday?  That works

15     for me.

16                     COURT CLERK:  At one o'clock.

17                     THE COURT:  Will that work?

18                     MS. HART:  At one o'clock?  I

19     believe so, your Honor.  I unfortunately left my

20     iPad at work, so I don't have the dates.

21                     THE COURT:  If there's a problem,

22     let Ms. Lee know immediately.

23                     MS. HART:  I will.

24                     THE COURT:  But we'll shoot for the

25     2nd at one o'clock in the afternoon.

109

1              MS. HART:  And that will just be

2     for argument, and no more subpoenaed witnesses

3     will have to appear at that point?

4              THE COURT:  We could do -- I'm

5     giving you that afternoon, folks.  How we want to

6     do that, might make sense to do the argument

7     first, and then go from there.

8              MS. HART:  Well, I'd rather not

9     have to bring --

10             THE COURT:  And in the meanwhile,

11    I'd still like to gently urge you to see if you

12    can resolve this matter.

13             MS. HART:  And we still are, Judge.

14             THE COURT:  Okay

15             MS. HART:  So -- so they're not

16    going to be subpoenaed and have come down here

17    unless we have a hearing before then?

18             THE COURT:  Then we'll need to have

19    a hearing before then.

20             MS. HART:  Yeah, I hate to drag him

21    back down here.

22             THE COURT:  I hate to drag anybody

23    back down here.  Do you want to do -- let's see.

24    What's -- the date before that is November the

25    1st.  Late in the afternoon, would that be --

110

```
 1                    MS. HART:  Yeah, we could do that.
 2        I just don't want -- like I said, if we can get
 3        everything resolved --
 4                    THE COURT:  Yeah, that would --
 5                    MS. HART:  You know, he's
 6        subpoenaed other witnesses.  We're probably going
 7        to have objections to those other witnesses.
 8                    THE COURT:  Yeah.  I want -- I'd
 9        like to get the witness list squared away first.
10                    COURT CLERK:  How long will that
11        take?
12                    MS. HART:  Not very long.
13                    THE COURT:  So we'll set this for a
14        hearing November the 1st at --
15                    COURT CLERK:  Do you want to do 11
16        o'clock, or do you want to do three?
17                    THE COURT:  Three?
18                    MS. HART:  Three.
19                    THE COURT:  Three o'clock better?
20                    MS. HART:  Yeah, that's fine.
21                    THE COURT:  Probably for you,
22        coming from the Grand Rapids area.
23                    MR. DePERNO:  How about one or
24        three?  It doesn't matter.
25                    COURT CLERK:  Not one.
```

111

1               THE COURT:  One, I've got things

2       going on.

3               MR. DePERNO:  Okay.  All right.

4       Three is fine.

5               THE COURT:  Let's do three o'clock.

6       I'll do new notices setting the hearing at three

7       o'clock on the 1st, and then continue the exam on

8       the 2nd at one.

9               MS. HART:  Thank you, Judge.

10              MR. TOWNSEND:  Thank you.

11                  *      *      *

12              (At 12:18 p.m., proceedings

13              concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

112

1  STATE OF MICHIGAN  )
                      )  SS
2  COUNTY OF ST. CLAIR )

3            <u>CERTIFICATE OF NOTARY PUBLIC</u>

4            I, the undersigned, do hereby certify

5       that the foregoing and attached 112 pages in

6       the above-entitled matter, was taken by me by

7       means of Stenography; afterwards transcribed

8       on computer; and that the record is a true and

9       complete transcript of the testimony given.

10           I do further certify that I am not

11      connected by blood or marriage with any of the

12      parties, their attorneys or agents; that I am

13      not an employee of either of them; and that I

14      am not interested, directly or indirectly, in

15      the matter of controversy.

16           IN WITNESS WHEREOF, I have hereunto

17      set my hand and affixed my notarial seal at

18      Riley, Michigan, County of St. Clair, State of

19      Michigan, this 13th day of November, 2017.

20

21                    _____
                      Candace C. Noblett  R-2238
22                    Notary Public, St. Clair, MI
                      My Commission Expires: 5-23-2018
23

24

25

113

1                    STATE OF MICHIGAN

2    IN THE 71-A DISTRICT COURT FOR THE COUNTY OF LAPEER

3   PEOPLE OF THE STATE OF MICHIGAN,

4        Plaintiff,              HON. LAURA CHEGER BARNARD

5   v                           District No. 16-1385-FY

6   TODD ANTHONY COURSER,        Circuit No. 17-013022-FH

7        Defendant,

8   _____/   VOLUME 2 OF 2

9            PRELIMINARY EXAMINATION HEARING

10     BEFORE HON. LAURA CHEGER BARNARD, DISTRICT JUDGE

11      Lapeer, Michigan - Wednesday, November 1, 2017

12  APPEARANCES:

13  For the People:    GREGORY TOWNSEND (P35857)

14                     DENISE M. HART (P45127)

15                     MICH. DEPT. OF ATTORNEY GENERAL

16                     3030 West Grand Boulevard

17                     Detroit, MI  48202-6030

18                     (313) 456-0285

19  For the Defendant:  MATTHEW S. DePERNO (P52622)

20                     951 W. Milham Ave, PO 1585

21                     Portage, MI  49024-1248

22                     (269) 321-5064

23                     *     *     *

24  RECORDED BY:    Shelley Lee, CEO 5171

25  TRANSCRIBED BY:   Candace C. Noblett, CSR 2238

```
                                                          114
1  WITNESSES:                                          PAGE:

2             ***   None Presented   ***

3                   *      *      *

4  OTHER MATERIAL IN TRANSCRIPT:

5      Closing Argument by Mr. Townsend        120

6      Closing Argument by Mr. DePerno         121

7      Rebuttal Closing by Mr. Townsend        124

8      Rebuttal Closing by Mr. DePerno         126

9      Defendant bound over to Circuit Court   127

10                  *      *      *

11 EXHIBITS:                          IDENTIFIED RECEIVED

12            ***   None Presented   ***

13                  *      *      *

14

15

16

17

18

19

20

21

22

23

24

25
```

115

1                    Lapeer, Michigan
2                    Wednesday, November 1, 2017
3                    3:13 P.M.
4              *    *    *
5          THE COURT:  This is a continuation
6     of the preliminary examination.
7          Are the People ready to proceed?
8          MR. TOWNSEND:  Yes, your Honor.
9     And for the record, Gregory Townsend, Assistant
10    Attorney General on behalf of the People of the
11    State of Michigan.
12         MS. HART:  And Denise Hart,
13    Assistant Attorney General on behalf of the
14    People.
15         THE COURT:  Defense ready?
16         MR. DePERNO:  Yes.  Matthew DePerno
17    on behalf of defendant Todd Courser.
18         THE COURT:  Okay.  The record
19    should indicate we did have a brief discussion in
20    chambers, where some information was given to
21    defense counsel with respect to the recording by
22    the previous witness on the stand, with respect
23    to the make, model and process of the recording.
24    And that's going to be verified by tomorrow.
25         MS. HART:  As soon as I get the

116

1          information from his attorney.

2                    THE COURT:  As soon as you get

3          the -- okay.

4                    MS. HART:  From Mr. Graham's

5          attorney.

6                    THE COURT:  Okay.  And with that

7          being said, was there --

8                    MR. TOWNSEND:  I want to place

9          something very briefly on the record, if I may?

10                   THE COURT:  All right.

11                   MR. TOWNSEND:  The last hearing it

12         was indicated that -- Mr. DePerno had indicated

13         that he had not received from the People the

14         recording of the May 19th recordation by Mr.

15         Graham in the office.  I believe that Mr. DePerno

16         was obviously mistaken.  He may have misplaced it

17         the last --

18                   THE COURT:  Has he received another

19         copy, so that --

20                   MR. DePERNO:  Yeah, I do have it.

21                   MR. TOWNSEND:  Yeah.

22                   THE COURT:  Okay, good.  Then

23         everybody's clean.

24                   MR. TOWNSEND:  Right.  I would also

25         indicate, though, back on March 7th, 2016, that

117

1        Mr. DePerno did sign off on the discovery that we

2        had provided.  And included on that is the tape.

3        There's no question.

4                    THE COURT:  Well, I see no foul,

5        no --

6                    MR. TOWNSEND:  Well, I'm just

7        saying --

8                    THE COURT:  Yeah, yeah.

9                    MR. TOWNSEND:  -- they had made a

10       mistake or misplaced it.  That's all I'm saying.

11                   THE COURT:  Well, the file has

12       about -- I'm looking at about eight inches on my

13       podium here, so I can understand something

14       getting misplaced or --

15                   MR. TOWNSEND:  We're not making any

16       allegations --

17                   THE COURT:  Yeah.

18                   MR. TOWNSEND:  -- at this point of

19       any type --

20                   THE COURT:  No.

21                   MR. TOWNSEND:  -- other than he

22       made a mistake.

23                   THE COURT:  You just want to make

24       sure that --

25                   MR. TOWNSEND:  I want the record

118

1       clear --

2                   THE COURT:  -- People did what

3       they're supposed to do.

4                   MR. TOWNSEND:  -- that we

5       provided -- right.

6                   At this point in time, your Honor, after

7       consideration of the evidence that was produced

8       at the last date for preliminary examination, Ms.

9       Hart and I discussed the elements of the case and

10      whether or not sufficient evidence was provided

11      on that date.  We believe so.

12                  For purposes of preliminary examination,

13      the People would rest.

14                  THE COURT:  Mr. DePerno?

15                  MR. DePERNO:  Thank you.

16                  The -- for the record, the information

17      we were looking for from Ben Graham was the make

18      and model number of the telephone he used to

19      record that conversation in Todd Courser's

20      office -- in his office on May 19th, I believe it

21      was.  We wanted to know the name of the voice

22      application that was used to record it, and the

23      operating system that was used.  So hopefully

24      we'll get that tomorrow from Ben Graham's

25      attorney.

119

1                    THE COURT:  The information as best
2       known at this point in time was given to you, but
3       it's going to be verified by tomorrow.  And I
4       believe that the prosecution will come through
5       with that information.
6                    And with that being said, were you going
7       to call any -- was the -- the prosecution's not
8       calling any other witnesses?
9                    MS. HART:  No, your Honor.
10                   THE COURT:  Are you calling any
11      witnesses for purposes of exam, with that caveat
12      being out there?
13                   MR. DePERNO:  No.
14                   THE COURT:  All right.  Then
15      argument.
16                   MR. TOWNSEND:  Your Honor --
17                   MS. HART:  Your Honor, could I just
18      interject that all the subpoenas --
19                   MR. TOWNSEND:  I'll stop.
20                   MS. HART:  I'm sorry.
21                   MR. TOWNSEND:  That's okay.
22                   MS. HART:  All the subpoenas that
23      have been issued by defense for the preliminary
24      exam are really -- all should be released?
25                   THE COURT:  All right.  They can be

120

1      released.

2                     MS. HART:  Thank you.

3                     MR. TOWNSEND:  Your Honor, very

4      briefly as this Court's aware, the defendant is

5      charged with misconduct in office in this matter.

6      And I believe that the evidence provided

7      certainly shows fiduciary responsibility.

8              The defendant in this case is elected or

9      was elected in a position of one of the highest

10     offices of the state, co-equal with the other

11     branches of the executive and judicial.  He has a

12     fiduciary duty not only to the entire people of

13     the State of Michigan, he had a fiduciary duty

14     more importantly to his constituency, and a

15     fiduciary duty to his colleagues in the House of

16     Representatives.

17             The evidence is quite clear that the

18     defendant's intent in this case was to lie to the

19     people of the State of Michigan, and to lie to

20     his colleagues, and more importantly lie to the

21     constituency that he has this obligation to, for

22     the purposes of his own self interests, in order

23     to get the people to believe this -- as they say,

24     this over-the-edge e-mail that he had sent out.

25     That obviously falls within the parameters of

121

1    misconduct in office.

2         Misconduct in office is being -- using a

3    part of your office being a public official, that

4    it's malfeasance.  And clearly it's malfeasance.

5    This way the defendant intentionally does this

6    for a -- I would say an extremely self-centered,

7    selfish position.

8         The definition of the corrupt part of it

9    is morally depraved.  Obviously morally what he

10   was doing throughout the entire episode, and I'm

11   not talking about with regard to any affair that

12   he may have had, but the moral corruption with

13   the intent to lie to the people that actually

14   voted him into office to represent them.

15        Further definition of corruption is a

16   taint.  A taint is something bad.  Clearly there

17   is a question of fact as to that issue.

18        I would reserve any further argument for

19   rebuttal, your Honor.  And I would move to have

20   this matter bound over to the Lapeer County

21   Circuit Court on the charges alleged in the

22   complaint and warrant.

23             THE COURT:  Response?

24             MR. DePERNO:  Thank you, your

25   Honor.

122

1           We don't believe that the prosecution

2      has hit the elements in this case under MCL

3      750.505, which is the misconduct statute.

4           In this case, the felony complaint

5      alleges that Mr. Courser committed an indictable

6      offense of common law, where he solicited a state

7      employee, a member of the legislative staff, to

8      send out a false e-mail for public dissemination

9      in order to cover up the extramarital affair.

10          And when we look at the actual elements

11     of misconduct, they require that Mr. Courser was

12     a public official.  We don't take issue with

13     that.

14          We do take issue with the fact that Ben

15     Graham was acting as a state employee at the time

16     of that meeting.  The testimony is that Ben

17     Graham also operated a political consulting

18     business out of the upstairs of Todd Courser's

19     law office.  He had a key to the office.  He had

20     files at the office.  He was there, we believe,

21     as a political consultant, and not as a state

22     employee.

23          And I think that's bolstered by the

24     testimony of Mr. Graham, when he stated that that

25     evening he contacted two people.  He called Keith

123

1    Allard and he called Joshua Cline, as to whether

2    he should go and talk to Mr. Courser.

3            And Joshua Cline at the time was not an

4    employee of the State of Michigan anymore.  So

5    why would Ben Graham call Joshua Cline if Ben

6    Graham was acting as a state employee?  We don't

7    believe he was.  We believe he was talking to

8    Joshua Cline, because that was his business

9    partner, his business partner in that consulting

10   business.

11           The next issue is corrupt intent.  And

12   that is a necessary element of misconduct.  And

13   the question is whether Mr. Courser had corrupt

14   intent with what he did.  And corrupt intent is

15   not as the prosecution says.  It's not simply the

16   issue of a taint or being morally corrupt.

17           But in People verse Coutu -- C-o-u-t-u,

18   which is 459 Mich 348, 1999 case, the court very

19   specifically said that when charging misconduct,

20   criminal intent is an essential element of the

21   crime.

22           What -- where's the criminal intent?

23   Todd Courser didn't do anything with criminal

24   intent.  Nothing he even did was a crime.

25   Sending out the e-mail he sent, is not a crime.

124

1   He didn't have any criminal intent to cover up an

2   affair.  There's nothing criminal about what he

3   did.  And I think that's pretty important.

4          The other issue is they claim that

5   the -- in their indictment, that he solicited a

6   state employee to send out a false e-mail.  I

7   heard no testimony at all from Mr. Graham about

8   the truth or falsity of any of that.  Just I

9   didn't hear that at all.

10         So I don't think they've hit the

11  elements.  But most importantly, you've really

12  got to look at the issue of criminal intent.

13  It's just not there.

14         Thank you.

15             THE COURT:  Thank you.

16         Any response?

17             MR. TOWNSEND:  Briefly, your Honor.

18             THE COURT:  Briefly.  Very briefly,

19  Counselor.

20             MR. TOWNSEND:  I'm always brief.

21         I would indicate, Judge, and I don't

22  know if Mr. DePerno heard it, but I sure did,

23  when Mr. Graham testified that he went to his

24  office because he was a state employee.  He was

25  afraid that if he didn't go, that that could

125

1    certainly cause him to be fired.  He certainly

2    testified that it was he was not there as a

3    political consultant.

4         And I would further indicate that when I

5    specifically asked him about the discussions with

6    the defendant, I said was it his intent with this

7    e-mail to lie to the people of the State of

8    Michigan?  Yes.  To lie to his constituency?

9    Yes.  So he affirmatively stated all of that

10   information.

11        People very Coutu also defines, and I'll

12   quote from the same case, that -- let's see.

13   Corruption in this context means a sense of

14   depravity, perversion or taint.

15        It indicates that the state of being

16   depraved, that depraved is defined as morally

17   corrupt or perverted.  And clearly the evidence

18   shows that.

19        It also says the definition of taint

20   includes a trace of something bad or offensive.

21   Lying to the entire State of Michigan, and more

22   importantly to the people that put you in office,

23   your constituency, to as he put it "inoculate the

24   herd" certainly is something offensive.

25        We believe that it is certainly a

126

1          question of fact for the jury, and we would ask

2          the Court to bind over.

3                         THE COURT:  Thank you.  On the

4          issue --

5                         MR. DePERNO:  Your Honor, may I

6          briefly -- very briefly?

7                         THE COURT:  All right.

8                         MR. DePERNO:  Very briefly.

9                         MR. TOWNSEND:  I'm counting.

10                        MR. DePERNO:  I don't disagree with

11         what Mr. Townsend just stated in the Coutu case,

12         but it's two elements.  It's the corrupt intent

13         and criminal intent.  And if we're going to --

14         lying to a constituency is not criminal.

15         Legislators do it all the time.

16                        THE COURT:  I was going to -- I was

17         thinking that --

18                        MR. DePERNO:  We see it all the

19         time.

20                        THE COURT:  -- Counselor, but I

21         wasn't going to say it.

22                        MR. DePERNO:  It's not criminal.

23         There's nothing he did that had criminal intent

24         in that.  Not one bit of testimony from Mr.

25         Graham hit on the issue of criminal intent.  It

127

1    may have been bad.  It may have been all kinds of

2    things we don't like, but there was no criminal

3    intent.

4              Thanks.

5              THE COURT:  Thank you.

6              Well, the issue before the Court is a

7    very simple one.  The common law offense is to

8    look at if there's probable cause to believe that

9    the defendant did commit an indictable offense at

10   common law, to wit soliciting a state employee, a

11   member of the legislative staff to send out a

12   false e-mail for public dissemination, or cover

13   up an extramarital affair, contrary to 750.505-C.

14             There are some issues of fact that I

15   think would go to a trier of fact, that have

16   arisen in this particular case with respect to

17   the defendant's intent.  And I do find probable

18   cause to believe that the common law offense

19   has -- the threshold has been met, and that the

20   venue is proper.

21             And I am binding the matter over for

22   arraignment before the Honorable Nick Holowka.

23   I'm going to continue the bond as previously

24   ordered.

25             What date are we going to use for

128

1      arraignment on that?

2                    COURT CLERK:  February 13th at

3      1:30.

4                    THE COURT:  With that being said,

5      I'm going to still gently urge the parties to see

6      if they can get a resolution of this, and go from

7      there, gentlemen and ladies.

8                    MS. HART:  Thank you, your Honor.

9                    MR. TOWNSEND:  Thank you, your

10     Honor.

11                   MR. DePERNO:  Thank you.

12                   THE COURT:  Just a minute, and

13     you'll get your paperwork.

14                       *     *     *

15                   (At 3:26 p.m., proceedings

16                   concluded.)

17

18

19

20

21

22

23

24

25

129

1   STATE OF MICHIGAN   )
                        )  SS
2   COUNTY OF ST. CLAIR )

3                  CERTIFICATE OF NOTARY PUBLIC

4              I, the undersigned, do hereby certify

5       that the foregoing and attached 17 pages in

6       the above-entitled matter, was taken by me by

7       means of Stenography; afterwards transcribed

8       on computer; and that the record is a true and

9       complete transcript of the testimony given.

10             I do further certify that I am not

11      connected by blood or marriage with any of the

12      parties, their attorneys or agents; that I am

13      not an employee of either of them; and that I

14      am not interested, directly or indirectly, in

15      the matter of controversy.

16             IN WITNESS WHEREOF, I have hereunto

17      set my hand and affixed my notarial seal at

18      Riley, Michigan, County of St. Clair, State of

19      Michigan, this 13th day of November, 2017.

20

21      _____
                Candace C. Noblett  R-2238
22              Notary Public, St. Clair, MI
                My Commission Expires: 5-23-2018
23

24

25

**CANDACE C. NOBLETT, C.S.R.  2238**
255 Clay Street, Lapeer, MI  48446
(810) 245-4816